**Pages 1 - 50**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

HONG KONG UCLOUDLINK NETWORK )
TECHNOLOGY LIMITED, et al., )
                              )
          Plaintiffs,         )
                              )
   VS.                        )    **NO. C 18-cv-05031 EMC**
                              )
SIMO HOLDINGS INC., et al.,   )
                              )
          Defendants.         )
                              )

San Francisco, California
Thursday, January 17, 2019

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
                MORGAN LEWIS AND BOCKIUS LLP
                1111 Pennsylvania Avenue, N.W.
                Washington, D.C.  20004
           BY:  **ROBERT W. BUSBY, JR., ATTORNEY AT LAW**
                **STEPHANIE LAURA ROBERTS, ATTORNEY AT LAW**
                **COREY RAY HOUMAND, ATTORNEY AT LAW**


For Defendants:
                K&L GATES LLP
                Four Embarcadero Center - Suite 1200
                San Francisco, California  94111
           BY:  **HAROLD H. DAVIS, JR., ATTORNEY AT LAW**
                **JEFFREY C. JOHNSON, ATTORNEY AT LAW**



Reported By:        Marla F. Knox, RPR, CRR
                    Official Reporter

**Thursday - January 17, 2019**                    **1:56 p.m.**

                    **P R O C E E D I N G S**

                        ---oOo---

THE CLERK:  Calling civil action 18-5031, Hong Kong versus SIMO holdings, et al.

   Counsel, please approach the podium and state your appearances for the record.

MR. DAVIS:  Good afternoon, Your Honor, Harold Davis and Jeff Johnson on behalf of the Defendants, SIMO Holdings.

THE COURT:  All right.  Thank you, Mr. Davis, Mr. Johnson.

MR. BUSBY:  Good afternoon, your Honor.  I'm Robert Busby for Plaintiffs, Hong Kong Network Technology and uCloudlink America.  With me are my partner Corey Houmand and my partner Stephanie Roberts.

THE COURT:  All right.  Good afternoon.  Thank you.  So with respect to the request to file a counterclaim here -- first of all, this is a permissible, not a compulsory kind of claim.  I think the first question is whether or not this is so futile that this is not to be permitted.  And I understand the documents and some of the evidence so far.  I have the deposition testimony of Mr. Wine; but on the other hand, to say that it's futile as a matter of law at this point in facing the allegations is pretty tough; and the fact that at least in some points he appeared to have invoked the Fifth Amendment.  I

don't know what inference one could draw from that but -- you have that fact and now you have Skyroam claiming that there is evidence that he did use trade secrets for uCloudlink's benefit.  To say that this is futile as a matter of law is, I think -- not something that I think is a very strong argument.  And so I'm not inclined to refuse on that basis.

And as far as prejudice goes, I understand in the New York case, things had been moving along in trying to introduce those issues late in the game there could be disruptive.  Here, that we are early on in the game; and I don't see the kind of prejudice -- at least in timing wise -- in terms of disruption of any case management here -- now, it does add obviously to the breadth of the response that has to be now devoted to answering this claim; but generally that is not the kind of prejudice that would provide a basis to deny an amendment or to counterclaim.  I understand in New York there was a concern about sort of -- I don't know if the words contamination -- but affecting the jury.  But here this is a counterclaim and not a sort of adding aspersions and helping to burst a claim.  This is a counterclaim.  So I don't see the kind of prejudice here that would prevent the counterclaim from going forward.

I guess one question is:  What could be gained in terms of judicial economy in having this counterclaim as part of this suit, as a part of a separate suit; and maybe that's where I would like to hear a little bit here.  Is there enough -- I

mean transactionally, I could see some link; but they are quite different.  The issues are different.  I don't know how much there is in terms of technology and tutorial understanding that might benefit the Court or the finder of fact.  I guess that's what I would like to know, what -- what economies might be gained by having these counterclaims involved in this infringement suit.

MR. JOHNSON:  I think that question is addressed to the Defendants, so I will answer it, Your Honor.  First of all, the core technologies are the same.  The core technologies in the five Chinese patent applications that we claim represent our trade secrets are these virtual SIM technologies, and those are the core technologies that are part of the patents-in-suit.

So on a very basic level getting up to speed on these core technologies, Your Honor will only have to do it once; the jury will only have to do it once if these cases are combined.  In addition, the experts are likely to be able to be experts on both the trade secret case and the patent case.  So both the technical experts and, for example, the damages experts can be the same, so the parties can conserve resources in that way.

You know, the both of the patents-in-suit and the patent applications that are part of the Chinese patent applications both rely heavily on this concept of distributing and how best to distribute virtual SIM cards, they are not the same; and we are not arguing they are the same; but they are different

aspects of how to do this most effectively.

So, in other words, the trade secrets involve distribution of virtual SIM cards; and the patents-in-suit involve the distribution of virtual SIM cards.

**THE COURT:** And understanding that technology you think is essential to understanding the counterclaim?

**MR. JOHNSON:** Yes, Your Honor. I think this is going to be a highly technical case in terms of the counterclaim.

**THE COURT:** All right. What is your reaction to that?

**MR. BUSBY:** Yes, Your Honor. Actually the core technologies aren't exactly the same with respect to the trade secret issue and the patent issue. The core technologies at the highest level relate to global SIM card usage; but what we have to remember is the patent infringement case. So as, Your Honor, I'm sure understands in this case, it is the uCloudlink's patent versus SIMO's technology, their products, different products. Of course, in the New York case it is their patents versus our products, certainly different products. That is going to raise issues of inventor-ship, which they have alleged in their motion. It is going to raise issues of different prior art for invalidity issues. It is going to raise issues with respect to the China patents, which are absolutely unrelated to the infringement in this case. They have cited at least six Chinese patents and patent applications which have nothing to do with this case. It is

going to relate to whether the technology in those Chinese patents relate to the technology in this case, and I will submit it doesn't.  It relates to back-end servers and other portions of the entire system but not related to products at issue in the case.

So as far as judicial economy, what happened in the New York case it wasn't necessarily -- prejudice was definitely an issue, but sufficient discovery was allowed that at some point Judge Rakoff -- and there was a lot of discovery, a lot of hearings, interrogatories and depositions; and that raises another issue, Your Honor.  It is a global issue.  So you are talking about judicial economy, we are going to be in Hong Kong.  We are going to be in New York.  We are going to be in -- definitely in California and possibly other places for third-party depositions.  So it is a big case.  And if Your Honor will allow it, we made a small presentation.  We can walk you through or -- here is one for cocounsel.

**THE COURT:**  Of what?

**MR. BUSBY:**  Kind of lay out these issues if you want to take it back to chambers or anything like that.  But to answer your question, it is a very large, distinct, discreet case.  The Wang Bin issue has been kicked around for four months already; and, again, Judge Rakoff came to the conclusion it needs to be a separate case.  Judicial economy, it is very large case.  It is their products, our products in New York,

different patents, different invalidity.  I'm not conceding or agreeing it will be the same experts.  Again, it is the different products and different damages issues.

THE COURT:  If the counterclaim were filed separately as a trade secret theft case in this court, don't you think chances are it would be related back to this court?  Would there be enough there to relate this case to the -- my current case, the current case?

MR. BUSBY:  I don't think so, Your Honor.  Again, this issue -- their entire case relates on this Wang Bin issue. Again, he is a Chinese citizen.  He is no longer a party -- employee of any party, uCloudlink; and the party he was an employee of is -- in Shenzhen -- has nothing to do with either of the two cases.

Your question how does it relate?  It relates to with respect to there are products used in different systems that relate to SIM -- global SIM bank issue.  This is going to turn into, as they have alleged, some sort of inventor-ship issue. The inventor in our patents, Wen Gao, is the CEO of two of uCloudlink's -- the Plaintiffs in this case; but now they want to add two other uCloudlink entities who have different CEOs, different parties, different locations.  I don't see how to relates to this case.  Again, at core we are here on a patent infringement case, their patents versus -- our patents versus their products.  This trade secret issue is also global

allegations about documents and servers and Chinese citizens.

**MR. JOHNSON:**  Can I address that, Your Honor?

**THE COURT:**  Yes.

**MR. JOHNSON:**  So the inventor of the two patents-in-suit, Gao Wen is also a named inventor on two of the patent applications that are part of the trade secret case.  So it's got even the same inventors involved; and, of course, our argument is that Mr. Wang conspired with Wang Bin to misappropriate the trade secrets that ended up in this patent, which goes to the first issue, which I think you have already resolved, the futility issue; but these technologies are very similar.

**MR. BUSBY:**  May I address that, Your Honor?

**THE COURT:**  Yeah.

**MR. BUSBY:**  The -- Jeff's point that the inventors are somehow overlapped, well, actually makes my point and makes Judge Rakoff's point.  They are going to make allegations that defense counsel just raised.  You know, I understand their point.  They are going to make allegations that somehow Wen Gao, the CEO, the only named inventor in this case, somehow conspired with this guy Wang Ben and created the inventions on the Chinese patent applications where Wang Bin is named.  So that goes to Rule 404 and Rule 403.  They are going to tell the jury that he somehow conspired to create the technology at issue in this case.  That is certainly not -- certainly

prejudicial.

THE COURT:  Well, do the -- do the validities of the patent at issue turn at all on the alleged theft counterclaim?

MR. BUSBY:  Does not.

MR. JOHNSON:  It is uncertain at this point, Your Honor.

THE COURT:  How would that happen?

MR. JOHNSON:  Well, if -- we don't know the full scope of the trade secret misappropriation at this point, Your Honor. We know a lot of things but there are a lot of things we don't know because all we have done is taken a deposition, and we haven't done any document discovery on the trade secret case. So it could be the case that one of the things that Wang Bin took and disclosed was something -- and then was used by the actual -- the named inventor in the patent case here -- it could have been something that he learned from Wang Bin.  In other words, something that my client, Skyroam, had already been working on and Wang Bin was exposed to during the four months that he worked for us.  We don't have evidence of that now, but we don't have complete evidence.

THE COURT:  So why wouldn't one course be because -- you know, some of this may depend on discovery and some other things, facts relevant -- is to allow the counterclaim but reserve the power, for instance, to bifurcate the case in terms of the -- if it ends up being a rather severed matter; there is

not sufficient overlap when we get to, whether it is trial --
to bifurcate the case?  And then it still allows the
possibility that there could be some -- say, if nothing else --
if there is tutorial on some technology that could be
consolidated, if it ends up there is some kind of transaction
interplay that could come in; and it would kind of wait and see
how that develops; but also keep in mind that if there is not
much of an overlap here, and there is a danger of, perhaps,
either confusing the jury or something else; you simply
bifurcate the case.  It leaves that option open rather than
making that decision now.

        **MR. BUSBY:**  Of course, Your Honor, that is an option;
but I think the breadth of that case is much larger than the
patent infringement case.  I think there will come a point in
that trade secret case -- based on what I know, having been
involved with this for four -- five months now -- by the way,
there was more than one deposition.  The depositions in Hong
Kong turned into the Wang Bin case.  Every single deposition,
including the deposition of Wen Gao, who I defended, turned
into 85 percent of questions about trade secrets, not patent
infringement.  Nevertheless, there will probably become a point
in the trade secret case where we will try to file a motion for
summary judgment trying to resolve that.  We are going to be
going through this massive discovery issue that is frankly
going to outweigh the patent infringement case.

**THE COURT:** Well, if I deny the leave to file a counterclaim, I suspect this is such a big case, it is going to be filed. It is going to be filed somewhere. So the amount of discovery -- somebody is going to have to deal with this one way or another, whether it is this court, somebody on this court, somebody else in another court. In terms of overall judicial savings, I -- you know, I'm not sure if anybody saves anything. In terms of your client, I'm not sure it saves anything either; but at least this gives us a chance if I see, you know, it makes sense to do some consolidation. And if it doesn't make sense, keeping in mind the potential issues of prejudice, et cetera, confusion, I also reserve the right to bifurcate or separate this case out; and I will just treat it like two separate cases.

**MR. BUSBY:** Well, your Honor, Judge Rakoff gave him that option. He says there is too much prejudice in this issue and this is an issue after allowing discovery in a patent case and offered him in his order; said they are welcome to file a case in this court in front of the judge who knows most of the issues at this point, and they chose not to. I think it is pretty clear what the strategy is here in this court, but I think that is obvious that the prejudicial issue certainly exists from the getgo; and there is going to be global discovery on a lot of entities which -- the three new entities that they proposed to add in order to get sufficient

jurisdiction in this case.  There is going to be discovery on all those issues that is not necessary and not part of that case.

THE COURT:  Well, let's talk about the other defendants too because at least with respect to Shenzhen and Hong Kong, I actually have trouble seeing how there is personal jurisdiction of these matters, at least as pled.  There is no assertion of direct contact, right, in this state -- in this country.  The stream of commerce argument doesn't seem -- to me doesn't apply because what is at issue here is not injecting into the stream of commerce ineffective products which then injures somebody else.  This is about conduct that occurred and -- I don't see this as a stream of commerce kind of a case.  So those cases don't seem to apply to me, and the agency theory is a difficult theory, it seems to me after *Daimler*; and there is not any specific alter ego that is alleged.  So I have trouble seeing jurisdiction over those entities at least.

MR. JOHNSON:  So can I address the -- I would like to address the entities separately.

THE COURT:  Yeah.

MR. JOHNSON:  Let's start with the Shenzhen company.  That is the entity -- the uCloudlink Shenzhen is the entity that employed Wang Bin.  It is the entity that Wang Bin assigned all of his patent rights to, so they are currently owning patent applications that we claim contain our trade

secrets.  In the -- I have to tell you, I took a couple depositions in this case; and I still have a hard time trying to figure out what the Shenzhen company actually does; but in the declaration that accompanied the opposition, they say that they do R&D and development of systems and back-end servers.

So we know that uCloudlink sells its products in California.  That is part of what our submission in our reply is, but you have to think about what is this back-end server. What are they doing with it in Shenzhen?

Well, it is actually the key part of this entire technology, Your Honor.  The way it works is that uCloudlink doesn't even manufacture its own devices.  It buys them from third parties.  The magic of what they do is that they distribute these virtual SIM cards anywhere in the world, and the way they do that is through the back-end servers in Shenzhen.  The product doesn't work without that.  That is the key feature and functionality.  The other thing that the back-end servers do is they allow uCloudlink to track the data that is being used by a user and to sell the data to the user. The business doesn't -- the business is all about selling data, and it doesn't work without these back-end servers.  So people who are customers of uCloudlink in the United States are utilizing these back-end servers all the time.  They have to be.  Otherwise, the business doesn't work.

THE COURT:  So they are a key beneficiary then of the

alleged conduct?

**MR. JOHNSON:**  It's a cog in the business -- the business model goes away without it.  It is really selling a service, and they are selling it in the United States.  That is undisputed, in California; and the other key, Your Honor, is that the service that they are selling is using -- we allege is using our trade secrets.  So the whole reason for this lawsuit is a service they are selling in California that misappropriates our trade secrets.

**THE COURT:**  If the back-end server function were performed by truly an independent third party, they wouldn't be properly named as a Defendant, would they?

**MR. JOHNSON:**  If they were using the trade secret, they would be.  If they had just taken the trade secrets and instead of giving it to their subsidiary, gave it -- took it and if they gave it to Acme company --

**THE COURT:**  There would be jurisdiction over foreign -- let's say it is a company in some other part of the world --

**MR. JOHNSON:**  Well --

**THE COURT:**  -- that is performing that function.

**MR. JOHNSON:**  So the device that utilizes this virtual SIM is talking to the back-end server from here.  If I had that -- if I had this virtual SIM -- let's say I bought this in California -- bought this phone that had this global roaming possibilities, and I took it from California to Mexico.  The

phone is being -- it talking to the back-end server all the time, and same thing would happen if I took the phone from Mexico to California.

THE COURT:  Is that the nature of the contact then?

MR. JOHNSON:  Yes.

THE COURT:  Is the fact that the activities the Shenzhen back-end server, the company that runs that, is in constant communication and providing service to U.S. customers.

MR. JOHNSON:  I think it is even a little simpler. That's true.  I think it might even be a little simpler, which is they are selling a product and service that is bundled, right; and the service that they are selling is being delivered by Shenzhen, and they are selling that in California.

THE COURT:  And that bundle is tainted by?

MR. JOHNSON:  The trade secrets.

THE COURT:  The trade secrets.  Even if that part of that bundle service is provided by an offshore company, if it is tainted, the jurisdiction exists because this is conduct directed to -- what is the --

MR. JOHNSON:  I would use the purposeful availment terminology that it is used in specific jurisdiction cases.  I would say they purposefully availed themselves of the right to do business by selling --

THE COURT:  That is using contract theory.  Purposeful availment is usually a contract cause of action.

**MR. JOHNSON:** It usually comes up when they talk about -- you know this takes me back to law school, of course, but it is the terminology used in a lot of the personal jurisdiction cases they ask if there has been personal availment and that means under -- there is good California precedent cited in our briefing that says that you can be found to have purposefully availed yourself of the jurisdiction by selling products and services within the jurisdiction and especially when those products and services incorporate the trade secrets.

Now, there is another issue that is important here, Your Honor, and that is the effects test; and we cited a couple of different cases on the effects test, and what happened is that since 2014 the trade secrets we allege have been developed by our California subsidiary and so they are partially owned by the California subsidiary and the damage has occurred here in California under the effects test.

**THE COURT:** Well, effects test has gone through some iterations; and you have to look at not just whether there is an effect due to the location of the party that is injured, but you have to show some direct connection or connection between Defendant's conduct and the form state; and if the conduct is all occurring in Shenzhen, I'm not sure that gets you there.

**MR. JOHNSON:** Well, I believe that the *Applied Materials* case which we cited is pretty on point in terms of the allegations.  I believe that's a district court opinion,

and it is not binding on you; but I think it is persuasive and it follows the *Dole* decision.

THE COURT:  What is your response, Counsel?

MS. ROBERTS:  There are a few issues.  I don't think they have established what they need to to pierce the corporate veil.  These are separate corporate entities.  They have alleged that these products are bundled.  We disagree.  We think it is more akin to the passive website cases.  The products at issue are phones and hotspots that do contact the back-end servers, but the back-end servers aren't being purposefully directed towards customers in California.  They are global.  As counsel stated, no matter where you are, you can access these back-end servers.

THE COURT:  But the back-end servers -- is the allegation that the back-end servers are using unlawfully obtained trade secrets?

MS. ROBERTS:  That's what they are alleging, yes.

THE COURT:  If the trade secrets were taken from -- well, that seems different.  It is not just the fact that they are providing a service.  It is the fact that the service is tainted by the alleged conduct here.

MS. ROBERTS:  We disagree, of course.

THE COURT:  Yeah, but that is the allegation; and that service is then being used to service customers in the forum state.

**MS. ROBERTS:**  We believe they are used globally.  We think it is more akin to -- you know, while they can access the back-end servers, there is nothing being directed towards California.  In addition, the harm that they just talked about -- that counsel just talked about, he said starting in 2014, I believe, there was joint ownership of the trade secrets by the California entity, but Wang Bin joined uCloudlink in 2013.  He worked had for Skyroam prior to that; and the alleged trade secrets were taken in China and used -- allegedly used in China.

**THE COURT:**  So is there a dispute about where the trade secrets were taken?  I mean, it happened off shore; right?

**MR. JOHNSON:**  No dispute about that, Your Honor.

**THE COURT:**  So your main point is that -- what the jurisdictional hook is is the product that is being sold and the service that is being sold is sort of tainted by the trade secret and it is being -- the product is being shipped into essentially the forum state.

**MR. JOHNSON:**  And another way of looking at it, Your Honor, is that the product that they are selling in the United States and in California doesn't work without the back-end server; and it doesn't work without our trade secrets is our allegation.

**THE COURT:**  So it is continued use of the trade

secret -- beyond the initial theft, is the cause of action and the counterclaim based on the continued use of the trade secret?

**MR. JOHNSON:**  Continued use is most definitely a violation of the Uniform Trade Secret Act in California and the Defendant Trade Secret Act.  There is excellent California precedent on this that we have cited in our brief.  I can find you the case, I think, in my notes.

The *PMC versus Kadisha* is a case where some investors went and bought this company that had a taint of having built its business on trade secrets.  They claimed well, we can't be liable for trade secret misappropriation because we are just the investors that bought the company.  The court said absolutely you can if you had reason to believe that they were using trade secrets, and I would submit to you that the six patent applications that are tainted with our trade secrets, uCloudlink Shenzhen has reason to believe they are tainted given the motions that we filed and the depositions we have taken.

**THE COURT:**  Let me ask you:  If someone violates -- infringes on someone's copyright and writes a book, and that book is sold throughout the world -- not just in the U.S. but throughout the world -- it is a tainted product, but it is being shipped all over -- does that fact alone make the distributor or author of that book that, let's say resides

offshore in Europe or Asia, subject to personal jurisdiction in the United States simply because it is shipped to there as well as Mexico and Japan and everywhere else?

**MR. JOHNSON:** We would have to do -- I don't know the answer. We would have to do a purposeful availment analysis of that situation, but you are assuming -- just so I make sure I understand your hypothetical, the book is being distributed throughout the world from some location outside of the U.S. in your hypothetical?

**THE COURT:** Yeah.

**MR. JOHNSON:** I think that could have personal jurisdiction in California if you are the author, and you own the copyright in California. The book is being purposefully sent to California.

**THE COURT:** That's where I'm not sure I agree with that. I think that's where the purposeful direction goes unless there is some -- if the theft occurred in California or the United States, but let's say the theft occurred -- not theft, copyright violation -- it is someone else's copyright offshore, and all that happened offshore; but then the product, the tainted product, is then distributed and shipped around the world. I'm not sure just a mere shipping of tainted product gets you personal jurisdiction.

**MR. JOHNSON:** Well, in the trade secret cases that we have cited, Your Honor, one of the key issues is the fact -- is

the definition of misappropriation where ongoing use of the trade secrets constitutes misappropriation.  I'm not sure what the similar issue would be under copyright law; but I would think if I was the author of a book that was being infringed in California, I could sue the distributor that was outside of California for doing that.

THE COURT:  Your reaction?

MS. ROBERTS:  We don't agree in this hypothetical that the person selling -- offshore selling the copyrighted book in California would then be liable.  I mean, in our case the back-end servers are located in China.  Any alleged ongoing use of their trade secrets is happening in China, not in the U.S. It's -- they are only saying that the back-end servers touch the products that are sold in the United States.

MR. JOHNSON:  Your Honor, there is actually a copyright case that is on point to this that is just coming to mind as I'm thinking about your hypothetical.

THE COURT:  Yeah.

MR. JOHNSON:  It's a first sale doctrine case that is -- I can't give you the name of it, but I can describe it for you; and I can supplement the record afterwards -- but essentially it was a very entrepreneurial young man who was buying books that were sold -- college textbooks that were sold overseas that were identical to the textbooks that we all got over -- we all had to pay too much for here and was shipping

them into the United States, and the people who make a lot of money on college textbooks were not happy about that.  They sued him.  They were able to establish jurisdiction, and the only way he was able to avoid liability, was the first sale doctrine because he had -- they had sold him the books legally overseas; and once you do that, you can't then bring another copyright infringement case.

**THE COURT:**  You are saying the court found specific personal jurisdiction even though he was offshore?

**MR. JOHNSON:**  That's right.

**THE COURT:**  He had no other contacts with the United States?

**MR. JOHNSON:**  I don't know about that.  I know that -- I'm digging into my memory on this one, Your Honor; but that is a case, and I know that that -- the case went to -- I forget whether it was the Supreme Court or Ninth Circuit; but it was definitely a well publicized case when it came out.

**THE COURT:**  You have the last chance to respond.

**MS. ROBERTS:**  I'm sorry.  I can't respond to the case.

**THE COURT:**  It is hard to respond if you don't know the case.

**MS. ROBERTS:**  I haven't looked at this case since it wasn't in their brief.

**THE COURT:**  I'm going to take the matter under submission.  My inclination at this point is to allow the

counterclaim; but with respect to the Shenzhen and Hong Kong proposed counter-defendants -- counterclaim defendants, I have some skepticism.  I will take a second look at the -- at your briefs in the case along with this question about whether there is enough jurisdiction to add them in.

MR. BUSBY:  Your Honor, may I make one point about the technology the allegations?

THE COURT:  Yeah.

MR. BUSBY:  These back-end servers -- first of all, the claims in both cases are related to the devices.  So we are talking about tainted trade secrets.  The question is if you want to bring this trade secret into this case, again, we think it is prejudicial.  But their trade secrets have to allege to the devices.  This process is global, okay, so the assumption here that Defendants' counsel is making is that the servers are in Shenzhen.  I'm going to let him stay with that assumption. It is not correct, but let's just stay with that assumption. They are global.  They are all over China.  They are other places.

THE COURT:  What is all over China?

MR. BUSBY:  Singapore, Hong Kong.

THE COURT:  What is it?

MR. BUSBY:  Servers, different kind of servers.  The systems can't operate with one type of servers.  There are multiple types of servers.  Some of them attract accounting.

Some of them have, what are called, virtual SIM clouds. Some of them talk to a cellular network. There are different types of servers. This is sort of this hand waving about a server that is tainted and sitting in Shenzhen. That's not the case. The whole process is sort of attenuated from any alleged trade secret. Let's assume there is a trade secret. Let's assume Shenzhen technology -- not a named party -- was involved in stealing a trade secret. They are not a named party. They don't use the technology at issue in these cases; and, again, that kind of goes to the point either this is so discreet from these patent infringement cases --

THE COURT: You just said that Shenzhen does not use the technology that was allegedly stolen?

MR. BUSBY: I don't know how to grapple with that question in effect that they don't make the devices, okay. Those are made at another entity, okay. Their core technology is work at designing servers, designing the interaction of the process, the overall system. These guys know that from the discovery in the New York case. So the point that -- the argument that is that you have one server in a global system that is somehow using the technology that is incorporated in a device, and it is somehow directed to California is just too attenuated. I can't even imagine under any case law that that would suffice for personal jurisdiction. Again, Shenzhen --

THE COURT: So the servers interact with the device

but it does not?

**MR. BUSBY:**  That's actually not true either.  In some way they interact with the device.  Again, there are multiple servers.  Some have data.  Some attract accounts.  Some talk or -- used to talk to the cellular system.  You get to use a cellular phone network as well on the system.  The whole point of this thing is you use your phone.  You get into the cellular network.  The cellular network goes to these companies.  Let's say I live in San Francisco, and I go to London.  I don't want to roam -- pay roaming charges with my phone.  I don't want to dial a Nevada phone and pay roaming charges back to AT&T.

The way the systems work generally is they -- you pay for a service, and these systems have a bank somewhere in the cloud; and it has got every SIM that they subscribe to, Vodafone, whatever, Singapore, India, all these SIMs.  I pay the service.  I dial in.  I get on the cellular network, the phone network.  I establish a link, and then through that link that local SIM card is virtually downloaded to my phone.  Now I'm on that network.  So there are servers everywhere doing different functions.

So, again, this allegation that some -- a Shenzhen entity that is not related to the core technology of the patents in this case, that is all the more that is a completely separate issue from this case.  And then the servers, most importantly, are not in California.  There are -- none of the servers in

California.  Frankly, there are no uCloudlink servers in the United States.

**THE COURT:**  Right.  Well, the assumption is that the server is in Shenzhen or somewhere.  That I understand.

**MR. JOHNSON:**  Your Honor, can I briefly address the last point?

**THE COURT:**  Very briefly.

**MR. JOHNSON:**  Here is how the system directs activity from the back end to California:  In the example that was just given, when you show up in California and you activate the system, it has to give you a virtual SIM card that works in California.  In other words, the back-end server is sending a virtual SIM card that is maybe T-Mobile or AT&T or Verizon; but it is giving you one that is designed to work in California that is part of their SIM bank; and we contend that the method they use to do that infringes on our trade secrets.

**THE COURT:**  All right.  I will take the matter under submission.

**MR. JOHNSON:**  Thank you, Your Honor.

**MR. BUSBY:**  Your Honor, we have some case management issues to discuss as well.

**THE COURT:**  All right.  I left my binder back in my -- what would you like to discuss?

**MR. DAVIS:**  I think there are four areas of the case management statements in which we have divergent opinions.  I

will go in order of how they are listed in the case management system.

The first deals with evidence preservation, and really what I think the big debate here I hope is going to be about forensic inspection of their server systems that they use and their internal computer systems.  One area that we also want to resolve is preservation of e-mail and also text messaging applications such as WeChat.  We chat is the number one text app in China, and we expect there to be a number of communications.  We expect that those text messaging application messages would have been preserved particularly with respect to uCloudlink employees, Mr. Gao, who is the CEO and Wang Bin, who we allege is the original misappropriater of the trade secrets.  But what I mentioned earlier is the forensic inspection of the server, so far in the New York case we have been unable to either reach an agreement or get compelled an inspection of that server.  If I can characterize at least my characterization of what I think the Plaintiff's position has been as well, trust us; this trade secret information wasn't transmitted between Mr. Wang Bin or the Shenzhen entity to uCloudlink, some of the named parties here in this case.  We know that that is just not true, and I brought documentary evidence that we can show that that is not true, Your Honor; and I can pass that up to you now. Essentially what it is is it is internal uCloudlink documents,

the Plaintiff here, in which they used word-for-word trade secret information out of a SIMO, our clients' documents.  You can put them right next to each other, and I can show you those documents now; and so we know for a fact that that information -- what we contend part of it that is trade secret information is on these party servers or was at some point in time.  We need to conduct a forensic inspection of those computer systems.

THE COURT:  All right.  What is the -- what is the response?

MS. ROBERTS:  We disagree.  We have done -- we have made copies of Bin Wang's computer.  He made a copy of his own personal computer that is not in our custody or possession.  That is in his own -- like his Mr. Wang's own personal possession.  We disagree that we have not done the correct evidence.  We don't think evidence preservation -- we don't think they need to inspect our servers.  They can do -- they can issue RFPs if the trade secrets are allowed in this case.

THE COURT:  Where are the servers?

MS. ROBERTS:  The servers are in China, I believe.

THE COURT:  Tell me what the downside is of allowing forensic inspection of the servers?

MS. ROBERTS:  We think that would give them access to things that are complete wholly unrelated to the trade secret.

THE COURT:  Can't that be done -- this is not

uncommon.  It can be done through a third party; use a taint team or whatever they do similarly in criminal investigations. There is ways of handling that particular problem.  Are there operational problems or what is --

MR. BUSBY:  So, Your Honor, just to clarify a couple points, there is two computers.  There is the personal computer -- I will get to answer your question.  It is kind of related -- there is a personal computer of Wang Bin, and there is the work computer.  The work computer was seized immediately.  We produced these documents through RFPs.  They told us Wang Bin was a former employee for four months at Skyroam.  Anyway, we produced these documents.  There is 12.  I don't know what they are, and it turned into a big blow up in New York.

Immediately uCloudlink Shenzhen, who is not a named party in New York, grabbed his -- secured his work laptop; had a forensic image done of it.

THE COURT:  Had a forensic image was made?

MR. BUSBY:  Of the hard drive, yes.

THE COURT:  Who made that?

MR. BUSBY:  A company called D4 in Shanghai.

THE COURT:  At whose request?

MR. BUSBY:  They just did it to be safe.

THE COURT:  The work computer?

MR. BUSBY:  The work computer, yes.

**MS. ROBERTS:**  That was at UCloudlink's direction.

**MR. BUSBY:**  UCloudlink, the employer of Wang Bin at that time, as soon as defendants in this case/Plaintiffs in that case raised the issue, that day they seized his work laptop.  They had a forensic image taken of his hard drive.  And that's in the custody right now of D4.  As far as his personal computer, when they deposed him the first time in Hong Kong, based on the patent case -- that turned into the trade secret issue.  They discovered -- that Judge Rakoff allowed -- he wouldn't allow -- Mr. Bin -- Mr. Wang would not allow -- he wouldn't answer questions.  Didn't want anything related to his personal computer in the case.  We -- actually uCloudlink asked him to please answer questions; produce your personal computer.  He wouldn't.  So that's when -- a whole other issue about that.

So Wang Bin had a forensic image taken of his personal computer.  That uCloudlink has never had any custody or control of, any uCloudlink entity, let alone Shenzhen, who again is not in either cases.

Judge Rakoff asked Morgan Lewis, our firm, and uCloudlink Shenzhen to file a declaration in court that said we don't have access to the personal computer.  Never had access to the personal computer.  Never had access to the forensic image, etc.  That is a public declaration.  That is in court.  Once that happened, Judge Rakoff said that is the end of the issue.

So as far as a server, Judge Rakoff asked us confirm that

none of these documents have been transferred to any servers, have been transferred to any uCloudlink employees, have been used by any uCloudlink employees.  We confirmed that, and then the defendants deposed him for two days; asked him all these questions.  These were questions that were answered.  He answered under oath that he never transferred these in anyway to uCloudlink.  They were never incorporated in any of this information given to uCloudlink.  He has answered under oath. He had separate counsel in the second deposition.  He answered -- the discovery for the New York case was sufficient to show that this issue has been vetted.  That is why Judge Rakoff came to the conclusion that that is a separate issue.  Discovery on that issue would be requiring getting a Chinese citizen that no longer works for uCloudlink; getting at a forensic image that no longer involves in any way uCloudlink.

That goes back to the earlier issue, your Honor, this is -- that the prejudice is huge.  I know I'm kind of looping back to that.  Trying to answer your question, getting at the servers and getting at these images and getting at the work computer and the personal computer, that is quite a discovery issue.

THE COURT:  What is it that you want access to, the server or the other work computers and the --

MR. DAVIS:  Right.  There is two issues.  There is the uCloudlink computers, and then there is a personal computer of

this former employee Wang Bin which there is a forensic image --

**THE COURT:** I am hearing there are three things. There is the computer at work --

**MR. DAVIS:** That's right.

**THE COURT:** -- there is an individual computer, and then there is the server generally.

**MR. DAVIS:** Yeah. What I understand he had a work laptop. He had a personal home computer, and then there are servers in which documents are stored throughout the company, okay. And so the work laptop and the company ones is the first issue I will address, and Mr. Busby's statement that Mr. Bin -- Mr. Wang Bin never transferred these documents to uCloudlink is false; and, Your Honor, I have the documents right here to show it to you if you permit it.

**THE COURT:** What is it you are asking for of these three?

**MR. DAVIS:** For those -- for all of them, we would like the forensic image of those.

**THE COURT:** I was told the forensic image was already done of two of these.

**MR. DAVIS:** I understand -- previously -- this is the first time I've understood it has been done on the work computer and the personal computer. I had only been under the impression that it had been done on his personal computer.

Regardless, we haven't gotten access to any of those forensic images.  I understand their argument, at least with respect to the forensic image of the personal computer, that that is in the possession, custody and control of Mr. Wang Bin.  They have no access to it.  But as to the work computer, the work computer is their product -- their property.  They should be able to have access to it.

THE COURT:  Based on what you have just heard, that there does exist a forensic image that was taken at or about the time these allegations arose, do you have a suggestion as to how to handle it?

MR. DAVIS:  We would like to have our independent expert look at that forensic image to see whether these trade secrets and to whom -- we know they were transferred in uCloudlink.  I have the documents right here --

THE COURT:  If they were transferred to the server, you would see that on the work?

MR. DAVIS:  Exactly, that's right.

THE COURT:  Is there a problem with sharing that forensic image which was taken promptly making that available to their consultant?

MR. BUSBY:  Well, Your Honor, the answer is I don't know because this applies to whether uCloudlink Shenzhen -- they are in China.  They are not a named party.  They really have nothing to do with this case, as we have been discussing

all morning but, you know, in theory -- if it was a company down the street, of course, in a trade secret case, that is the type of evidence that should be provided if it is in the custody and control of the named parties.

**THE COURT:**  So who has control and custody of the forensic image of the work computer?

**MR. BUSBY:**  My understanding right now is the company D4.  I think it is D4 in Shanghai that did the forensic image.

**THE COURT:**  Who has control over D4?

**MR. BUSBY:**  I don't know.  I don't know how to answer that.

**MR. DAVIS:**  Your Honor, I think it is our understanding that uCloudlink paid D4 to do the forensic image. Somebody had to pay them.  D4 didn't just walk in and take a uCloudlink and computer it and image it out of the good of their heart.  They paid for it.  They presumably have a contract with D4.

**THE COURT:**  So I don't see why that can't be made available.

**MR. BUSBY:**  Your Honor, I'm not disagreeing.  I don't know -- I can't say something I don't know.

**THE COURT:**  I would like you to meet and confer to see if you can work out allowing access to that image and that will tell you something about whether there is something to be found on the server, wouldn't it?

**MR. DAVIS:**  I think that's -- I think that's true, Your Honor.  It could provide information, but it wouldn't be the only source.  We would have to look at their server as well.  And if I can -- if not hand you the documents, at least describe what they are to you, which is Wang Bin applied for a patent in China which is part of our trade secret allegations.  He described that patent application, and that was sent through the uCloudlink company; and that was sent through the servers in uCloudlink.  Those are documents that were produced by uCloudlink in the New York action.  That document word-for-word lifts our trade secret out of a SIMO internal document that Mr. Wang Bin stole from us.

**THE COURT:**  You say there is evidence that that went through the server?

**MR. DAVIS:**  Yes, because of the nature of the form that was sent.  It is a patent application that was sent.  If you look at the patent holders of those, they are the ones who paid for those patent applications in China, which ultimately culminated into a patent; and this is the document that is in Chinese.  We also have the English translation, and then we have the SIMO internal document which shows word-for-word copy.

**THE COURT:**  How do you know it went through the server?

**MR. DAVIS:**  Right, because this is a document that is addressed to the uCloudlink internal team that decides about

patents.

**THE COURT:** All right. So what about that?

**MS. ROBERTS:** We don't know whether it went through the server or not, but this is -- I mean, this is the argument of their merits of their case.

**THE COURT:** Right, but isn't that enough to suggest that they have an interest -- legitimate interest in looking at the server, whether -- you know whatever the forensic tools is, are -- why not?

**MR. BUSBY:** Well, Your Honor, first of all, is this going to -- is the issue of the scheduling for the case management, are we -- I apologize. I'm not sure. Are we talking about prediscovery or are you just trying to rustle with the issues right now? The answer is: My understanding is those came off the work computer. That's the issue. Whether they went through the server or not, I don't know. But in answer to your question again, are they a party; do they have custody and control, the answer is in general yes.

**THE COURT:** You are asking for -- we are at the point now -- there has not been formal discovery instituted yet; is that right?

**MR. BUSBY:** Correct.

**THE COURT:** There has been a first set --

**MS. ROBERTS:** That's correct.

**THE COURT:** -- of request for production.

MR. BUSBY:  Correct.

MS. ROBERTS:  The Plaintiffs have served interrogatories in request for production.

THE COURT:  So discovery has commenced?

MS. ROBERTS:  Yes.

MR. BUSBY:  Yes.

MR. DAVIS:  Your Honor, we had the --

THE COURT:  This is part of the discovery you want?

MR. DAVIS:  This is -- as part of the case management statement, we have to provide the Court with an outline of evidence preservation that we want; and we believe that getting a forensic image of their servers in addition to the work laptop, which I hear has already been taken, needs to be preserved and kept.

THE COURT:  Preservation is different from inspection.

MR. DAVIS:  Right.  I do want to inspect.  Inspection is another issue, but at least you are asking about how this came up; and I'm trying to provide you with an answer.

THE COURT:  With respect to preservation, I think you want to confirm that with respect to the personal computer there is, in fact, there does exist a forensic image taken?

MR. DAVIS:  Yes.

THE COURT:  And you also -- since at some point you will want to see it, you should start talking about how you get access.  The second question is with respect to the server,

uCloudlink server, is whether -- now, what preservation steps are you asking for in that regard?

MR. DAVIS:  Right.  What I would like to do -- we have a service that did a forensic image to see the interactions between Mr. Bin Wang's computers, whether those be personal or his work laptop, because we don't know whether he only worked on his work laptop.  It is clear that he used his personal laptop to get information that he has transmitted to his work laptop, and so we have to see how that was done.  The preservation we want to see is the transmission of these documents through their server system.  Were they uploaded?

THE COURT:  You want a forensic examination to see what, if any, interactions there have been between his two laptops and the server?

MR. DAVIS:  Any laptop or device that he may have had. I don't want to limit it to just -- I don't know for sure.  He may have used a public computer.  He could have used his cell phone.

THE COURT:  How will that be -- that would be reported?  That is the preservation if it is reported?

MR. DAVIS:  Yeah, yeah.  In the server itself, it will indicate where documents were or if these documents exist in a database on their server.  Their allegation is he never -- he never shared the documents with uCloudlink.  It was on his own personal situation he did that.  We now have evidence from the

documents that have been produced, that that's not the case.

THE COURT:  So what you are asking for is to be able to send in a forensic examiner to look at the server, to look specifically for interactions with laptops that were possessed?

MR. DAVIS:  Right, that and then the other thing would be a snapshot of the database to see -- to do searches to see, for example, if the SIMO documentation -- that we allege is our trade secret that we know Mr. Wang Bin took with him when he left -- if that appears on the server.  And we know that at least text from that document appears at least on his work computer, if not the server, because of this document trail that I have right here which shows, you know, word-for-word copying from the SIMO document.

THE COURT:  You want to look for the documents that constitute the trade secrets, and you want to look for interactions with Mr. Wang Bin's computer?

MR. DAVIS:  That's correct, Your Honor.  That's what I want to look at.

THE COURT:  That can be done on premises?

MR. DAVIS:  Yes, I mean -- well, I say yes.  It is difficult to do those forensic images in China without, you know, some sort of court order or whatever.  I do believe -- we do have a team in Hong Kong from one of the leading, you know, e-discovery, that could go over to China and do an image.  I mean, this takes an hour or so.  There is a forensic tool, and

they just take a snapshot; and then they are able to run from that snapshot that nothing gets changed within the system. They are able to do searches and look to see where the documents were transferred.

**THE COURT:** There is a preservation order in existence I assume now. Have you all stipulated to that, nothing would be --

**MS. ROBERTS:** We are working on that.

**MR. DAVIS:** We haven't stipulated it to -- I feel we will work out most of the details. This has been the sticking point which is why I want to bring it to the Court's attention.

**THE COURT:** Well, preserving is one thing. There is no reason you can't all agree to not expunge or delete any -- now that you know specifically what counsel is looking for, you can certainly make sure that is not done. At least if there is a preservation order in existence, that takes a little bit of heat out of the time. You don't have to do that tomorrow. That is the first thing. It seems to me you ought to agree on a protective order -- preservation order. You are generally covered by the Federal Rules anyway, and now you have been alerted specifically. In this case -- I think this is the kind of case where I think it would benefit from an expressed preservation order. I'm going to ask the parties to meet and confer to finalize that preservation order.

With respect to this, I would like you to meet and confer

to see whether there is a way to arrange in due course this forensic -- this examination.

MS. ROBERTS:  We think this is a little bit premature since their trade secrets haven't been added.  This case management statement generally -- like all of the due dates and the schedule -- doesn't include anything relating to their trade secrets.

THE COURT:  Right.

MS. ROBERTS:  It doesn't contemplate --

THE COURT:  It is a fair statement to a certain extent.  I haven't even ruled on this, but I'm indicating that number one, you should do preservation right away.  Make sure there is no problem there.  Two, if and when it becomes an issue, at least the request, as I am hearing it, sounds on its face seems to be one that is reasonable and seeking relevant information and not overly burdensome.  So I will leave you with that; and hopefully once I get out my order on the counterclaim business, you can meet and confer and see if you can work something out in that regard.

MR. DAVIS:  Your Honor, I know we are taking up a lot of your time.  There are three other discreet issues.  One is about the request for admissions.  That is in Section 8F of the case management statement.  We just -- we are going to agree to the Plaintiff's position in that.  We had a disagreement in the case management statement; but after considering it, we are

going to try to reach agreements when we can.  That is one we want to take off the table and alert the Court to that.

The next issue is about privilege logs.  That is Section 8H.  The dispute between the parties is the timing of when we should log information.  They want to cut off logging at the time the New York lawsuit was filed, and we think they need to log -- at least until, you know, current time and the issue there that we are concerned are about is communications with Bin Wang; and what happened there is by their own admission they determined that a conflict of interest arose between the company and Bin Wang.  Yet they continued to have communications with him and his lawyer, not only about the imaging of his personal computer that contained what we allege is our trade secrets, but may have had other allegations about the scope of his involvement through with uCloudlink -- I mean, with Skyroam.  So because of that we want at least on the log -- we are not saying that there might be communications yet -- we need to have a log of what those communications are so that if we do feel the need to challenge those and get a request that those get produced to us, we at least know what to challenge.

**THE COURT:**  What is the filing date of the New York case?

**MR. DAVIS:**  Your Honor, you caught me on that one.  I think it is August.

**MR. BUSBY:**  August 15, 2018.

**THE COURT:**  We are talking about a five-month difference?

**MR. DAVIS:**  Yes.  And really where this arose was in the depositions that occurred last year because what happened in the middle -- we were starting to depose Mr. Wang Bin.  He was an employee of uCloudlink.  Then they alleged the conflict of interest arose.  They got him separate counsel.  They paid for and got him separate counsel.  There is a conflict of interest by their own admission.  That means there is no joint defense.  There is no common interest at that point, and so those communications would be discoverable.  And so that is the thing that I'm trying to get at with the timing of the log.  I think what they are trying to do is by saying, We don't have to log those, is really trying to preclude us from finding out --

**THE COURT:**  Why not produce a privileged log if there is anything to be covered during the period after August 15th?

**MS. ROBERTS:**  Well, this also covers a lot of -- this would also cover anything related to the Southern District of New York case which doesn't necessarily have anything to do with their trade secret issues.

**THE COURT:**  Can that be excluded?

**MR. DAVIS:**  That's right, Your Honor.  I'm willing to stipulate -- we are not concerned about what uCloudlink talked to their counsel about and having them log those e-mails.

That's not what I'm asking for.  What I'm concerned about here is the communications with Wang Bin that relates to, you know, the issues at hand.

**THE COURT:**  You are asking specifically to include in the privilege log subsequent to August 15th any assertion of privilege as it relates to communications with Mr. Wang Bin?

**MR. DAVIS:**  Yeah, that's right, Your Honor.

**THE COURT:**  If any, so --

**MR. DAVIS:**  Right.  There may not be any written ones.

**THE COURT:**  That doesn't seem very burdensome to me.

**MR. BUSBY:**  Your Honor, I apologize.  I don't know how to address this.  The Wang Bin issue is so global and complex. What do you want?  He is asking for communications between us, Morgan Lewis, and Wang Bin?  Is that what he is asking for?

**MR. DAVIS:**  Yes, Your Honor.  To address the counsel's question directly, what we are asking for are communications either between their counsel and Wang Bin or between their counsel and Wang Bin's counsel; and what we are asking for is a privilege log of those so we can at least figure out if there is something to challenge on privilege.  I'm not asking them to produce those communications now.  I'm not saying I won't after I see the privilege log.  However, I don't know what exists, what is out there.  So I can't even assess that yet.  So if there is a -- you know, letters back and forth, I think that those would be discoverable because by their own admission

there was a conflict of interest.

**THE COURT:**  This would be communications with Wang Bin or his lawyer?

**MR. DAVIS:**  That's right.

**THE COURT:**  For which a privilege is asserted?  If there is no privilege asserted, it would not be in the privilege log.

**MR. DAVIS:**  That's exactly right, for which privilege is asserted.  So they hired an attorney for him.  So morgan Lewis represented --

**THE COURT:**  Yes, it is specific.  To the extent that there is any claim of privilege as to communications with Mr. Wang Bin or his lawyer, that would be listed on a privilege log.

**MR. BUSBY:**  Your Honor, if it becomes relevant to this case -- again, I don't understand the relevancy -- but, of course, if it is, Your Honor's order.

**THE COURT:**  As amended, you should include that.

**MR. DAVIS:**  Okay.

**THE COURT:**  What is the last issue?

**MR. DAVIS:**  The last issue, Your Honor, relates to damages contentions under the local patent Rule 3-8.  This is Section 22E, the last portion of the case management statement; and I got to be honest with, Your Honor, we have been struggling with these contentions or these rules in a number of

cases, most recently with the Judge Seeborg and Magistrate Judge Corley.

Our position is that these are contentions, and that they need to provide us their -- A, identify the theory of damages they are going for and all facts that support those damages by the deadline that is provided under the local patent rules. They can't just rely upon maybe complaints about whether the sufficiency of the discovery that was produced to them.  I will give you a perfect example of that.  That relates to if they are going to assert loss profits.  They can certainly provide information relevant to the Panduit factors that identify loss profits certainly at the time of their disclosures and what theories they are going on.  And in this case it's unique because they already have our damages report on patent theories.  They will have their expert damages report by this time.  They will have conducted depositions -- fact depositions of the witnesses and the experts.  So they will have a lot of facts to put in there, and so we contend that these are contentions because they are identified as such in the local patent rules and they can only be amended for good cause.

**THE COURT:**  Tell me specifically, what is it that you are asking then?

**MS. ROBERTS:**  Your Honor, can I address this, because our first sentence says that we will provide the Court with our contentions as required by the local patent rules.

**THE COURT:** That's what I'm trying to figure out. What is the dispute?

**MR. DAVIS:** It seemed to me the dispute was they were not going to do this until you -- if you read the next sentence there, it talks about Well, until we get all of this information from you. And my indication is that I don't want on that date to get -- you know, nothing that there are factors that need to be identified regardless of their own discovery, for example, what theories they are proceeding under and facts within their own knowledge, Panduit factors --

**THE COURT:** What is the date?

**MR. DAVIS:** Fifty days after the invalidity contentions are due.

**MS. ROBERTS:** Your Honor, he is creating a dispute that doesn't exist yet.

**THE COURT:** I'm not sure I understand. We are not even there yet. We haven't even agreed on a schedule. Invalidity contentions and damages contentions aren't due until May 28th. You are anticipating a problem?

**MR. DAVIS:** Your Honor, we are required under the rule to put this portion in the joint case management statement and to address it with Your Honor. Parties took divergent opinions on what and the nature of the scope of those disclosures should be, and that's why I'm addressing it now.

**THE COURT:** I guess I'm not understanding what the

dispute is.  What do you think they are going to do that is short of the rules?

MR. DAVIS:  It seemed to me by the statement that they put in -- instead of just agreeing that they will abide by the rules, it appeared to us -- and the reason why I'm bringing it up is that they were saying preemptively we are not going to produce this information until we get a lot of discovery from you.  And what I'm saying is that our interpretation of the rule is is that they have got to provide all the fact information they have as of the date in which those things are due including identifying what remedy they are choosing and what their dollar figure is going to be based on that theory.

THE COURT:  I don't see -- I'm looking at paragraph E, and I'm not sure I see where you are reading certain conditions and limitations.  Am I missing something?

MR. DAVIS:  I guess it is the second sentence where it says:  Plaintiffs require at least the following information to provide a non-binding good-faith estimate of the damages range for this case.  First off, our contention is it is binding. That is the local patent rule.  It is not a good-faith estimate.  It is your contention; and, second, and most importantly, they say Plaintiffs require this information. That to us -- by putting that information in unilaterally, seemed to us they were suggesting that they were not going to put in their contentions without, I guess, some satisfaction --

their own satisfaction, their own subjective belief as to the sufficiency of our discovery responses.

**THE COURT:**  You will have provided discovery responses by the time the contentions are due.

**MR. DAVIS:**  Correct, Your Honor.

**THE COURT:**  And I assume you are going to make your compliance with the patent local rules?

**MS. ROBERTS:**  Yes, Your Honor.

**THE COURT:**  And however binding it is, you can't put unilateral conditions on it.  It is what it is.

**MS. ROBERTS:**  Understood, Your Honor.

**THE COURT:**  There is no dispute until there is a dispute, so I'm not going to -- I assume that counsel understands their obligations and how things work, so I'm not going to assume otherwise until it is brought to my attention.

**MS. ROBERTS:**  We understand the obligations, Your Honor.

**MR. DAVIS:**  Thank you.

**THE COURT:**  So with that said -- and the last thing -- ADR, you are not ready to talk ADR until after claim instruction on the patent?

**MS. ROBERTS:**  That's correct.

**THE COURT:**  Okay.  All right.  I'm going to adopt the scheduling order that you both have proposed.  It seems reasonable, and I'm going to therefore -- we will have -- up

through claims construction.  I'm not going to set a trial date.  My practice is to get it to claims construction.  I have in mind your proposed trial date, but I want to get this thing on the road and make sure that we get the first several months off and going.

In the meantime, I will rule on the -- take the matter under submission.  With respect to the motion to amend, right now I'm inclined but I haven't ruled finally on allowing a counterclaim; but I am skeptical about adding two defendants.  I will have to take a closer look at that.

Meanwhile, the preservation order I would like you to make sure -- I don't want to get into a problem of alleged spoliation.  I want you to agree on a preservation order and then start to talk about if the counterclaim goes forward, how you are going to handle forensic evidence with respect to the servers.

**MR. DAVIS:**  Understood, Your Honor.

**MS. ROBERTS:**  Yes, Your Honor.

**THE COURT:**  Thank you.

(Proceedings concluded at 3:06 p.m.)

---oOo---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript

from the record of proceedings in the above-entitled matter.


DATE:   Tuesday, February 5, 2019




_____

Marla F. Knox, RPR, CRR
U.S. Court Reporter