Pages 1 - 21

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN

| | |
|---|---|
| HONG KONG UCLOUDLINK NETWORK TECHNOLOGY LIMITED and UCLOUDLINK(AMERICA), LTD., <br><br><br> Plaintiffs, <br><br> vs. <br><br> SIMO HOLDINGS, INC. and SKYROAM, INC., <br><br> Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) No. C 18-5031 EMC<br>)<br>)<br>)<br>)<br>) San Francisco, California<br>) Thursday<br>) April 18, 2019<br>) 2:30 p.m. |

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiffs:**          MORGAN, LEWIS & BOCKIUS LLP
                             2049 Century Park East
                             Suite 700
                             Los Angeles, California 90067
                        BY:  **SETH M. GERBER, ESQ.**

                             MORGAN, LEWIS & BOCKIUS LLP
                             1111 Pennsylvania Ave, NW
                             Washington, DC 20004
                        BY:  **STEPHANIE LAURA ROBERTS, ESQ.**

**For Defendants:**          K&L GATES LLP
                             Four Embarcadero Center.
                             Suite 1200
                             San Francisco, California 94111
                        BY:  **HAROLD H. DAVIS, ESQ.**

          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

*Reported By:*   *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
          *Official Reporter - US District Court*
          *Computerized Transcription By Eclipse*

**APPEARANCES:   (CONTINUED)**


**For Defendants:**          K&L GATES, LLP
                             925 Fourth Avenue
                             Suite 2900
                             Seattle, Washington 98104
                      BY:    **JEFFREY C. JOHNSON, ESQ.**


                              _   _   _

**Thursday - April 18, 2019**                                   **3:21 p.m.**

                              **P R O C E E D I N G S**

                                   **---000---**

THE CLERK:  Civil Action 18-5031, Hong Kong uCloudlink Network Technology Limited, et al versus SIMO Holdings, Inc., et al.

Counsel, please approach the podium and state your appearances for the record.

MR. GERBER:  Good afternoon, Your Honor.  Seth Gerber and Stephanie Roberts of Morgan Lewis for plaintiffs and counterclaim defendants.

THE COURT:  All right.  Thank you.

MR. DAVIS:  Good afternoon, Your Honor.  Harold Davis and Jeff Johnson for the defendants.

THE COURT:  All right.  Plaintiff has moved to dismiss the -- no.  There is a Motion to Dismiss the fifth and six causes of action in the counterclaim.

So with respect to the misappropriation theory, there is not a very clear enunciation in the allegations.  There is sort of a lumping together of the various uCloudlink entities here.

Generally there should be some specificity and enough specificity so that the responding party can understand what its role was.  And there has to be under *Iqbal* something that's not simply possible, but plausible; and not necessarily likely, but it's been a claim here.

So why shouldn't there be greater evidence here, more specificity?

MR. JOHNSON:  Well, I guess you're addressing that question to me, Your Honor.

THE COURT:  Yeah.

MR. JOHNSON:  You may recall that when we were last here, we were trying to add some additional parties and you gave us leave to do some jurisdictional discovery.

We're still in the process of jurisdictional discovery and we received actually amended responses yesterday on that.  We had a dispute about the scope.  We resolved it amongst ourselves, but it was yesterday that we got that.

We can add more specificity.  The issue here is that it's a little unclear who did what amongst all these parties still.

THE COURT:  So it's a chicken or egg kind of a problem?

MR. JOHNSON:  Well, no.  I mean, with respect to the parties who are actual parties right now, you know, quite clearly the Hong Kong entity, you know, its CEO is the coinventor of a patent that we think -- we know has our trade secrets in it.  I mean, this is a cut and paste job where --

THE COURT:  Well, that's one question I have.  It sort of relates to the second theory as well, continued use after November.  And is it -- is it because of the patent application or the patent that it's evident that the trade

secrets have been -- is that --

          MR. JOHNSON:  That's the most obvious piece of evidence we have.

          THE COURT:  How specific is that?

          MR. JOHNSON:  It's literally the document that was -- that we discovered in the New York action, that's our internal -- you know, Skyroam internal confidential document labeled "Top Secret," authored by this guy Wang Bin.

     So we get that and then we have -- we see that in the Southern District of New York case that the patent application that -- not the application, but the invention disclosure that led to the patent application, there is large portions of it that are verbatim cut and pasted into that invention disclosure that then becomes the patent that then Gao Wen, who is the CEO of the Hong Kong company that is the entity here, is a co-inventor on.

     And then when we depose Gao Wen, he doesn't know anything about inventing the -- this invention.  Has no documents. Can't say what he contributed to it.

          THE COURT:  So you're saying from the face of the patent documents it's very clear that these were the trade secrets.

          MR. JOHNSON:  Well, that's one of the buckets of trade secrets, yes.

          THE COURT:  Now, one ironic sort of maybe question is

once that's been published in this fashion, has its status as a trade secret been lost, at least prospectively at this point?

**MR. DAVID:**

**MR. JOHNSON:**  So the only -- the case that was cited in the reply, the *Google* case.  That's a pretty new case.  We haven't had a chance to respond to that because it wasn't cited in the motion.

I will tell you this; that there are, you know, cases going back centuries saying -- decades saying you can't steal someone's trade secret, publish it and then get away with it. That's just not the law.

**THE COURT:**  Seems wrong.

**MR. JOHNSON:**  Just to give you one example. *Underwater Storage versus U.S. Rubber*, which is a D.C. Circuit case from, at 371 F.2d 950, is a good example -- but there is many, many others.  And the pin cite for that would be 955.

**THE COURT:**  What does it say?

**MR. JOHNSON:**  It basically says that it's not the law that you can steal someone's trade secrets and then you and your colleagues publish them and then take advantage of them and not be held liable.

In fact, the filing of the patent itself is a misappropriation, but continued use is also a misappropriation.

In any event --

**THE COURT:**  What's your response to that point?  It

does seem inequitable in a sense.

MR. GERBER:  Well, I think the *Attia versus Google* case is very clear.  Google did exactly that.  They published a patent and the case basically said once it's published, it's no longer a trade secret.

Under the DTSA there's a number of issues that are problematic, and I'll start with the fifth cause of action, which is their claim for violation of the Defend Trade Secret Act of 2016, which was enacted on May 11th, 2016.

The allegations in the Complaint relate to conduct which all occurred extraterritorially in China.  You have Bin Wang employed by Skyroam Shenzhen in China in 2013.  He's there for four months and then he goes to another entity Shenzhen Netshing Technology in China.

When he allegedly went there, they claim that he took and then disclosed trade secrets from a Chinese company in China which was then the subject of patents filed -- Chinese patents filed several years later, three of which were filed and published prior to May 11th, 2016, the enactment of the DTSA, and three of which were published after.

They then wait until the deposition in 2018 of Mr. Bin Wang, where they claim all of a sudden these two entities, which are the counterclaim defendants here, which did not employ Mr. Wang.  Bin Wang was employed by uCloudlink Shenzhen, which is not a counterclaim defendant.  And those patents were

not filed by either of these two entities that are the counterclaim defendants.

So their only claim, because the DTSA is not retroactive, is that there was some continuing use of the trade secret information following May 11th, 2016. And it has to be continued use by a party that had reason to know or suspicion, reasonable suspicion, that the information they were using was obtained improperly.

And what they allege in their brief and in the pleading is that when Mr. Bin Wang was deposed in 2018, that put these two entities, the counterclaim defendants, on notice that he had improperly acquired the information from the Chinese entity he worked for six years ago. And so any continued use thereafter, they contend, would be a violation of the DTSA.

The problem with that theory, Your Honor, is that what they are claiming at that point in 2018 is a trade secret is no longer a secret. It was the subject of the patents filed in China and published in China in 2016.

And the case law is very clear. You've heard no response to the case *Attia versus Google*. It's a 2019 case. And therein is other authority we cite.

But it's common -- it's just by definition under the DTSA, under 18 U.S.C. 1836 and the definition of trade secrets, it has to be a secret.

THE COURT: So what's the proper remedy? If that's

the case, it loses its trade secret status and, therefore, its use thereafter at that point is no longer violative of the DTSA.

What's the remedy for somebody whose trade secrets were stolen?

**MR. GERBER:** Well, the remedy would be if they have a claim, they should bring it in China because all the conduct here occurred in China. The taking and use of the information occurred from a Chinese citizen who worked for a Chinese company and went to another Chinese company and filed patent applications in China that allegedly disclosed the trade secrets. And the DTSA is not retroactive and it's not extraterritorial unless there is some nexus to America under 1837.

And so they cannot establish that the act was undertaken by an American citizen or a permanent resident in the U.S. He was not. By their own pleading he was a Chinese citizen.

And the only wrongful act that they say has a nexus to America occurred post 2018, when they say these two entities first became aware that perhaps the products were --

**THE COURT:** So if the violation had occurred -- I'm just thinking more philosophically.

If this all happened and we didn't have the territorial problem, it all happened in the U.S., how do you prevent an injustice stemming from this phenomenon; that once the trade

secret is stolen and then published and then continued to be used, there had is no remedy.  It's no longer a trade secret. What is the remedy for the victim?

MR. GERBER:  You have a remedy under the trade secret law.  You have a remedy to the party that took and improperly disclosed the information in the patent.  The problem is that those are not the parties before this Court.

THE COURT:  Well, I can imagine a problem that the damages, sometimes you were able to get profits.  You know, your damages are measured by the profits made by the defendant, as opposed to profits lost by the victim.

And here if somebody quickly publishes it and it loses its status, I guess there is an argument that, well, any profits made thereafter are no longer trade secret profits and they are exempt from the damages calculation.

MR. GERBER:  Well, they can always get a reasonable royalty if lost profit -- actual damages based on lost profit or unjust enrichment can't be determined.  They can seek a reasonable royalty --

THE COURT:  That reasonable royalty might be cut off. Once that trade secret became published and lost its status of trade secret, your royalty rate stops at that point, I would think.

MR. GERBER:  Well, if you're suing the party that disclosed or used the trade secret information -- took and

disclosed the information, they can seek all their lost profits.

But the problem is is that individual is not the counterclaim defendant and the company he worked for is not the counterclaim defendant.  They are suing two other parties that didn't employ this individual and didn't file those patents in China.

THE COURT:  And their liability is based on alleged notice of the unlawful status of the information.

MR. GERBER:  What they are saying, Your Honor, is in 2018, when Mr. Bin Wang was deposed, that put these two entities on notice that information that was in these Chinese patents from two years prior in 2016 was improperly acquired. And so any use of those purported trade secrets at that point was wrongful.

The problem is the information which they are claiming is a secret had been published in six Chinese patents in 2016 according to their allegations.

THE COURT:  By their discovery, it already had been published.  No longer was a trade secret.

MR. GERBER:  The trade secret status was extinguished two years prior with the publication that occurred from other individuals not before the Court.  They are suing the wrong people.  There's no -- they are not the counterclaimants here.

So that's the problem with the DTSA claim.

**THE COURT:**  I understand.

What's your response?

**MR. JOHNSON:**  First of all, the *Attia* decision should be read very narrowly.  It only applies to Defend Trade Secret Act cases and it only applies in a circumstance where the disclosure happened.  I think the patenting happened in that case in 2012.  The judge that heard that case, who I believe is in Oakland, was very clear in both opinions because it originally came up in a RICO decision, but then it came up -- actually, the plaintiff essentially conceded to the result so that they could take it up on appeal.

But the bottom line is, it's a Defend Trade Secret Act specific kind of argument, which is if a patent was published in 2012, you can't sue under it, a statute that was only enacted in 2016.

In this case several of these patents were published after the enactment of the Defend Trade Secret Act.

But I want to back up and --

**THE COURT:**  Well, it's not just the enactment of the -- I mean, even if you were to sue some other -- under, you know, local law, state trade secret law, it's the same theory.

I mean, once it's disclosed under any trade secret law it's no longer a trade secret.  And if the theory is liability arose after the deposition, which occurred after the disclosure, that's the problem.

**MR. JOHNSON:**  That's the issue.  If you don't believe that there is any conspiracy going on here --

**THE COURT:**  Well, that's the other theory.

**MR. JOHNSON:**  -- A.

And, B, you know, under state law, you're not allowed -- under well-established state law trade secret law you're not allowed to steal somebody's trade secrets, publish them or be part of the group that publishes them and then say, oh, that -- there wasn't a trade secret.

**MR. GERBER:**  The thing is, Your Honor, their allegations make very clear that these aren't the entities that, quote, stole the trade secrets.

They allege that Bin Wang was employed by uCloud Shenzhen. That is not -- that entity is not before the Court as a counterclaim defendant.  It's a separate corporate entity that's not before the Court.

**THE COURT:**  Who is alleged to be part of the conspiracy under the -- the basic conspiracy?

**MR. JOHNSON:**  Certainly.

Where I started my argument about the cutting and pasting from our documents that found their way into the patent application, that -- the owner or the inventors, claimed inventor on that is a gentleman by the name Gao Wen.  He is the CEO of Hong Kong uCloudlink Network Technology Limited, one of the parties to this case.

We think --

**THE COURT:**  So that's the hook into uCloudlink.

**MR. JOHNSON:**  Yeah.

**THE COURT:**  As a co-conspirator.

**MR. JOHNSON:**  Correct.

I also want to dispel one myth that hasn't been dispelled yet, which is that our trade secret claim relates only to the six patent applications.  It doesn't.

**MR. GERBER:**  Well, the allegations say otherwise and we have to look at the allegations, Your Honor.  It says right here in Paragraph 125 and Paragraph 126, it says:

"Counter defendants manufacture, offer for sale products in the United States that embody the" -- in initial caps -- "Bin Patents and, therefore, are based at least in part on SkyRoam's trade secrets."

They go on to say in Paragraph 126:

"Counter defendants manufacture, offer for sale and sell the products that embody the, quote, Bin Patents is ongoing."

Their claim for trade secrets violation is based on information that was published in patents in 2016 in China. The ongoing use, which is the basis of their trade secrets claim, is based on information that's no longer a secret.  It was published years prior.

**THE COURT:**  Well, all right.  But on the basic

conspiracy theory that Wang Bin worked at Skyroam for a short time and then shortly after leaving, he was interviewed by uCloudlink in Hong Kong and uCloudlink Shenzhen hired him.  And then, I guess within a reasonable time thereafter, that's when the -- they're named.  He and the uCloudlink CEO were then named as co-inventors on a patent that, at least as alleged, was a cut and paste.

Why isn't that enough at least to raise a fair inference of some -- of an agreement?

**MR. GERBER:**  Sure.  It's a fair question, Your Honor, and let me walk through a little bit of the timeline so you understand their theory as alleged and why it doesn't meet the standard under the law for conspiracy.

They allege that because Mr. Bin Wang worked at Huawei where some other executives worked, that automatically assumes there is something nefarious going on.  There is 180,000 employees at Huawei.  Okay?  So put that side.

They say they sent them to Skyroam Shenzhen to -- for a few months.  But they specifically allege that Mr. Bin Wang, who is a system architect in the months that he was there, he's the one who invented the trade secrets that they allege he then stole.  They -- they say he's deeply involved in the creation of the trade secrets.  It's throughout their pleading.

So what they are saying is that he -- they literally -- their theory of conspiracy is we're going to send someone to a

competitor, have him create trade secrets for them, and then leave, and then two years later file a patent application in China that uses the same information.

It makes no sense.  Who would send someone to a competitor to create the very information --

**THE COURT:**  Sending Bin Wang to Skyroam was part of the conspiracy?

**MR. GERBER:**  That's what they allege.

But they say here in Paragraph 93:

"Wang Bin was substantially involved in creating the solutions and the trade secrets."

In Paragraph 94 they say:

"Wang Bin was highly involved in the conception and attempted implementation."

They say that he drafted the key documents that he stole.

So the concept, the idea that simply because they worked at Huawei together and then this system architect joins this company where he then creates the trade secrets, that they claim he then went back to steal two years later is just not plausible.

Why would you -- why wouldn't you just bring him into your company and have him create the trade secrets for you instead of going there to invent the very information that your conspiracy allegedly stole.

**THE COURT:**  You say two years.  When was he --

**MR. GERBER:**  He was at Skyroam Shenzhen from April of 2013 to August 20, 2013.

The patents were filed starting in, I believe, the first one in January of 2016.

So, you know, two -- more than two years later he files a patent application.  And they say simply because the CEO is a co-inventor on the patent, that means that he must have been conspiring with this multi-year conspiracy.

**THE COURT:**  Okay.  So what about this gap in time?  If it all was proximate in time, as soon as he left Skyroam with the goods and met with the CEO at uCloudlink and then shortly thereafter they -- they used the appropriated information to file a patent, but when there is a two-and-a-half year gap, a little harder to infer a conspiracy there.

**MR. JOHNSON:**  It's not a two-and-a-half year gap, Your Honor.  The dates -- there is a mistake in the controlling.  The dates that are being referred to are the dates that the patent was published.  In China a patent is published 18 months after it's filed.  So you have to take the timeline back 18 months.  So counsel is mistaken about that.

**THE COURT:**  Does the Complaint have the filing date?

**MR. JOHNSON:**  It has the publication dates.

**THE COURT:**  It doesn't have a filing date?

**MR. JOHNSON:**  No.  I mean, we could certainly address

that if Your Honor --

**THE COURT:**  What you're telling me is it seems significant, but it's not in here.

**MR. GERBER:**  Not only that, Your Honor.  They need to do more than just simply say the CEO was a co-inventor of the patents.

They need to allege that the CEO knew that there was wrongful conduct and that he took an act in furtherance of a conspiracy and there is no allegations of that.

In fact, what they allege is the opposite.  They say that the company had no idea until 2018 that he stole the information.  They didn't know until he was deposed, which contradicts the whole notion that simply because your name is on a patent application, that means you must have been part of some criminal enterprise or a criminal conspiracy.

If that was the case, then that would open up anybody who co-invents a patent to a conspiracy allegation.

**THE COURT:**  Well, I'm going to grant the Motion to Dismiss with leave to amend.  There's some stuff you're going to have to do to make a better inference.  You've got to identify who the conspirators were and not just, you know, lump everybody together and then have to say -- you have to allege, consistent with Rule 11, that there was -- each of those persons intended and knowingly engaged in an agreement to do -- what was the agreement?  Was it -- at what point did that

start?  Did it start when Wang Bin first went to Skyroam?  Was it already a pre-planned thing or did it happen after he left and he was able to get ahold of this stuff and he said, "Let's use it."

You're going to have to, you know, allege wrongdoing; that the co-conspirators knew that this was wrongly obtained trade secrets.  The usual things that -- all the elements of a conspiracy.

I think it is a problem.  You can try and get around it.  I'm not sure how with respect to the timing that -- the fact that use -- to the extent that the misappropriation is based on continued use after disclosure as a result of the deposition, if the -- if the -- it there has already been disclosure and it's no longer a trade secret, a remedy may not lie as to that defendant.

I mean, obviously, those who originally took it may be liable, but I do think that may be problematic and I don't know if you want to continue down that road.  But you have the basic conspiracy theory, but you're going to have to enhance that.

MR. JOHNSON:  Okay.

THE COURT:  So 30 days?  How much time do you need?

MR. JOHNSON:  Well, Your Honor, I'm thinking the problem is that the Southern District of New York case is going to trial on, I believe, May 1st now.  So a little more time than that.

And, also, the reason is we're -- I haven't looked at what you guys sent over yesterday, but we're still in this jurisdictional discovery. And so it may be that an amendment will be -- we may be asking you to reconsider based on what we're finding out in discovery on the other parties as well. So seems like we should handle all that together, if possible.

MR. DAVIS: And there is a third reason. We'll be seeking to amend at least our answer in part to a certain inequitable conduct defense to the patent allegations that they have made.

THE COURT: So what does that mean? Where does that leave you, 60 days?

MR. GERBER: I think 45.

MR. JOHNSON: Why don't we just say 60?

THE COURT: All right, 60 days.

MR. GERBER: Thank you, Your Honor.

THE COURT: Do we have it for further status at some point, a control date?

MR. JOHNSON: I don't believe we have a further status set at this time, Your Honor.

THE COURT: Yeah. I would like to set some control date. We may end up not using it. We may end up consolidating it with a hearing if there is yet another Motion to Dismiss. But if we set something 90 days out, we can always move it back and forth.

So we will give you a date here.

THE CLERK:  July 18th, Your Honor.

THE COURT:  All right.  July 18th.

MR. GERBER:  That's fine, Your Honor.

MR. JOHNSON:  I hesitate, Your Honor.  If I could get maybe another week?  That happens to be my daughter's birthday and I have family coming in from out of the country for that.

THE COURT:  Oh, glad you remembered that at least.

MR. DAVIS:  Well, she's only two.  I have family coming in from Taiwan so I need to handle that date.

THE COURT:  All right.

MR. DAVIS:  So if we could get another day or few days after, that would be much appreciated.

THE CLERK:  July 11th?

MR. DAVIS:  That's fine.

THE COURT:  That works.

MR. GERBER:  That's fine, Your Honor.

THE COURT:  All right.  July 11th.

MR. GERBER:  What time?

THE COURT:  10:30.  All right?  See you then.

MR. GERBER:  Thank you, Your Honor.

MR. JOHNSON:  Thank you, Your Honor.

(Proceedings adjourned.)

*Debra L. Pas, CSR, RPR, RMR, CRR*
*Official Reporter - U.S. District Court - San Francisco*
*(415) 431-1477*

## CERTIFICATE OF OFFICIAL REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Tuesday, April 30, 2019