**Pages 1 - 36**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

HONG KONG UCLOUDLINK NETWORK    )
TECHNOLOGY LIMITED, et al.,     )
                                )
          Plaintiffs,           )
                                )
   VS.                          )    **NO. C 18-05031-EMC**
                                )
SIMO HOLDINGS, INC., et al.,    )
                                )
          Defendants.           )
                                )

San Francisco, California
Tuesday, September 3, 2019

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

          MORGAN, LEWIS & BOCKIUS LLP
          2049 Century Park East - Suite 700
          Los Angeles, California  90067
     **BY:  SETH M. GERBER, ATTORNEY AT LAW**
          **STEPHANIE L. ROBERTS, ATTORNEY AT LAW**


For Defendants:

          K&L GATES LLP
          Four Embarcadero Center - Suite 1200
          San Francisco, California  94111
     **BY:  HAROLD H. DAVIS, JR., ATTORNEY AT LAW**
          **PETER E. SOSKIN, ATTORNEY AT LAW**
          **GINA A. JENERO, ATTORNEY AT LAW**




Reported By:       Marla F. Knox, RPR, CRR
                   Official Reporter

<u>Tuesday - September 3, 2019</u>                    <u>1:39 p.m.</u>

                    P R O C E E D I N G S

                         ---000---

        THE CLERK:  Calling Civil Action 18-5031, Hong Kong uCloudlink Network Technology, et al. versus SIMO.

    Counsel, please approach the podium and state your appearances for the record.

        MR. GERBER:  Good morning, Your Honor, Seth Gerber and Stephanie Roberts on behalf of the Plaintiff and Counterclaim Defendants.

        THE COURT:  All right.  Thank you, Mr. Gerber.

        MR. DAVIS:  Good afternoon, Your Honor, Harold Davis for the SIMO Defendants.  With me today is Ms. Gina Jenero and Mr. Peter Soskin.

    In accordance with your local rules, Ms. Jenero is going to be handling the motion to dismiss for our side.  She is a fourth-year associate but has substantial trial experience including handling the vast majority of our case in chief in the New York action.

        THE COURT:  Good.  Thank you.  Welcome.

    All right.  As I understand it, the Counterclaimant's theory of conspiracy was that Gao Wen directed Wang Bin to leave Huawei to join Skyroam and really sort of plant himself as a -- I won't say spy -- but gather a bit of information, correct?

MS. JENERO:  That is one of our allegations, Your Honor.  That's correct.

THE COURT:  Well, is there another allegation of a conspiracy?

MS. JENERO:  Well, yes, Your Honor.  You had asked at the last hearing when exactly the conspiracy was formed.

THE COURT:  Yep.

MS. JENERO:  I believe that we plausibly allege facts that support two theories.  The first is what Your Honor just articulated; that the conspiracy was formed when both Gao Wen and Wang Bin and additional employees -- that now work at uCloudlink -- worked at Huawei.

Alternatively, Your Honor, under an additional theory, it could be at the time at which Wang Bin worked for Skyroam, he knew that he was getting access to Skyroam's most core technology as the chief architect there.  And subsequently upon his return to his buddies from Huawei at the uCloudlink entity, he came to an agreement to further the conspiracy because those former Huawei employees, who now worked and formed uCloudlink including Gao Wen, knew that he had the very information that uCloudlink needed in order to get a product to the market.

THE COURT:  So I thought that theory was no longer asserted.  The theory of -- that the conspiracy was formed after Wang Bin left Skyroam to join his buddies again, that's when an agreement was formed to then take that information and

utilize the trade secrets.

**MS. JENERO:**  We would espouse both theories, Your Honor.

**THE COURT:**  Where -- is that in the counterclaim, the current --

**MS. JENERO:**  It is, Your Honor.  If you look, for example, at -- so the former allegations that Wang Bin left Huawei to join Skyroam in 2013 at the direction of uCloudlink's CEO Gao Wen -- you see that at paragraphs 165 and 174.  There is additional information at paragraph 134 relating to the coinventing of the patent applications by Gao Wen and Wang Bin.

You see in that paragraph you have uCloudlink Hong Kong and uCloudlink Shenzhen employees conferring over technical disclosures related to the very patent -- very trade secrets that Wang Bin stole from Skyroam during his employment as chief architect.  And at that point the -- all of the entities, the uCloudlink Shenzhen and uCloudlink Hong Kong entities, we allege, came to the agreement that in order to further the business of uCloudlink and to put a competitive product on the market, which uCloudlink had not been able to do prior to that point, that's when the agreement was reached in furtherance of the conspiracy.

**THE COURT:**  Where is the paragraph alleging that agreement?

**MS. JENERO:**  It doesn't explicitly use the term

"agreement," Your Honor.  It does state that that is where the technical disclosure was discussed between employees of multiple uCloudlink entities.  That is paragraph 134.

THE COURT:  Well -- subheading F, Counter-Defendants conspiracy with Wang Bin, starts at 159, now only encompasses the 165 through 167, et cetera; and it does not allege as part of the conspiracy sort of having originated prior to his leaving.

It says at the direction he left Huawei early 2013 to join -- Huawei to join Skyroam.  I don't see any other allegation of conspiracy in that subheading.  So I had the impression that that provision -- that second theory of conspiracy was no longer at issue.

MS. JENERO:  I would contend, Your Honor, that while it is not in that particular section, if you take a look at paragraphs 154 and 155, which explicitly list out the questions to which Mr. Wang Bin pled the Fifth in his deposition, you will see much of the activity around the 2013 timeframe that goes to the core of the dispute as to whether Wang Bin was, in fact, acting as in furtherance of the conspiracy.

We are at the plausibility phase, right, Your Honor.  So if we take those answers as inferences to show that there were others who he is protecting on behalf of uCloudlink entities and that he was furthering the uCloudlink business purpose at that time, then we see actually what is happening here is

Skyroam is being punished for Wang Bin pleading the Fifth instead of taking these allegations or these responses for what they should be worth. And, that is, that he could not respond to answer these questions regarding his activity in the 2013 timeframe.

THE COURT: What I don't understand is why isn't it alleged as part of the conspiracy under the subheading Counter-Defendants conspiracy with Wang Bin? I mean, when did it start? Did it start as he was leaving Skyroam? Did it start after he left? I mean -- I mean, the theory that is alleged in part F is very clear. It started in early 2013 when he was directed to join Skyroam in advance. If that's not the theory, what is the timeframe for the second theory?

MS. JENERO: I would say that is also the timeframe for the second theory given that he left Huawei in 2013 and also joined the Skyroam Shenzhen entity shortly thereafter.

So he was only at the Skyroam Shenzhen entity for four months. He returned to uCloudlink shortly thereafter with all of the Skyroam information. So the conspiracy did still start at that time, Your Honor. The question is more so whether Wang Bin was sufficiently related to the uCloudlink entity at that time, and I believe that his answers in response to his questions at deposition and also the subsequent authority we submitted late on Friday from the Southern District of New York case evidence that it is more than plausible that he was.

THE COURT:  But at what time would an agreement have been formed?  Under the second theory, that is the part that is not alleged here.

MS. JENERO:  I believe that goes back to paragraph 134, Your Honor; and that's when there was a meeting of the minds in their patent evaluation conversation between individuals on behalf of uCloudlink Hong Kong -- that is Gao Wen, the Chief Executive Officer.  We also have David Du listed on that e-mail.  He is the Chief Operating Officer of uCloudlink Hong Kong.  He also, Your Honor, has ties to uCloudlink America that are indisputable given that he signed the very patent assignment agreement that gives uCloudlink America jurisdiction to bring its patent infringement claims in this Court that is before the Court today.  You also have Wang Bin who was an employee of uCloudlink Shenzhen at that conference.

THE COURT:  Counsel, what is your response to what is at issue here?

MR. GERBER:  Thank you, Your Honor.  First of all, I appreciate the question of when was an agreement formed to enter into a conspiracy.  I don't think there is any factual allegation here at paragraph 134 that addresses events in October of 2015 that indicates there was an agreement to enter into a conspiracy, any act in furtherance of a conspiracy, anything of the sort.  All this paragraph discusses was a

patent evaluation conference.  There is no facts indicating that Wen Gao or anyone else knew that Wang Bin years before had downloaded onto a USB device and then downloaded onto his personal computer documents from Skyroam.

There is a lot of blurring in this second amended complaint on the dates because one of the things that we talked about at the last hearing, I believe, in April was, how is it plausible that Gao Wen left in 2011 Huawei to form uCloudlink and then two years later -- there is a two-year delay before Wang Bin leaves Huawei to join Skyroam -- that two-year delay led to a lot of discourse at the last hearing.  And there is an attempt in this second amended counterclaim to blur these dates.

If you look at paragraph 183, for example, it states in short Wang Bin worked with Gao Wen and other uCloudlink founders and individual investors at Huawei, a company notorious for industrial espionage.  When Gao Wen left to start the company to directly compete with Skyroam, Wang Bin went to Skyroam.  Well, that allegation is just false and contradicted by the other allegations with respect to the timing.

Specifically, Your Honor, the complaint alleges elsewhere in paragraph 11 that Gao Wen left Huawei in 2011.  And then in paragraph 165 all the way at the end of the counterclaim, the second amended counterclaim, they allege Wang Bin left two years later in 2013.  So the specific factual allegations,

which are dispersed by over a hundred paragraphs, show that there is a two-year gap in time; but in paragraph 183 they try and construct this conspiracy by saying, Well, they left at the same time.  One left to go to Skyroam and one left to go to create this competitor.  That is just false.

I think the allegations in 174 that there was a conspiracy, it is all conclusory.  The fact that when Wang Bin took the Fifth and refused to answer questions, that doesn't mean that everything that they asked in the question is true.  There are no facts indicating an agreement to enter into a conspiracy when this individual left two years after Gao Wen to join Skyroam.

They claim today that they were buddies.  There is no allegation they were buddies.  There is an allegation that they had -- it was an acquaintance.  They knew each other.  It doesn't mean they worked together.  It doesn't mean they were friends.  It doesn't mean they sat down and broke bread together.  They knew each other.  There is a hundred plus thousand people that work at Huawei.  So the mere fact that they both worked for the same company and left with a two-year time span doesn't indicate any conspiracy.

**THE COURT:**  That goes to the question of whether there is a plausible allegation of a conspiracy as it is alleged.  My first question is:  Is there another conspiracy claim alleged that does not hinge on a -- sort of a premade plan to plant

Wang Bin in Skyroam back in 2013?  That's where I'm asking -- I will get to the question of plausibility.  I thought this counterclaim had been amended to make clear that there was only one conspiracy theory.

MR. GERBER:  Well, I don't see any agreement -- any facts indicating an agreement to enter into a conspiracy.  They try and build a conspiracy based off of making these illogical arguments.  For example, they say, Well, uCloudlink must have conspired with Wang Bin because they went to market with a product just a few months after he joined the company.

Well, he was only at Skyroam for a few months as well.  He joined in April of 2013 and left in August of 2013.  And in those four months, Skyroam, which had been founded in 2008, finally developed a product which they went to market in 2013.  That's all in paragraphs 11, 12, paragraph 112 and 87, 88.

So in those four months he was at Skyroam, he authored the very documents they claim he then stole.  As we go back to their plausibility issue, they claim that there was a conspiracy to send him there to create the trade secrets he then stole; and they say, Well, he must have conspired because once he joined the new company, they went to market so quickly.  Well, they also went to product within a matter of months when he joined Skyroam.  So the mere fact that this individual, who was able to author the documents for them, came to this new company and authored documents, that doesn't indicate -- in and

of itself -- that there was some agreement to engage in wrongdoing.

THE COURT:  Again, that goes to your questioning of the plausibility of the conspiracy as it is alleged in paragraph 165, et al. *et seq.*

My question is -- I'm now hearing from counsel that they have not given up the claim that the conspiracy formed after Wang Bin left the company and joined uCloud after he left Skyroam.

MR. GERBER:  Well, I'm not seeing that in their actual allegations.  I think the paragraph that Counsel directed us to in paragraph 134, it just states:  On October 23, 2015, several uCloudlink employees including Gao Wen and Wang Bin participated in a patent evaluation conference discussing the contents of proposed patent application.

It goes on to state:  This e-mail exchange makes it clear that it was Wang Bin who was responsible for drafting the patent applications related to the very same technology he worked on at Skyroam with other Skyroam engineers while employed by uCloudlink Shenzhen.

That's all the paragraph says.  There is nothing factual in there indicating that simply because he authored a patent application that Gao Wen or anyone else at uCloudlink had any knowledge that he had engaged in wrongdoing.

MS. JENERO:  Your Honor, if I may, there are other

paragraphs -- I think we have to take this in and put it all into context.  It is not that paragraph in and of itself.  If we look at the circumstantial evidence, which we know is sufficient at this stage, under the plausibility standard, because we also know that at times courts find -- grant motions for summary judgment of misappropriation based entirely on circumstantial evidence.

If we look at the rest of the circumstantial evidence, we have Wang Bin invoking the Fifth Amendment when asked if others were involved in his efforts to take Skyroam's trade secrets at paragraph 154.  We do have the fact that uCloudlink couldn't get a competitive product off the ground until after Wang Bin joined uCloudlink after having worked at Skyroam as the chief architect.

And I want to correct something that Counsel said.  The brevity of his time there is in no way indicative of the amount of information he was able to procure given that the documents that he produced as a part of the Southern District of New York show the extensive information he was able to gather during that time from SIMO.

**THE COURT:**  That all goes to the plausibility of the conspiracy as it is alleged in part F.  I'm still trying to figure out exactly whether there is a second backup theory, a plan B theory; that is, if there was not a conspiracy while Wang Bin was at Skyroam but only formed after he left, took the

stuff with him and then -- you know, I don't know when that second theory of conspiracy would have begun.

**MS. JENERO:**  It would have begun, Your Honor, upon his employment at uCloudlink when uCloudlink became aware that he had previously worked at its only competitor and when uCloudlink knew that he would have in his possession unique information that goes to the heart of the trade secrets here.

**THE COURT:**  Did he already have that information in his possession by the time he started uCloudlink?

**MS. JENURO:**  He did, Your Honor.

**THE COURT:**  So the conspiracy would have started after he had already taken it from -- it is really a conspiracy then to use stolen trade secrets, not a conspiracy to steal trade secrets?

**MS. JENERO:**  It would be a conspiracy to both disclose and use the trade secrets, Your Honor.

**THE COURT:**  And where -- and that is by implication. It is not expressly alleged there was an agreement?

**MS. JENERO:**  That's right, Your Honor.  There is a lot of circumstantial evidence that shows that what uCloudlink was doing with Wang Bin once he joined their company was intending to hide the fact that he had this knowledge.  For example, they hid him as a member of the maintenance department.  They added Gao Wen onto patent applications who is the chief executive officer of uCloudlink Hong Kong.  Gao Wen purported to -- at

his deposition stated that Wang Bin had absolutely no involvement in the research and development and technical side of the case.  And then when we plopped the patents on which he was a co-inventor in front of him, he suddenly had a different answer.  So there is a lot of concealment going on subsequent to Wang Bin joining uCloudlink that at least rises to the level of more than sheer possibility that there was a conspiracy going on between these entities.

**MR. GERBER:**  Your Honor, I don't see how it is concealment when we put the individual's name on a patent application when we filed for patent protection in China.  That seems like disclosure to me.  If they were going to conceal his involvement in developing these technologies, why would you list him on the patent application?  So their theory -- that you are hearing for the very first time, which I'm not seeing alleged -- is not -- it is contradicted by what happened.

They filed a patent application with Wang Bin's -- they filed six patent applications with the individual's name on it.  So how does that show concealment?  It was publicly disclosed.  So they were on constructive notice as soon as those were published that this individual was involved in the development of the technology they claim was stolen.  That is not concealment.  And, in fact, what that indicates, Your Honor, is that they never reached an agreement to do anything improper with this individual because why would you include his name on

the patent application?  You would only do that if you thought it was all developed independently and without any impropriety.

They did not know, until his deposition in November of 2018, of these circumstances.  In fact, their allegations claim that they were on notice for the very first time in November 2018 when his deposition was taken, and he started pleading the Fifth.  The first deposition was suspended so he could obtain his own counsel.  Obviously there were issues, and he refused to answer questions.

The fact that you put the individual on a patent application doesn't show you secretly conspired with him.  Why would you expose that in a publicly filed document once, twice, three times, four, five, six times?  That is not hiding it.

**THE COURT:**  So what is the allegation that shows this second theory of conspiracy starting at the time that Wang Bin started working for uCloudlink?  Where in here is there some allegation at that point of -- in agreement to take -- to knowingly employ and disclose and utilize stolen trade secret information?

**MS. JENERO:**  So that allegation -- there is not direct evidence of that in the second amended complaint, Your Honor; but there is, again, the circumstantial evidence that I have pointed to.

And I think primarily what we have going on here is the meeting of the minds at that meeting in October of 2015.  And

if you know that your current employee was formerly a chief architect; you know that he suddenly has information within his purview that he did not have prior to joining uCloudlink, I think we can make the inference that that information came from his employment at Skyroam.

Again, Your Honor, the fact that we are having this debate here -- only in my mind -- would tend to suggest that there is a factual dispute to which we are entitled discovery in this case.

THE COURT:  Except *Twombly* makes it clear under the rules of pleading that -- at least with respect to a conspiracy claim, you have to allege more of the facts that are consistent with the conspiracy.  You have to allege enough of a plausible inference that there was, in fact, a conspiracy here.  And I -- so far it seems to be based primarily on his answers in taking the Fifth in a deposition.

I don't see -- there is not even express allegation of an agreement, what was known.  It is all based on inferences which could easily be drawn as an inference in the other direction. You know, it wasn't known to uCloudlink that what he was employing and bringing to the table was stolen trade secret information in until his deposition.

MS. JENERO:  We would contend, Your Honor, that especially in light of the supplemental authority filed with respect to the Southern District of New York case, there is no

dispute that what occurred here was that Wang Bin was working to facilitate the goals of uCloudlink as a broader entity; and -- I'm not sure if you had a chance to look at that -- but the court in the Southern District of New York at page 8 references the jury's finding of willfulness saying that it is not so that SIMO did not produce evidence that any of the bad acts allegedly undertaken by Mr. Bin were done with the knowledge or direction or even for the benefit of uCloudlink.

If you turn to page 9, the jury was permitted, though not required, to draw an adverse inference from these refusals to answer; and the jury found willfulness which means that the jury was instructed that even it didn't have to hold Wang Bin's refusal to answer against uCloudlink if they found he was sufficiently associated -- and those are the words of Judge Rakoff -- the jury should find willfulness. The jury there found willfulness.

I will remind, Your Honor, that the only two parties that were on behalf of uCloudlink in that case are the same parties we are dealing with here, uCloudlink America and uCloudlink Hong Kong.

So the jury in that case found that Wang Bin's activities were at the direction of or that he was sufficiently associated with uCloudlink Hong Kong and uCloudlink America.

THE COURT: Sufficiently associated, is that the same as conspiracy?

**MS. JENERO:**  I would say, Your Honor, that it is because in order for a conspiracy theory to carry the day, you have to show that there were wrongful acts taken in furtherance of the conspiracy, right.

So if he is sufficiently associated with the two entities against whom we make our trade secret allegations here, then those entities had knowledge of the wrongdoing and he was furthering that purpose.

**THE COURT:**  What is your response to the Judge Rakoff's comments and what happened in Southern District of New York?

**MR. GERBER:**  Well, I think only the jury knows why they rendered their finding of willfulness.

**THE COURT:**  Could that finding be made in a way that doesn't imply a conspiracy?

**MR. GERBER:**  Absolutely.

**THE COURT:**  Why don't you explain that.

**MR. GERBER:**  Well, willfulness just shows -- and I will confess.  I'm not a patent litigator.  That is a patent case, first of all.  And they tried to inject, you know, Wang Bin allegations into the patent case, and I'm a bit confused as to the overlap as to what they now contend is a patent.  Are they contending that everything he stole had to do with patents or are they contending here that it's trade secrets?  And now they filed this case in China that they didn't disclose to

Your Honor after the last hearing. So they have got three different jurisdictions where they are just trying to throw Wang Bin in every single case from here to Shenzhen.

The fact of the matter is sufficiently associated under this law is not necessarily the same allegation with respect to willfulness on patent infringement as the elements in California to establish a conspiracy where you need to show an agreement to enter into the conspiracy, some act in furtherance of that conspiracy. You don't need to show an agreement in order to show willful conduct for patent infringement purposes in New York.

I don't think it is the same thing. I'm a bit perplexed, and I don't think they are very clear in their allegations. Are they now claiming that everything he stole had to do with their patent technology or is it their trade secret technology?

It's just to me -- this is an effort to inject something prejudicial in three different jurisdictions in two different countries. But we are here on this case under the DTSA and under California's Uniform Trade Secret Act trying to determine whether they have a plausible claim. There is no factual allegation of an agreement to enter into a conspiracy, and it is just simply not plausible that two years after Gao Wen leaves that he was directing the conduct of Wang Bin. There is no factual evidence indicating that Gao Wen knew that Wang Bin had downloaded things onto a personal computer years before.

There is nothing in there.  Paragraph 134 doesn't say it, and their other theories are simply not plausible.

THE COURT:  Is uCloud's liability under the cause of action here, which is the trade secret violation, DTSA, does that require a conspiracy?  Can that be found just whether there was an agreement or not, whether they knowingly used -- if they knew this was a trade secret?

MR. GERBER:  Yes.  You don't need to establish a conspiracy to show that there was misappropriation, but the problem that they face here -- and there is a number of legal problems.  First of all, some of the conduct occurred before the DTSA was even enacted.  It was enacted on May 11, 2016.  And two of the six patents were published in, I believe, January of 2016.  So some of the conduct isn't even covered by the DTSA.

They also have an extra territorial problem with both the DTSA and CUTSA.  We have a situation where all of the conduct here -- the taking, the use and the disclosure -- all occurred in China.  This is unlike a situation where someone works for a California company and hops on an airplane with a USB device and takes it to China and competes improperly in China.  That was one of the scenarios or hypotheticals that led to the enactment of the DTSA.  That is why they put in place the ex parte seizure order notion; that you could seize someone's USB as they are about to board the flight to go overseas.  The DTSA

does not cover conduct that occurs entirely overseas.  There was no amendment to 18 U.S.C. 1837.  It is clear that --

THE COURT:  Isn't there an allegation that products were sold -- some of the products were sold in the United States?

MR. GERBER:  Right.  That goes back to their continuing use theory.  Their argument is that -- and you address that in your first court order, Your Honor; that there was misappropriation once Hong Kong -- uCloudlink Hong Kong and uCloudlink America were selling the products in the United States.  Those are not the entities that employed Wang Bin.  UCloudlink Shenzhen employed Wang Bin.

When these American -- when these two entities sold products in the U.S., they said, Well, that is a continuing use.  The problem they have there, which we addressed in the first hearing, Your Honor, and as you mentioned in your court order, is that there is no facts -- there are no facts indicating that either of those two entities had knowledge that the information was improperly acquired by Wang Bin, which is an element to establish misappropriation; and that the only time they were on notice of any potential impropriety was when Wang Bin was deposed and pled the Fifth on November 7, 2018.  At that point all six patents had long been published in 2016 in China.

So under the law that you cited in your order, and we

mentioned at the last hearing, once those trade secrets are allegedly published in Chinese patents, it is no longer a secret. And the cases are *Underwriter Storage versus U.S. Rubber*, 371 F.2d 950; *Etienne versus Google*, 2019 Westlaw --

THE COURT: So the question is whether or not there was any sufficient allegation of knowledge in advance of that deposition?

MR. GERBER: That's right. And there is no facts alleged that anyone at uCloudlink Hong Kong or uCloudlink America knew of any impropriety prior to his deposition in November 2018 when he pled the Fifth, got his own lawyer and so forth.

In addition, you have the fact that two of the patents were prior to the DTSA. This is not a situation where -- other than that one with the sale, there is no other conduct that occurred here in the United States; and I think that is clear when you look at the allegations in paragraph 4, paragraph 11, 9, 12, 72, 125, 129, I could go on and on; but the allegations when you parse through the various parts of the complaint show that Wang Bin worked for U -- Skyroam Shenzhen in China. Wang Bin is a Chinese citizen. He allegedly downloaded the documents in China onto a USB onto his personal computer in China. He then joined uCloudlink Shenzhen in China where he then developed the patents allegedly, which he filed in China, which institute the use and the disclosure.

So the taking, the use and the disclosure happened by a Chinese citizen from a Chinese company who went to a Chinese company with Chinese patents.  So all the conduct occurred overseas.  So they have an extraterritorial issue with both statutes here.

THE COURT:  Unless they can establish advance knowledge on the part of Hong Kong and U.S.  Why don't you address that?  Is there a particular set of paragraphs here that make an allegation?

MS. JENERO:  Sure, Your Honor.  First, I would like to say that even to the extent the knowledge wasn't obtained until November of 2018, I think there are a few fundamental problems or points that need to be corrected.

First of all, not all of the trade secret allegations here and the trade secrets themselves have necessarily been disclosed through patent applications.  Yes, we found six patent applications that purport to disclose the very trade secrets that are at issue here.  If you note in paragraph 95, Skyroam is the owner of trade secrets and confidential information relating to several types of technology, and the patents, Your Honor, we would contend, do not cover all of those buckets of technology.

So even assuming that as of November 2018 that is the first time that uCloudlink Hong Kong and uCloudlink America learned of this impropriety or wrongdoing, it is not fair to

say -- because it is past May 11, 2016, it is not fair to say that necessarily our trade secrets right are extinguished in their entirety.

As we learned from the *Luminati* case, Judge Gilstrap said that an act in furtherance of the offense is committed in the United States when a product is sold embodied in the trade secrets in the United States. We contend, Your Honor, that through the sale of the products -- of the uCloudlink products that are sold by uCloudlink Hong Kong and America, that act in furtherance of the misappropriation is still occurring to this day.

THE COURT: But that's where the comeback is at that point -- that was in 2018 if it was done knowingly, that there was nothing left. You say, Well, there was something left. Where do I see -- how can I discern from this counterclaim that there was some trade secrets; at that point it was knowingly used or disclosed in the process of selling to U.S. customers that had not already been disclosed by any of the six patents?

MS. JENERO: Sure. It would require, Your Honor, going through -- in the first instance going through the exhibits that are the patent disclosures and kind of walking through how those align with our trade secret allegations in paragraph 95; but more fundamentally, I think the issue is that Wang Bin could not testify as to whether the documents that he had stolen, which embodied the trade secrets, are the only

documents that he had.  So through further discovery we could learn here if there is more information that contains SIMO's trade secrets that fall into these other buckets; but without that, Your Honor, we are kind of left without information as to what else they have in their possession.

SIMO does contend that it has additional trade secrets, as alleged in paragraph 95; and I'm happy to kind of walk through the patent disclosures as compared to the buckets in paragraph 95 if that would be --

THE COURT:  Why don't you give me one example of something that is identified as a trade secret that would not have been disclosed.  Just point it to me now so I can look at it.

MS. JENERO:  Sure.  So if we look at data link management for carrier re-authentication.

THE COURT:  Yeah.

MS. JENERO:  The patents that were disclosed by Wang Bin and Gao Wen and Mr. Gong (phonetic) don't cover the entirety of the trade secrets alleged under that technology.

THE COURT:  How do I know that?

MS. JENERO:  It would require, I suppose, an analysis of the exhibits that are the patent disclosures themselves which honestly, Your Honor, I don't think I could do in the public domain.

MR. GERBER:  Your Honor, this is the first we are

hearing that there are other trade secrets other than the Bin patents that they claim the products embody.  And I would refer you specifically to paragraphs 221 and 245, for example, where they have always taken the position in both this rendition of their complaint and the prior one, that the trade secrets were all publicly disclosed in the Bin patents and the products embody the Bin patents.

Paragraph 221, for example, states:  Counter-Defendants manufacture, offers for sale and sales of the products that embody the Bin patents is ongoing.  Bin Patents being initial capped.

Paragraph 245 says:  Similarly, Counter-Defendants manufacture, offers for sale and sales of the products that embody the Bin Patents, initial cap, is ongoing.

They have always taken the position that the trade secrets were used in disclosed -- in the Bin patents -- in the products embodied in the Bin patents; and, therefore, they used the trade secrets.

Now we are hearing for the very first time -- and I don't see it alleged in any factual way in this second amended cross-complaint -- that there are some other specific trade secrets they contend are at issue.  They have always said the products embody the Bin patents, and the Bin patents relate to public disclosures.  So at this point any secrecy had been extinguished in 2016.  That's what they have done in every

rendition of this complaint.

And you were very clear in the last hearing, Your Honor, that the Rule 11 applies here.  If they are going to allege conspiracy and that our clients knew what this individual did years before with his personal computer, they had to have specific facts under Rule 11.  And they are here basically throwing a lot of stuff; still lumping together entities; still blurring the lines.  In one part they say he left to compete and he left to join Skyroam at the same time.  Other times you find out there was a two-year gap.  They have not satisfied their Rule 11 obligations, Your Honor.

**THE COURT:**  I will give you the last chance to comment.  It does seem like there is this shifting, this -- I feel like there is a bit of a whack-a-mole thing here.  We proceed on one understanding, and then I make comments to rule; and then I -- as things evolve, as the opposition evolves, we seem to get a different theory.

How do you re-conciliate what you said about paragraph 95? It doesn't say what you said.  It just lists -- there is no assertion here that there are sort of, quote, residual trade secrets not covered by the Bin patents which seems to be consistent with paragraphs 221 and 245.

**MS. JENERO:**  So paragraphs 221 and 245 state that the products embody the Bin patents.  It is not exclusionary, Your Honor.  It doesn't say that is the only information upon

which the products were created.  And I think to make that conclusion is a little bit of a leap.

But more importantly, Your Honor, this isn't the first time that we have said that there is more to the trade secrets than what was disclosed.  In fact, if you look at the transcript from the April 2019 hearing, my colleague argued just the same thing.  And even more I think fundamentally, this all started under the assumption that we would agree that uCloudlink's knowledge did not come to be of the wrongdoing until 2018, which is not a concession that we are making.  It was just an example of how this could move forward even if 2018 was the first point.

THE COURT:  Where is allegation in here other than asking the Court to look at the terms of paragraph 95 and then look at the six patents and try to discern what is left?

It seems to me the burden is on the party asserting a trade secret to identify -- especially in light of the very close inner relationship, both transactionally and subject matter that arise and everything else, between the Bin patents and the asserted trade secrets, even if you had to do it under protective order, what is an example of a trade secret that you are alleging that was taken that has not already been disclosed by one of the six patents?

MS. JENERO:  So, Your Honor, I would just go back to 95 which is where we have the listing of the different types of

trade secrets.  And the Bin patents, you know, we go through each one and state when -- first of all, when they were published and we have, I believe, attached them in order to show what the content is that they cover.

So that is --

THE COURT:  Even then, typically patents have to be construed to find out exactly what they cover and what the claim terms mean and everything else.  To expect the Court to do that sua sponte, I think, is not a realistic proposition.

It seems to me that the burden ought to be on the party making the allegation especially in light of a -- of a current allegation that the Bin patent was part of this whole transaction to show what residual -- give some examples of some residual things.  And just as a matter of notice to the other side, as a matter of fairness, you would have to, I think under these circumstances, be more specific as to what kind of trade secrets are on the table here.

MS. JENERO:  That's fair, Your Honor.  I will also note that, again, we were starting from that assumption that the knowledge was first obtained in 2018.  So even if we look at the Bin patents themselves, there was one on which Wang Bin was named an inventor that did not publish until December 7, 2016.

The DTSA was enacted in May 11 of 2016.  We know that uCloudlink America was founded within that timeframe.  There

are still products that are being imported into the United States within that timeframe that embody the trade secrets.

THE COURT:  And what paragraphs do you rely on to show that Hong Kong and U.S. entities had knowledge prior to 2019 in a deposition?  Is there something new in this amended counterclaim that suggests as opposed to Shenzhen's knowledge, U.S. and Hong Kong's knowledge?

MS. JENERO:  I think it is the facts that we went through, Your Honor, that uCloudlink initially failed to get a competitive product off the ground; and only after Wang Bin joined, after having the unique knowledge of the misappropriated trade secrets, were they able to due to his employment as the chief architect.  It is the timing and the circumstantial evidence, Your Honor, that gets us over the plausibility standard.

As I mentioned, there is case law in which circumstantial evidence allows courts to grant trade secret misappropriation motions for summary judgment, and my concern here is what is being required is for us to prove up facts without the benefit of discovery at this point.

THE COURT:  All right.  I will give you the last chance to explain why that is not a piece of circumstantial evidence from which one could infer.  It is not inexorable.  It is not clear.  It depends on a lot of factors.  I don't know whether four months is a long time or isn't a long time in this

industry.  I don't know what the preexisting knowledge was, whether there were two or three breakthrough things.  Why can't one infer that when one comes from a different company and the recipient is able to get stuff off the ground immediately, why isn't that at least a reasonable inference for purpose of 12(b)6?

MR. GERBER:  Thank you, Your Honor.  It is a very fair question and one I wanted to be able to address.  And I think Skyroam's own history with Wang Bin shows that he was able to author the very documents they claim he stole in a matter of four months.

And so when you look at the allegations in paragraphs 87 to 88, we know that SIMO was founded in 2008.  They didn't launch their virtual SIM platform until 2013.  There were many years there in between, five years before they were able to actually launch their product.

Now, we know that Wang Bin joined Skyroam Shenzhen in April of 2013, and that's in paragraphs 11, in paragraph 112.  We know that he left Skyroam Shenzhen in paragraph 12.  We know he left in August of 2013.  So Skyroam had a five-year delay before they were able to launch their virtual SIM platform, and he was only there for four months.  So the fact that he was there and was such an integral member of their team and invented, created and all --

THE COURT:  I understand that.  So it's not shocking

that somebody with that kind of talent could get things off the ground and get things moving within four months.  Therefore, it is not shocking when he went to the next company.

On the other hand, why isn't it fair, one inference, that he may have come with something a little extra the second time around?

**MR. GERBER:**  Well, because they also allege elsewhere in the complaint that there were something like 13 or 16 other people that were involved in the development of this product.  So it is not like he was the only one.  So they had a whole team of 13 or 16 people that they allege elsewhere -- 16 people.  I believe that is paragraph 6.  They allege 16 people were involved in the design.

So if there were that many people involved in the design of the product, it is not like they didn't have anything going; and then this guy shows up and they created this very sophisticated product.  They had 16 people working on this product for a very long time, and then he -- Wang Bin came in and they were able to go to launch; and that's not any different than Skyroam's experience with the individual.

So I don't think the fact that they went to launch with a product a few months after he joined is any more suspicious than what happened at Skyroam.

**THE COURT:**  Well, except he is coming from a competitor having just successfully launched a product.

**MR. GERBER:**  Came from Huawei, which is a competitor of Skyroam.

**THE COURT:**  There was no showing that he was working on something similar at Huawei that he could have taken with him to Skyroam.

**MR. GERBER:**  Right.  If you are hiring what you believe is a very talented engineer who comes in, and they say they put him together with their -- important people on his team and he helps them develop a product, that doesn't necessarily mean that he did anything wrong.

There is no factual allegation that any of the 16 team members that were at uCloudlink knew what he had downloaded onto his personal computer.  There is no evidence from the other case that he disclosed these documents to anybody else at the company or discussed them with anybody else at the company. He did this on his personal computer years before.

The fact that he helped them come to market with a product, that in and of itself, doesn't raise knowledge of impropriety.

I would also just like to go back --

**THE COURT:**  Other than him having taken those trade secrets with him, there is no affirmative evidence of disclosure or downloading onto uCloudlink's servers?

**MR. GERBER:**  I think what the evidence has shown is that he uploaded something onto the server.  There is case law,

Your Honor, that says mere possession alone is not misappropriation because of the obvious elements of you have to be aware that it was acquired by improper means and so forth.

THE COURT:  And uploading onto uCloudlink's server was soon after he arrived?

MR. GERBER:  I don't know the specifics, but I would assume that -- well, I don't want to speak out of turn.  I actually don't know when he did it.  But my understanding is the way the information migrated, it went from Skyroam Shenzhen's documents -- oh, I apologize.

I want to be clear.  Ms. Roberts informed me that it wasn't uploaded onto the server.  It was uploaded by Wang Bin onto his work computer.  I want to be very clear about that distinction because I'm not sure whether anybody else had access to his work computer as opposed to uploading something onto a shared drive on a computer -- on a server.

There is no factual allegations that anyone in the company knew that he had done that.  And so, you know, what we are hearing here today is:  Let me shift our theories again, and let us take discovery so we can come up with a trade secret to make up for the Bin patents.  But that is not the way this should proceed.

They should specifically identify the trade secrets before the lawsuit goes forward; otherwise, they hunt for information and whatever they find, they then claim is a trade secret.

We have had multiple iterations of this complaint.  They have shifted from a theory that it was all preplanned years before Wang Bin even left, and now you are hearing today a totally different theory; that once he got there, there was a conspiracy.  But what you are not seeing are any facts showing any agreement.  The mere fact that he was there for a few months, that in and of itself doesn't show any wrongdoing when you look at his experience at Skyroam.

**THE COURT:**  All right.  I'm going to take the matter under submission.

**MR. GERBER:**  Thank you, Your Honor.

**MS. JENERO:**  Thank you.

**THE COURT:**  Appreciate.  It.

**MR. DAVIS:**  Your Honor, we do have one case management issue that I want to bring to your attention.

**THE COURT:**  Yes.

**MR. DAVIS:**  Right now there is a motion to amend our answer to the patent claims, and that hearing is scheduled for October 10th.

I need to work with my co-counsel.  I may have a problem with that date.  I'm expecting my second daughter.  She will be born outside of the country.  I will be out of the country.  That may be something that gets ruled on by the papers anyway.  I just wanted to advise you while we were here.

**THE COURT:**  If you want to stipulate to a new date,

just put it in an order.

        **MR. GERBER:**  Thank you.

        **MS. JENERO:**  Thank you, Your Honor.

        **THE COURT:**  Thank you.

              ---oOo---

**CERTIFICATE OF REPORTER**

      I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Monday, September 16, 2019

_____

Marla F. Knox, RPR, CRR
U.S. Court Reporter