Pages 1 – 45

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN, JUDGE

```
HONG KONG UCLOUDLINK NETWORK TECH.  )
LTD, et al.,                         )
                                     )
            Plaintiffs,              )
  VS.                                ) NO. C 18-05031 EMC
                                     )
SIMO HOLDINGS, INC., et al.,         )
                                     )  San Francisco, California
            Defendants.             )
_____ )
```

Tuesday, February 18, 2020

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

SHEPPARD, MULLIN, RICHTER & HAMPTON
2099 Pennsylvania Avenue, N.W.
Suite 100
Washington, D.C.  20006-6801
**BY:  ROBERT M. MASTERS, ESQ.**

SHEPPARD, MULLIN, RICHTER & HAMPTON
329 Lytton Avenue
Palo Alto, California  94301-1479
**BY:  EDWARD V. ANDERSON, ESQ.**
**TREVOR J. QUIST, ESQ.**

For Defendants:

K&L GATES
70 West Madison Street
Suite 3100
Chicago, Illinois  60602-4207
**BY:  BENJAMIN E. WEED, ESQ.**
**GINA JOHNSON, ESQ.**

Reported By:  **BELLE BALL, CSR 8785, CRR, RDR**
Official Reporter, U.S. District Court
(Appearances continued, next page)

**APPEARANCES, CONTINUED**:

For Defendants:

K&L GATES
Four Embarcadero Center
Suite 1200
San Francisco, California  94111-5994
**BY:  PETER SOSKIN, ESQ.**

**Tuesday - February 18, 2020**                    **1:12 p.m.**

                     **P R O C E E D I N G S**

THE CLERK:  Calling Civil Action 18-5031, Hong Kong uCloudlink Network Technology Limited, et al. versus SIMO Holdings Inc., et al.

Counsel, please approach the podium and state your appearances for the record.

MR. ANDERSON:  Good afternoon, Your Honor.  Ed Anderson on behalf of uCloudlink.  And with me are my colleagues, Rob Masters and Trevor Quist.

MR. MASTERS:  Good afternoon, Your Honor.

MR. QUIST:  Good afternoon.

THE COURT:  Good afternoon.

MR. ANDERSON:  Trevor will be doing the tutorial this afternoon and my colleague Rob Masters will be doing the procedural matters today.

THE COURT:  Okay.  All right.  Thank you.

MR. WEED:  Good afternoon, Your Honor.  Ben Weed from K&L Gates on behalf of SIMO Holdings, Inc.  And with me at counsel table are Jeanette Gennaro Johnson and Peter Soskin.

We will similarly be dividing the presentation.  I will be doing the tutorial, and Ms. Johnson will be doing the procedural matters.

THE COURT:  Okay.  All right.  Well, why don't we start with the tutorials to help me understand the technology

here.  Do you have a PowerPoint or what's -- what is your plan?

**MR. QUIST:**  Yes, Your Honor, we have a PowerPoint as well as the printouts.

Would you like us to bring them up?

**THE COURT:**  Sure, yeah.

(Documents handed up to the Court)

**THE COURT:**  Thank you.  Do we have an extra copy for my staff?

(Documents handed up to the Court)

**THE COURT:**  Give that to Shao-Bei.

**THE CLERK:**  (Nods head)

**MR. QUIST:**  Good afternoon, Your Honor.

**THE COURT:**  Good afternoon.

**MR. QUIST:**  Make sure we're all set up here for a moment.

(Document displayed)

**MR. QUIST:**  Okay, great.  As I mentioned, I am Trevor Quist.  This is the first time that I have been before you.  I appreciate you taking the time to hear us out today.

**THE COURT:**  Certainly.

**MR. QUIST:**  So, on this first slide, we have just identified the one patent that's still at issue.  Your Honor of course knows that there was another patent also at issue in this case, earlier on, that has now been dismissed.

**THE COURT:**  Right.

**MR. QUIST:** So today's technology tutorial is just going to focus on this one single patent, the '780 patent. And at a very high level, this patent is about addressing some problems faced in mobile communication.

If we turn to the second slide, just shows a quick overview of what I want to talk about.

(Document displayed)

**MR. QUIST:** And this is actually going to be fairly quick and fairly straightforward. As a background matter I'm going to provide you some -- a short discussion of some of the limitations that are faced in the mobile communications field that this patent is directed toward improving upon.

We're going to talk a little bit about SIM cards, which I imagine you are familiar with in large part. We will talk about some of the details surrounding SIM cards and then we are going to talk about a concept called "server sharing."

The '780 patent is directed toward kind of a combination of these two technologies. In the preamble of claim 1 it mentions SIM-based service sharing. And so I'm just going to give you a demonstration of -- or I'm sorry -- a description of, at a high level, what we are dealing with with this technology.

If we move to Slide 3.

(Document displayed)

**MR. QUIST:** What you have here is just a coverage map

similar to something that you might have seen.  When you go get your cell phone at a wireless carrier, they may show you a map of the coverage zones that you can obtain cellular services through when you travel to these various locations.

This is one that I made.  It's not an actual representation of a particular service carrier.  But what you can see here is basically the yellow represents the -- the service area that your cellular provider would provide to you directly, where they have their own network equipment.

Then you have these blue regions which most people refer to them as like a roaming area, or sometimes you might have heard it called an extended service area, where your network provider doesn't necessarily have equipment infrastructure in that area but they have come to an agreement with one of the local cell providers, and when you go there, they're still able to provide you with the service, with the cellular service that you are interested in, through that other carrier with whom they have come to an agreement.

So what happens when you go beyond your own wireless carrier's coverage area and you step from one of these yellow regions into one of these blue regions?

(Document displayed)

**MR. QUIST:**  Well, that's when you start to roam. Right?  When you leave the coverage area, your cell phone still tries to get services by grabbing them from the local provider

who your carrier has agreed with.  And that is where the term "roaming" comes from.  Roaming is possible because your carrier comes to an agreement with somebody else.  It doesn't just happen spontaneously.  The premise behind it is that these two carriers have come up with a way to charge you for services by using both networks.

(Document displayed)

**MR. QUIST:**  So what is wrong with roaming?  Right? Why can't we just continue on with roaming and use that whenever we travel internationally or travel somewhere where our own carrier doesn't actually have or offer services?

Well, there's a few problems.  One is sometimes you run into limited or low-quality service areas.  So you could go to a country where you might be able to roam and get onto somebody else's network, but your carrier may have agreed -- their roaming agreement may be with somebody who offers pretty low-quality service.  And really, you would rather get service from another carrier in that area, but you're stuck.  You have got to go with whomever your carrier has agreed with.

The second problem is oftentimes it's very expensive.  You may have noticed this if you have ever gone anywhere and your phone has roamed and you needed to make a call or download data, it comes at premium.  You don't get charged what the local subscribers get charged, you get charged something much higher.  So that's another issue.

Then third, sometimes there is just no agreement in the area that you're -- that you're in.  Your wireless carrier may not have come to any agreement with any of the local wireless carriers in a particular area, and so you just may be out of luck, out of service.

(Document displayed)

**MR. QUIST:**  And so what's been done in the past oftentimes, and you may have done this yourself, is sometimes when you go to another country, and you know you are going into an area where you might be otherwise roaming, you might take two cell phones.

If you are an international businessman and you're going back and forth, back and forth to a particular country, you may just have two or three cell phones.

Another alternative is some folks, at some point years ago they sold these little SIM wallets.  You could have a SIM card, you could have SIM cards for all these different carriers, and take your wallet with you as you traveled internationally, and slip the SIM card in and out of your phone, depending on where you were.

And SIM cards, I want to discuss SIM cards in a little bit more detail.  We'll go there next.

(Document displayed)

**MR. QUIST:**  SIM cards in general -- I think everybody has a fairly -- you know, everybody understands basically what

a SIM card is.  You've seen them when you go to pick up a cell phone with Verizon or with T-Mobile.  Oftentimes the person at the retail store will just put it into your phone for you and activate your phone, but sometimes you do it yourself.

Right?  It's a little electronic chip that you put into your phone.

**THE COURT:**  Unless you have an iPhone, in which case it is impossible to put in a --

**MR. QUIST:**  Point well taken.  Agreed.  So a subscriber identification module, let's talk a little bit more about what that is.  It's an electronic chip and it basically acts like a unique ID for you.  It ties you to the subscriber.  And it gives your phone the information it needs to access a particular network.

So if you are on Verizon's network, Verizon will issue you a SIM card.  You put that into your phone and activate your phone, and you're able to access Verizon's network.

The SIM card contains a number of pieces of information that are used and communicated to the network to sort of form this handshake between the phone and the network (Indicating), before a communication can take place.  SIM cards commonly include reading and writing capabilities.

(Document displayed)

**MR. QUIST:**  On this next slide this is basically just a simple illustration.  Verizon wireless, as an example,

provides you with a SIM card; the SIM card goes into your phone.  Your phone is then able to access Verizon's network.

But the main point that I'm driving here is the service area and the services that are available to you are tied to that SIM card that's in your phone.

(Document displayed)

**MR. QUIST:**  So what exactly is it that a SIM card does?  A SIM card can provide your phone, your device, with the information it needs to authenticate you to the cellular network and to interact with the cellular network resources to obtain services.

And this point may not come through as clearly in the printed slides because it's an animation, so if you have a monitor, I would direct your attention to that momentarily.

So your cell phone initially will send this IMSI number that is stored on your SIM card to the network (Indicating).  Okay?  The network will then send an authentication prompt to your phone.  Basically like a question.  A question that if your phone answers correctly it can verify to the network: This is the right person, we should authorize this service.

So your phone will then send a response, an authentication response (Indicating).  And if it's the right response, you have yourself a communication channel established (Indicating), and you can communicate over the network.

**THE COURT:**  Remind me what "IMSI" stands for.

**MR. QUIST:**  I'm sorry, what was the question?

**THE COURT:**  IMSI?

**MR. QUIST:**  It's international mobile subscriber identification.

**THE COURT:**  Okay.

(Document displayed)

**MR. QUIST:**  And one more point there.  The IMSI number is one type of data that could be transmitted.  It could be a number of different pieces of data, depending on the network and depending on how the carrier communicates back and forth with the SIM.

So it doesn't necessarily have to be an IMSI.  That's typically what it is.

(Document displayed)

**MR. QUIST:**  So now I would like to talk about the second -- I'm sorry, the third topic, which is server sharing. I mentioned at the beginning that the '780 patent is largely about addressing a problem in mobile communication.  And that it addresses and is directed towards something called SIM-based service sharing.

So we talked about SIM cards.  Let's just talk briefly about service sharing.

In general, service sharing refers to the allocation of a first entity's subscription to a local network's cellular service to a second entity.  So if you have one entity that has

access to a local network, it's going to share those resources with --

THE COURT:  You say "entity."  What does that refer to?

MR. QUIST:  It could be a person.  It could be -- somebody who has ahold -- who's got ahold of another SIM card. Okay?  And it might be a company that is offering -- you know, that has a bunch of these SIM cards, and it's going to offer credentials to these cards so that somebody else can share in that subscription.  Okay?

(Document displayed)

MR. QUIST:  Here's an analogy for you that I think is pretty helpful.  Suppose, you know, this woman is traveling and she has access through her key.  Let's say that's your IMSI or that's your SIM card.  And she has access through that key to her car.  And she's found herself in a new area where there's new terrain that is unfamiliar to her, and where her car may not perform very well.  And so she has a couple of options.

One is she can try and traverse the mountain range with her little car there.  Or, she can seek to get ahold of some local resources there at the base of the mountain from this man here, who has access to a bunch of keys to a bunch of different cars.

So the -- the woman may say: Well, I really would like to get across these mountains as efficiently as possible.  And the

man may be able to recognize, you know, that she's here in a new location for her, the services that she has are not -- not suitable for where she's headed, and offer to provide her with a key to a more suitable mechanism for traversing the mountain, which in this case may be the Jeep.

He may say "We've got a Jeep here for you, here is the key to a Jeep.  You can use it temporarily, and then bring it back, and we will charge you for it."

Very simple analogy.  I think it's illustrative of a situation that we are dealing with in the '780 patent.

(Document displayed)

**MR. QUIST:**  So if we look right at just the title page of the '780 patent --

**THE COURT:**  Can you again, in a nutshell, explain what SIM-based service sharing, how do you define that again?

**MR. QUIST:**  So, SIM-based server sharing is -- let's go back to this slide here.

(Document displayed)

**MR. QUIST:**  Sharing local SIM card information or functionality that corresponds to a local cell network.  You are sharing that with a device that doesn't have a typical subscription to the cellular network, so that device can use the shared SIM to obtain cell services from the local wireless carrier's network as though it had a subscription.

So maybe a better way to describe this, have you ever used

a hotspot, Your Honor?

**THE COURT:** Uh-huh.

**MR. QUIST:** You are familiar with a hotspot?

**THE COURT:** Yeah.

**MR. QUIST:** A hotspot is a little device you may get it from your wireless carrier, let's just say because we've been using Verizon as an example.  We'll just continue with that.

You have a hotspot given to you from your wireless carrier, you go to another country.  Your hotspot actually has a SIM card in it that is tied to Verizon's network.  And so you find yourself in the same situation where you are really limited to just whatever Verizon is providing, and whoever their roaming partners are.

But imagine if you had a hotspot device that was instead of -- instead of being limited to a single SIM card that was inserted within it, if it could communicate with another source that had a number of SIM cards for a number of local carriers, and it could grab those credentials and simulate a -- simulate basically a phone within that local area to the local network, and get the services that it otherwise couldn't.

So you're reaching out to a different network that's outside, outside the scope of your carrier's network and their roaming partnerships.

**THE COURT:** Right.

(Document displayed)

MR. QUIST:  So here's a practical example.  You fly to China, let's say.  So your phone is over there in China, and you -- again let's say you have Verizon.  And you go over to China.  And say Verizon doesn't have service there, but you need to roam to obtain services through whomever it is that Verizon has agreed with.

But there's a problem.  The signal's bad, or it's spotty, or the connection isn't fast enough for what it is that you need to use the service for.  Or it's too expensive.  You find yourself paying way too much for the service that you are getting.

So what do you do?

(Document displayed)

MR. QUIST:  You would like to -- turning to the next slide, you would like to connect with the local carrier, the best local carrier.  Let's say that's China Telecom.  You would really like to hop onto that network.

But when you go through this exchange that we talked about earlier, your phone sends its IMSI number or other parameter to the network, and the network responds back with a prompt.  And you give a response.  Your phone -- it's the wrong response. It doesn't work.  You can't connect to that network.

(Document displayed)

MR. QUIST:  And so the '780 patent is directed in

large part to resolving this problem.  And what it involves essentially is adding another device similar to what I was describing before, like a hotspot, but more of a global hotspot that has greater capabilities.

So if you look at this slide here, it is Slide 15.  Or 16, I believe.  You have what's called an MCCID (sic).  That just stands for multi-channel communication device.  Let's say that's the rough equivalent to the hotspot we were talking earlier.

But this hotspot has some extra-special features, wherein it can communicate with what you see here on the slide, the management entity, and tell that management entity some information.  Such as the location of where they are, the services that are wanted.

And that management entity can then connect with what I'm going to call in this presentation a SIM bank.  That's some common terminology that you may have heard before.

A SIM bank, it has a bunch of SIM cards, effectively.  And the management entity can call upon that SIM bank and pull some of these details that you would typically find on the card in your phone, and pull some of those details for a carrier that can provide better services than what you are getting, let's say, from China Telecom.

And then it passes those details through the management entity to the MCCD, and then the MCCD can simulate being a

local subscriber to the network, and provide the right answers, and establish a connection between the MCCD and the right network, or the best network.  And, and then the phone, itself, that you have then just connects to that.  Just like you would typically connect to a hotspot maybe through wifi, maybe through Bluetooth.

But then you avoid this scenario where you are -- where you are roaming with higher fees for lower-quality service, and instead, what you can do is get ahold of a much better service, pay a lower rate, maybe what the locals are paying for that particular subscription, and find yourself with better service.

**THE COURT:**  So it is sort of like having a set of SIM cards in the cloud that you can sort of borrow from?

**MR. QUIST:**  That's a great way of putting it.  Yes.

**THE COURT:**  Sort of curious.  I mean, that's what I understood, but how does one get actually charged if there is no agreement between, say, Verizon, your user, and these other networks?

**MR. QUIST:**  Yeah.

**THE COURT:**  You can get access, but how do you get billed if there's no agreement?

**MR. QUIST:**  Sure.  That's a great question.  So if you look back at this slide.

(Document displayed)

**MR. QUIST:**  Where I have this management entity, this

is owned by a company.  A company who may have acquired a bunch of SIM cards and have their own subscriptions with a number of different carriers, and, and it would be a far greater scope of carriers than the folks with whom your wireless carrier have entered into a roaming agreement with.

So the charges would effectively come from whoever, whatever entity is providing this management entity.

**THE COURT:**  I see.

**MR. QUIST:**  And providing you with these other options that otherwise are not available to you.

**THE COURT:**  All right.

(Document displayed)

**MR. QUIST:**  So if you look at the '780 patent, I've just included one figure here.  Just to kind of help tie, tie together some of these elements.

So if you look at Figure 4, on the left side you see a number of -- a number of boxes with the label "43" and they are called multi-channel communication devices.  This is this MCCD that you saw in the prior, in the previous slide.

The management entity would correspond to this 41, Box 41, which is the SIM scheduling management system.  And then the SIM bank from the previous slide would correspond to these SIM card read-and-write devices.

So the examples that I have been giving earlier only showed one, but you can imagine that these MCCD devices you can

buy them, they are relatively small (Indicating), you take them with you, and folks all over the world might have these, and be connecting to the management entity who would then connect to these SIM banks who might also be located all over the world, or who could be located in the same place as the management entity, and be facilitating that connection that was missing in the art.

**THE COURT:** So you do need -- your phone alone won't do it. You need a multi-channel communication device to be part of this system in order to --

**MR. QUIST:** So it could be embodied within a phone. It doesn't necessarily have to be a separate device, but it often is a separate device.

So you could have a phone that was equipped with this technology, to communicate directly with the SIM scheduling management system and then retrieve or have the system sort of intelligently retrieve the credentials from those SIM cards that you would need to simulate that you were a local user.

And so while we have shown them separately and in the accused product --

(Document displayed)

**MR. QUIST:** -- which is what you see here, one of the accused products, it's basically, you know, an extra device. You can hold it in your hand, put it in your pocket, that you can take around with you.

Does that help answer your question?

**THE COURT:**  Yeah.  Let me ask you, No. 42, the SIM card read-and-write device, is that the bank or is that something within the bank?

(Document displayed)

**MR. QUIST:**  Yeah, I'm sorry, that is analogous to the SIM bank.  So a SIM card can be -- you know, data can be read from it and data can be written to it.

And just like you would plug a SIM card into your phone, a SIM card read-and-write device is equipped with a port wherein the SIM card is insertable into that port.

**THE COURT:**  Yeah.

**MR. QUIST:**  And so it would literally have -- in a number of embodiments, literally there would be, you know, physical SIM cards plugged into this array or box of SIMS.

**THE COURT:**  And when you plug it in there's a read-and-write process that is going on?

**MR. QUIST:**  Yes.  That's right.

**THE COURT:**  So what would it read and what would it write?

**MR. QUIST:**  Yeah.  So, so, the device itself would be reading an IMSI number or another number from that device.  Right?  And then you would have on the return path once you provide that information to the network, then the network is going to be asking a prompt.  Right?  And a lot of times that

prompt is in the form of a number.

**THE COURT:** Uh-huh.

**MR. QUIST:** Like a 128-bit number that it will say: Okay, run an algorithm with this number, or hash this number and send us the result.

And so that number would then go back, and in some cases, be written upon, or at least provided in connection with the operations of the SIM such that it would produce a result. Whatever, whatever the result is of the hashing algorithm or the authentication ciphering code, basically, that it would take the prompt, process a result and send it on back.  That's what we're referring to there.

**THE COURT:** Okay.  So the accused device is the multi-channel communication device that performs -- and the system -- and the system used to perform this function.

**MR. QUIST:** So the accused -- it's a little bit larger than that.  It's a system-level claim.  And so there's a lot going on in the background with this management entity and the SIM bank.

(Document displayed)

**MR. QUIST:** So collectively together we have what's being accused.  But I thought it was helpful to just show the MCCD elements.  you know, this is something you carry around with you.  It's not necessarily like fastened to a wall in a building.  It's something you have in your pocket.

(Document displayed)

**THE COURT:** All right.

(Document displayed)

**MR. QUIST:** So with that, you can appreciate that this is a relatively straightforward -- I think that this patent is relatively straightforward to understand. But if there are any questions that you have that I haven't answered for you, I'm happy to do so now.

**THE COURT:** The personal device, the phone, the Verizon phone communicates with the MCCD through just wifi?

**MR. QUIST:** Yeah. Could be any communication method, but typically it would be wifi, Bluetooth, any communication mechanism that your phone is able to communicate with. Typically, the idea is the MCCD has multiple communication mechanisms in it. It can comply with a number of different standards. It can communicate over 4G and 3G and Bluetooth and wifi. So it can be a little bit more universal, a little bit more versatile.

**THE COURT:** Okay. That's helpful. Thank you.

**MR. QUIST:** Great. Thank you.

(Document displayed)

**MR. WEED:** Good afternoon, Your Honor.

**THE COURT:** Good afternoon.

**MR. WEED:** I think most of what Mr. Quist just said is something we don't take much issue with. I think our

biggest problem is that in our view we need to get a little bit deeper into the '780 patent to really understand what it's about.

If we start with Slide 3 of our presentation we have just clipped the bibliographic info from the '780 patent just to illustrate its timing.  And there was a Chinese filing made in late 2013 that led to the ultimate '780 patent.  And just as kind of a benchmark or a dateline in the sand, the iPhone was released in 2007.

So this patent comes many years after the iPhone was released, and really, many years after people needed lots of data on their mobile devices, pretty much all the time.

And so again, what Mr. Quist talked about is largely things we don't quarrel with.  We don't dispute the idea that SIM cards work the way he said.  We don't dispute the idea that the network situation is the way that it is.  But I think it's important to realize that that was the case long before the '780 patent was filed.

So if we look, for example, at Slide No. 4.

(Document displayed)

**MR. WEED:**  We just got a clip from the background of the '780 patent -- I'm sorry, this is from Column 6, but this is talking about existing networks, GSM being one.  That was a network whose standards started to be written in the late nineties.

So this is a very fundamental piece of technology which, while relevant to the '780 patent, is not what the inventors thought they had come up with in the '780 patent.

If we flip over to Slide 8 of our presentation.

(Document displayed)

MR. WEED:  Again, some of this stuff became redundant.  But in Slide 8, another clip from the background of the '780 patent talking about some of the existing technology. And here, right in the first sentence of the background of the '780 patent, we have the inventors telling the reader:  One of the things that existed, one kind of communication terminal that existed prior to filing of the '780 patent is something called a hotspot device.

And Your Honor probably recalls from the last time we were here, we were talking about pleadings where SIMO is asserting invalidity and inequitable conduct based on our own prior hotspot devices.

So it's not fair to say that this is a fundamental hotspot patent.  There is some detail there that I want to go through, but I think to really understand the '780 we need to understand exactly what it was that was disclosed, and really what it was the inventors thought they were adding to the art.

(Document displayed)

MR. WEED:  And so for that, I would like to turn to Slide 12, which is an excerpt from Figure 8 of the '780 patent.

And there are really kind of two flow diagrams in the '780, Figure 8 and Figure 9.  Figure 9 is a little bit of a different use case.  Figure 8 is a bit simpler.

But I think, at least when I read the '780 patent, this really helps me to understand exactly what's going on in the process of providing data to a device that might be roaming in another country or might be roaming on a network where it doesn't have a physical SIM card.

So we have drawn some cardboard boxes here to illustrate a point that I think one of your questions hit, on which is the handheld devices, themselves, the skyroam hotspot devices are a small part of the system that is discussed in the '780 patent.

And we've drawn a purple box around the left-most vertical column, the MCCD, as Mr. Quist talked about, to reference that portion of the system.  And as he said, these are system claims.  This is not a claim that is directed to an MCCD.  It's a system that includes several different components.

We have drawn yellow boxes on Slide 12 to illustrate the third-party components, if you will.  This is the Verizon network or the China Telecom network, depending on the situation.  These are cell networks out in the field that the device will be talking to at various points in the process.

And then in the green box we have drawn a box around components that are really kind of back-end components.  And as we'll see in the next series of slides, there's actually more

required by the claims than even what's in this Figure 8, but there are several components that are maintained by both skyroam and by uCloudlink that are kind of the back end that makes all this work.

And as we see through this flow diagram, they play an integral role in this SIM-sharing process.

So we've got a build here.

(Document displayed)

**MR. WEED:** Starting -- also still on Slide 12, it works a little bit -- Slide 13, I suppose, it works a little bit better on the screen. But we can really break this up into chunks to see what's happening during the process of sharing service.

So in this first chunk where we have highlighted Lines 1, 2 and 3, we see some message flow that happens between the multi-channel communication device and what's called service provider 1. So we can use the Verizon example and say Verizon is service provider one.

So this is a scenario where a user lands in the United States with a China Telecom SIM card and wants to talk to a U.S. network to get U.S. service, whether it's data or voice or something else.

And so what happens is the device roams onto Verizon's network, that is service provider 1, and establishes what the patent calls a management channel. So that's this initial

conversation with Verizon.  It's a roaming connection that's used to get data that will ultimately be used by the system for the real service the user is interested in.

So in Step 2 or in Line 2, the device, the MCCD, via the management channel, sends a message to the SIM scheduling management system which is part of the back end, saying:  Hey, I'm here, I'm roaming on Verizon but I want this type of service.  I want data, I want voice, I want whatever.  And the back end then decides which SIM card should be used for that requested service.

And so the response from the back end is what we see in Line No. 3 which is the -- some data about a SIM card that will be able to provide the user with what he or she wants, whether it's voice or data or some other kind of service.

So that's the first handshake.  This all happens over the Verizon network.  This is all a little bit unique to the fact that we have a roaming device.  The device is not treated by Verizon like a Verizon device at this point.

Moving on, for Lines 4 and 5, this is where it starts to look to the network more like a native device on the network. So as we see from Line 4, the MCCD logs into service provider 2 in this case, using the information it received from the back end that we highlighted in green.

And this is the point where service provider 2 -- let's call it AT&T just for ease -- AT&T at this point thinks it is

going to be talking to an AT&T device.  So at this point AT&T is contacted because an AT&T SIM card has been provided virtually to the MCCD.

Now, as Mr. Quist talked about, there's an authentication process here.  And I think, I think he would agree that the authentication process from the perspective of the service provider 2 network, is common.  Standard.  It looks to AT&T like it's authenticating an AT&T device.

So Line No. 5 on the slide here is an authentication request sent back by the AT&T network to the MCCD.  This is -- again, if I had an AT&T-based iPhone, this would happen every time I turn on my phone or enter an AT&T area of coverage.

Now, this is where the '780 patent, though, gets a little bit different from what would otherwise happen.

And as we see on the next portion of the build there are some messages here, No. 6, 7, the process that happens at 8, and then messages 9 and 10 are really what the '780 patent does to allow for the result that Mr. Quist talked a lot about.

So when the authentication request comes back to the device, the device can't answer that query.  It's kind of like an answer response protocol.  And the device at that point doesn't have enough information to answer.  And that is because it doesn't have the actual SIM card residing in the device.

So the '780 patent is really about:  How do we make it look to the AT&T network like the SIM card lives on the device?

So what happens is again going back over that first management channel, because that is the only place right now we have a working data connection, and messages sent back to the infrastructure, to the back end, with the authentication request received from AT&T.

That data is then forwarded to the SIM read-and-write device, which you spent some time discussing about, you know, the device that has the multiple slots for the SIM cards.

And on that device at the SIM card, a particular key is calculated. And that's box No. 8.

"Calculate the authentication data packet."

That's the thing the AT&T network expects to see as part of a normal AT&T authentication process. But that has to be calculated back in the back end because that's where the SIM card lives.

That information is then returned in Lines 9 and 10 to the MCCD, which can finally complete the handshake, as we see on the next portion of the build in Line No. 11, and provide that authentication response to the AT&T network.

So at this point, the data has now come from the back end in two chunks. And the result has been that AT&T has authenticated what it believes to be an AT&T device.

On the last portion of the flow, we sort of see the normal state of the world, the service being requested is provided so a hotspot can access data or voice. This is where the user is

actually using what he or she wanted to use.  And this is kind of the part that -- at least temporally, is the biggest part of the process shown in Figure 8.

There is some cleanup information here on the bottom of Figure 8, Lines 15 and 16.  15 relates to providing information back to the back end because, as Mr. Quist talked about in response to one of Your Honor's questions, part of the trouble here is:  How do you keep track of how much data has been used, how much voice has been used?  That information has to be provided back to the back end, some times.

There's not a lot of specificity in the patent about when that happens or how it happens or how it's tracked.  But Figure 8 does say that's one of the steps here.  The information about usage is provided back to the back end so that functions like billing can be achieved.

And then Line 16 is just sort of the idea that perhaps I go in a tunnel, and I come out of the tunnel, and have to redo this process.  It's sort of the idea that we can repeat.

So that's really, at least in our view, what the '780 patent in the description describes as being the features of its invention that make it different from what was known long before it was filed.

And we've got a series of slides starting on Slide 14 --

(Document displayed)

**MR. WEED:**  -- that show that this isn't just a

description.  This is really the scope of the claims at issue here.  And I'm not going to touch on claim construction issues, but I do think it's important to realize that when we're looking at even claim 1, which is the only independent claim, a lot of this architecture is required by the claim.

So it's not as simple as this is a SIM-based service sharing system, which is what the preamble says as we see on Slide 14.  It's not that simple.  There's a lot more to claim 1.  And then the other dependent claims add further limitations.  But every claim requires an architecture like what we see on Slide 14.

So we don't want to belabor the point, but I do want to highlight the different components of the system.  Mr. Quist showed Figure 4 of the patent.  I think it's a little bit more fair to look at something like Figure 8 or the claims which talk about all the subcomponents that are going into a working system.

So on Slide 15 --

(Document displayed)

**MR. WEED:**  -- we have highlighted the SIM card read-write device which you had some discussion with him about.

Again, we don't quarrel with that's what the patent is talking about, but that is one of the components actually required by the claim, and it does certain processes required by the claim.  And we'll get into some of that in the Markman

process.

(Document displayed)

MR. WEED:  Slide 16 talks about the SIM scheduling management system which is the box that we've illustrated in green here.  And what we're showing on Slide 16 is that from the perspective of that box, a request for a type of service must be received, along with the location of the device, and ultimately a response is generated.

That's sort of what we were talking about in the context of the Figure 8 flow diagram.  But the claim does require that specific functionality by those specific network elements.

(Document displayed)

MR. WEED:  On Slide 17, the claim requires a SIM card to be inserted in the box.  There is some dispute about what that means and what the data on the SIM card actually is.  But again, the claim does get to discussions about the actual cards, themselves.

(Document displayed)

MR. WEED:  On Slide 18, we have highlighted in purple the multi-channel communications device, which as Your Honor's question noted is either the roaming device, itself, or a device connected to the roaming device.  It's sort of on the user side of the equation.  So it's the thing that must be able to connect both to service provider 1, which in this slide is called "Original SIM Network."  In the prior example it was

Verizon, that I gave.

It also must be able to communicate with data-providing network which is the ultimate provider of the type of service requested by the MCCD.  And that, in my example, was AT&T.

And then the claim spends a good amount of time -- and I don't think we need to parse it in detail -- it spends a good amount of time talking about the other subcomponents of the SIM scheduling management system.

(Document displayed)

**MR. WEED:**  So, again we have here on Slide 19 the box in green that corresponds to that piece of the system, and we have illustrated the subcomponents of that.  Suffice it to say that there are four recited subcomponents.

(Document displayed)

**MR. WEED:**  On Slide 20, one of them is a SIM database.  And again, there's Markman disputes about that term.

One of them is something called a subscriber access unit, which handles some of the messaging with the MCCD.

(Document displayed)

**MR. WEED:**  That's on Slide 21.  On Slide 22 we show some of the other messaging that happens with the subscriber access unit.

(Document displayed)

**MR. WEED:**  This is sort of the two-way handshaking we talked about at the top of the slide about Figure 8.

On Slide 23 the claims recite some internal communication between the subscriber access unit, something called a SIM scheduling unit --

(Document displayed)

**MR. WEED:**  -- and the SIM database.  Part of the process for finding the information needed to provide the relevant data to the handset.

(Document displayed)

**MR. WEED:**  Slide 24 and 25 are the authentication handshake we talked about, the thing that AT&T sees from its perspective as being a standard AT&T device, authenticating on an AT&T network.

24 is the request; 25 is the result.

(Document displayed)

**MR. WEED:**  And then even with the communication between the SIM scheduling management system and the SIM card read-and-write device, which was the level of detail we saw from Figure 4 during uCloudlink's presentation, the claims recite some internal communication between the subscriber access unit, something called a SIM read/write management unit, and ultimately to the SIM card read/write device.

So again, at a high level, we don't dispute the way that they described the patent, but the claims in Figure 8 and most of the spec go into a fair amount more detail in discussing how to achieve the results that uCloudlink contends are part of

this patent and we contend are part of products and patents that existed long before the '780 patent.

So then just a couple of comments on some of the specific devices.  Again, some of Your Honor's questions drove at this. If we flip to Slide 29.

(Document displayed)

**MR. WEED:**  I think you had a specific question about what the MCCD was.  On Slide 29 we have provided the quote from the patent spec we think most clearly defines or describes what it is.

It is a user-equipment-side piece of hardware.  And as I said before, it can either be a part of the device or connected to the device, but it really is associated with the device that will be used to provide the service requested by the user.

**THE COURT:**  How -- how common is it to be integrated into the user equipment?

**MR. WEED:**  It's not real clear to me, from reading the patent, what the form factor of this device is.  The way I read it most naturally, it seems like it's kind of the circuitry and the antennas that would be needed to connect, for example, to Verizon and also to AT&T.

So I think if you talked about the user equipment as we see on Slide 29 as being a processor of an iPhone for example, or the processor of a hotspot, it would be connected to the processer, but not integrated in the processor.  But if you're

looking at it more as a housing, I think it's all going to be within the same housing most of the time.  But again, the patent doesn't give a lot of detail --

THE COURT:  One embodiment is a separate device?

MR. WEED:  Right, yeah.  It does talk about it being a separate device, not integrated.  And another embodiment is an integrated embodiment.  But I think -- maybe I'll be wrong about this, but I think the way that a lot of this case will play out, the devices that are at issue both from skyroam and from uCloudlink are dedicated hotspot devices that are housed in their own plastic cases, that then emit a wifi signal that you can connect your iPhone or your iPad to.

So it may be a distinction that doesn't matter, but the patent does talk about both.

THE COURT:  Okay.

MR. WEED:  And then, the last point I want to touch on a little bit, you had some exchanges about the SIM card read-and-write device in the patent.  And again, we don't disagree with the characterizations in general.

On Slide 30, we've kind of clipped in an overview of what the SIM card read-and-write device 42 actually is.  It's from Column 5, Line 34 to 37.  But there are actually three different types of SIM card read-and-write devices that are described in the patent.

(Document displayed)

**MR. WEED:**  If you go and expand that quotation down through column 5, line 51 -- and we've highlighted that on Slide 31 -- there are three types.  The first is a SIM rack of a large group.  The second type is a SIM array of a small group.  And the third type is what's called a SIM box of an individual.

And I just wanted to point out, I think what Mr. Quist showed you is really referring to the first and second types.  It's a SIM bank that's able to house quite a few SIM cards.  And really, they're there for more public consumption.

I'm not sure exactly the distinction between the first and second types.  I'm not sure it will matter.  But the third type of SIM card read-and-write device is something that we think is a little bit different.  There's a uCloudlink product called the SIM box, which we have got a picture of here on Slide 33.

And really, what this is is if you have a smaller organization, a small company or a family, even, where people are going to be in a few places frequently, I think what's being talked about here is the idea that you might have a SIM box like this (Indicating).  Let's say that users will be in the USA, London, and Hong Kong frequently.  You might buy a SIM card for a U.S. provider, a SIM card for a London-based provider and a SIM card for a Hong Kong-based provider, put them each in this SIM box, and kind of create on a micro scale the system we saw in Figure 8, where just users of my family

when they're in a particular location use a SIM card that they have already bought but that lives in this SIM box.

So again, I don't know that that will wind up making a difference. But since there was some questions about the SIM card read/write device and since that's one of the limitations of the claim, I thought it was important to point out that there are really three types of those devices described in the patent.

THE COURT: Okay.

MR. WEED: So, unless you have any further questions on that?

THE COURT: No, I think I understand the basic structure, architecture.

MR. WEED: Thank you.

THE COURT: All right, any other comments that I need to hear on the --

MR. QUIST: One final note. I would just mention it seemed to be the perspective that we were trying to convey that there were no other limitations to the claim, other than the preamble. That's absolutely not the case. We recognize there's architectural features and limitations throughout the claim.

THE COURT: All right.

MR. QUIST: Thank you.

THE COURT: I got that. All right. So, in light of

your case-management conference statement, what, tell me what matters you would like to discuss or what procedural issues there are.

MR. MASTERS:  Good afternoon, Your Honor.  Robert Masters for the plaintiff.

The joint status report that was submitted on February 11th I think fairly sets out the issues that currently are ongoing between us.  We have the Markman hearing on March 10th.  And I think Your Honor will see there are four terms.  It's, I think, fairly straightforward.

THE COURT:  Uh-huh.

MR. MASTERS:  Especially in light of the technology that was presented today.  And then we have depositions that are probably where parties have been discussing on several occasions, trying to sort out the logistics on that.  And we were scheduled to be in China the first week of March, but that's not going to happen.

We continue to talk about alternative sites, but again, there are logistical problems with doing that, such as being quarantined or whatever for the deponent.  So --

THE COURT:  How many depos were you planning?

MR. MASTERS:  Well, defendants have noticed three individuals that would be taken over the course of two or three days.  Plaintiffs have noticed four.  At least one of those witnesses is located here in the Bay area, and we're trying to

get that arranged as soon as the deponent is available.  And then the other three I understand are in China.

THE COURT:  So the bulk of the depos that are being proposed on both sides are witnesses in China?

MS. JOHNSON:  I would just correct Mr. Masters.  We have three of our witnesses available in the United States and one in China.  And that is defendants' witnesses.

However, I understand that plaintiffs' witnesses, all three of them are to be made available in China.  And we have had some issues scheduling that previously due to witness availability.  And now that the witnesses are available, due to the travel restrictions that are in place currently.

THE COURT:  Hm.

MR. MASTERS:  Well, that should make half of the problem go away since three of their witnesses are here in the U.S.  And as soon as they tell us they're available, we will be ready to take their depositions.

THE COURT:  But if you're -- of the deponents that you want to -- whose depositions you want to take, you said there were three in China?

MR. MASTERS:  We -- so defendants have noticed depositions of plaintiffs' witnesses.  There are three deponents in China.

THE COURT:  Three of those are in China.

MR. MASTERS:  And plaintiffs have deposed -- have

noticed four depositions of defendants' witnesses.  One of those is in China, so there is a total of four --

**THE COURT:**  Oh, one in China, three in U.S.

**MR. MASTERS:**  Yes.

**MS. JOHNSON:**  And to be clear, Your Honor, at this point we are only discussing 30(b)(1) depositions.  This does not include what we would envision as likely a second round of 30(b)(6) depositions.  To the extent the travel restrictions are in place and would require us to go over to China much later, there is a possibility that we could wrap them all up into one.  But that is one issue I wanted to bring to the Court's attention, in that this single round of depositions isn't the full set of depositions.

**THE COURT:**  So this does not include 30(b)(6), and 30(b)(6) deponents are likely to be in China?

**MS. JOHNSON:**  Since the witnesses who are on the initial disclosures of plaintiffs at this time all reside in China, I would assume that to be true.  For our 30(b)(6) witnesses, as defendants, it is likely that at least one will be in China.

**THE COURT:**  Okay.  And of course, the problem is we don't know what the future holds in terms of access.

**MS. JOHNSON:**  (Nods head)

**THE COURT:**  Have you discussed alternative means?  If the travel restrictions remain in place for an indefinite

period, what are your thoughts?

**MR. MASTERS:**  Yes, Your Honor.  We have had several discussions with counsel.  We did discuss other countries.  But at the time it seemed like it was the height of the Coronavirus outbreak, and it was a lot of unknowns, so those countries weren't really something that we could seriously consider.

**THE COURT:**  Okay.

**MR. MASTERS:**  We even thought about bringing the witnesses to the U.S.  But then the witnesses are quarantined for 14 days.  So we've continued to have a dialogue and hopefully as soon as something breaks we can get these depositions scheduled.  And I think it's kind of like a week-to-week type of discussions we are having just to see where things stand.

And when we are back before you for the Markman hearing hopefully we have some clarification to the issue and see where matters stand.

**THE COURT:**  Are these going to be document-intensive depos?

**MS. JOHNSON:**  Yes.  And most of these depositions, if not all, will occur via translation.  So to the extent we had considered, you know, video or something, we really think that would be way too complicated.

**THE COURT:**  Hm.

**MS. JOHNSON:**  So I don't think defendants are in a

position to take video or telephone depositions at this point.

I will add, Your Honor, that we are expecting an IPR decision on the institution of defendant's *inter partes* review petitions of the formally asserted '066 patent and the presently asserted '780 patents at the end of this month.

So I don't know that I can commit to whether defendants would be interested in pursuing a stay of the case, but that is a possibility that we would be thinking about in the event there is an institution.

**THE COURT:**  That is expected by the end of February?

**MS. JOHNSON:**  Correct.

**MR. MASTERS:**  I believe it's February 22nd, which falls on a Saturday, so maybe Friday or Monday, around that date.  But we are optimistic those institutions will be denied.

**THE COURT:**  All right.  Well, I guess we will cross that bridge depending on what happens.

**MR. MASTERS:**  Fair enough.  And that's why I suggested, Your Honor, come Markman hearing, we will have more clarification to where we stand, and especially on the deposition issues.  Which are, you know, they may be document-intensive, but they are routine type depositions taken in patent infringement cases.  And it's the plaintiffs really who have the bulk of the depositions to take to prove their case.  So --

**THE COURT:**  Well, and I normally don't set trial

typically anyway until claim construction, so all the more reason at this point I'm going to wait a little bit and see what happens.

MR. MASTERS:  Hopefully if Your Honor is inclined to do this at the end of our Markman hearing, that day, we can discuss a trial date.

THE COURT:  Yeah, we will double that up as a further status conference and see where things are at.

MR. MASTERS:  Thank you.

THE COURT:  Anything else that needs to be resolved at this point?

MR. MASTERS:  Nothing further from the plaintiffs' side.

THE COURT:  Okay.

MS. JOHNSON:  I think that's all from us as well, Your Honor.

THE COURT:  Okay.  Well, the whole situation is affecting a number of cases, as you can imagine, before this Court.  So we're all kind of struggling to figure out how can we move forward.  I've got cases where there is trial scheduled, and not sure what we're going to do yet.

MR. MASTERS:  We understand.

THE COURT:  Come up with something creative.  All right.

Well, this has been helpful.  Appreciate it.  I think that

anything that's helpful in this regard that will help me understand the technology is good.

So we will, I guess, see you next at the Markman hearing.

**MR. MASTERS:**  Very good.  Thank Your Honor.

**THE COURT:**  Great.  Thank you.  Appreciate it. Appreciate the presentation.

**MR. ANDERSON:**  Thank Your Honor.

**THE CLERK:**  Court is adjourned.

(Proceedings concluded)

**CERTIFICATE OF REPORTER**

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*Belle Ball*

/s/ Belle Ball

Belle Ball, CSR 8785, CRR, RDR

Tuesday, March 3, 2020