**Pages 1 - 87**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

HONG KONG UCLOUDLINK NETWORK )
TECHNOLOGY LTD., et al., )
                              )
        Plaintiffs, )
                              )
  VS. )  **NO. C 18-5031 EMC**
                              )
SIMO HOLDINGS, INC., et al., )
                              )
        Defendants. )
                              )

San Francisco, California
Tuesday, March 10, 2020

**<u>TRANSCRIPT OF PROCEEDINGS</u>**

<u>**APPEARANCES**</u>:

For Plaintiffs:
                SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
                2099 Pennsylvania Avenue, NW - Suite 100
                Washington, D.C. 20006
          BY:   **ROBERT M. MASTERS, ESQ.**

                SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
                379 Lytton Avenue
                Palo Alto, California  94301
          BY:   **EDWARD V. ANDERSON, ESQ.**
For Defendants:
                K&L GATES LLP
                70 West Madison Street - Suite 3100
                Chicago, Illinois  60602
          BY:   **BENJAMIN E. WEED, ESQ.**
                **GINA JOHNSON, ESQ.**
                FARRIS MATARIYEH, ESQ.

Reported By:  Ruth Levine Ekhaus, RDR, FCRR
              Official Reporter, CSR No. 12219

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

**APPEARANCES**:   (CONTINUED)

For Defendants:

                        K&L GATES LLP
                        Four Embarcadero Center - Suite 1200
                        San Francisco, California  94111
                   BY:  **PETER SOSKIN, ESQ.**

**Tuesday - March 10, 2020**                              **10:42 a.m.**

                              P R O C E E D I N G S

                                   ---o0o---

THE CLERK:  Calling Civil Action 18-5031, Hong Kong uCloudLink Network Technology Limited, et al., versus SIMO Holdings, Inc., et al.

Counsel, please approach the podium and state your appearances for the record.

MR. ANDERSON:  This is Ed Anderson on behalf of uCloud, Inc., along with my colleague, Rob Masters, who will be doing the Markman hearing this morning.

THE COURT:  All right.  Great.  Good morning.  Good morning, both of you.

MR. WEED:  Good morning, Your Honor.  Ben Weed from K&L Gates on behalf of the defendants.  With me at counsel table is Ms. Gina Johnson, and Peter Soskin, and Farris Matariyeh.

THE COURT:  Great.  Good morning, everyone.

All right.  Obviously, we need to take this claim-by-claim, or term-by-term.  But tell me what you have in mind as to the most efficient way to proceed.

MR. MASTERS:  Judge, for plaintiffs, we have a slide deck.

THE COURT:  Okay.

MR. MASTERS:  And we're prepared to go through each of

the four disputed terms --

THE COURT:  Okay.

MR. MASTERS:  -- and I could take them -- go through the entire slide deck at once.

THE COURT:  Let's do one term.  I would rather do it term-by-term, so we can get through the slide -- that portion of the slide deck that pertains to the first, and then do you have a slide deck or just an oral presentation or --

MR. WEED:  We have a slide deck, as well.

THE COURT:  Slide decks, I guess.

MR. WEED:  Dueling slide decks.

THE COURT:  All right.  Any interesting videos and audio to go along with it, or is it just --

MR. MASTERS:  Unfortunately, we do not.

THE COURT:  Oh.  Well, that's too bad.  Okay.  All right.  Music, anything else to make this interesting?

MR. WEED:  We have a device on counsels' table.

THE COURT:  All right.  All right.  Let's start with the first one about the -- I guess it's about "insertable."

MR. MASTERS:  That's correct, Your Honor.

THE COURT:  Is that where you start?  All right.  Go ahead and make your presentation.

MR. MASTERS:  Judge, I do have slide decks that I can pass up.

THE COURT:  Good.  All right.

MR. MASTERS:  Judge, for purposes of timing, so I know how to tempo the presentation, we have --

THE COURT:  Do you need more than 10 minutes for each term?

MR. MASTERS:  I can work -- that's 40 minutes in total.  So, yes, that's fine.

THE COURT:  All right.  Good.

MR. MASTERS:  So beginning with Slide 2 is -- just to set the agenda today, we would like to provide some very brief background, because I know we were here a couple of weeks ago in the tutorial, and I don't want to repeat any of that.  But, just to put us all in the proper frame of mind in context to discuss these four terms that we show here on Slide 2.

THE COURT:  Okay.

MR. MASTERS:  This relates to the '780 patent, which, you know, the problem we discussed is when you're traveling outside of your home area, so to speak, your cell service -- you lose your cell service, or the quality of the service is so poor that there needs to be a solution for that.

The '780 patent talks about this SIM-based service sharing system that is configured to provide access to the user regardless of where they are in the world.

THE COURT:  Let me ask -- I know it's going to come up, but "service sharing," if you only had just a chip that accessed one carrier, the one assigned carrier, the

old-fashioned way, is that service sharing, or does service sharing mean access to multiple carriers?

**MR. MASTERS:**  Well, if I have my iPhone, and it has a SIM card that's connected to AT&T, for example --

**THE COURT:**  Yeah.

**MR. MASTERS:**  -- that's not sharing.  That's my service with my SIM card.

But when I get outside of AT&T's home area -- say I'm in Japan -- I could be roaming, because AT&T has some contracts with other providers, but it's very, very expensive --

**THE COURT:**  Right.

**MR. MASTERS:**  -- or the quality of service would be poor.

So in that case, using the invention, there is a bank of --

**THE COURT:**  No, I understand that.  What I'm asking you is:  Is the term "service" -- if you didn't have the invention, if we weren't in '780 territory, the old-fashioned way, I'm in Japan, I have got one local carrier that has a contract with AT&T, and they charge five bucks a minute, or whatever it is, is that service -- is that a sharing; service-system?

**MR. MASTERS:**  It is not, because you're not sharing any other SIM cards.  You're using your own SIM card in that instance.

**THE COURT:**  So in your mind, "sharing" means the ability to access multiple carriers?

**MR. MASTERS:**  That's right, through acts -- sharing SIM cards.

**THE COURT:**  Okay.  Go on.

**MR. MASTERS:**  And so in the words of the patent, you know, "Subscriber acquires the appropriate subscriber identity information, as required.  It acquires international, any network, any service provider, any technology and mode, or any service network access service."

The claim is somewhat lengthy, so just to try to break it down, there are three main elements of the claim in the '780: It's the SIM card read-and-write device.  We have color-coded that in red; a SIM scheduling management system, in blue; and a multi-channel communication device, in green.

The read-and-write device is configured to receive physical SIM cards, and simulate the authentication procedures that would typically be performed by a user device when using a local SIM card.

The SIM scheduling management system manages a SIM card from the read-and-write device to perform the authentication procedure, and communicates that authentication result to the multi-channel communication device.

And the multi-channel communication device, that's the product that you carry with you when you're traveling

internationally, that uses this authentication result to acquire the access to a service provider, and allows the user device to connect and access services through another service provider throughout the world.

This, again, is the claim -- using the same color-coding scheme on the rest of the claim -- let me back up one, too, to -- Slide 9 shows the Claim 1 with the same color coding, how it correlates to Figure 4 of the '780 patent.  And then the rest of the claim, as part of the SIM-scheduling management system, correlates to Figure 6 as one embodiment.  And that's, again, shown in color-coding, just to assist the Court in understanding and deconstructing this claim.

And Figure 11 shows the entire claim, with Figure 4 and Figure 6 embodiment.

So with that, I want to move to Disputed Term 1.  This, Slide 12, shows the four disputed terms that we're going to. Discuss.

Only Claim 1, Disputed Term 1 is the term (reading):

"Wherein at least one SIM card providing service is insertable in the at least one SIM card read-and-write device."

The focus here is whether the word "insertable," that's used in the claim, means "insertable," or, as the defendants submit, does it mean "inserted"?

UCloudLink submits that the phrase means (reading):

"Wherein the at least one SIM card read-and-write device is configured to receive at least one SIM card that provides service."

It's insertable.

The focus in this claim should be on the structure that's being defined.  It doesn't require an actual SIM card to be inserted; it just has to be insertable.

UCloud's position is supported based on the plain and ordinary meaning of the claim language.  The '780 patent specification confirms the construction that we are advancing.  And the technical literature -- that is, the extrinsic evidence -- also supports uCloudLink's construction.

Term 1 recites that:  A SIM card is insertable in at least one SIM card read-and-write device.

The suffix "able" is used to convey, it's capable of being or, quote/unquote, able to be, unquote.  This suffix clearly indicates the limitation requires nothing more than capability for a SIM card to be inserted within the SIM card read-and-write device.

And the inventors could have very easily used the word "inserted," if that's what they wanted to do so; but instead, they used it to define the read/write device as -- the structure of the read-and-write device had a slot that allowed a SIM card to be insertable, if you'd wanted.

The specification at Column 5, lines 31 to 33, says

(reading):

"One or a plurality of SIM cards providing services may be inserted in each of the at least one SIM card read-and-write device."

Slide 18, another portion of the patent specification, states that the -- (reading):

"At least one SIM card slot" -- which is defined as referenced numeral 42 -- that's at Column 7, line 34 to 37. The claim very clearly defines the structure or the structure's capability or design.

It's not that a SIM card must be inserted at all times. It's akin to an invention covering a car with a gas tank.

SIMO would argue that the gas must be in that gas tank to infringe, but that's clearly not what this claim is directed to.

Even further -- further supporting the specification at Column 9, lines 36 to 41 says that (reading):

"The management channel establishing Unit 431 comprises at least one SIM card slot in a SIM card read-and-write chip connected to the at least one SIM card slot."

Again, focusing on the structure of the read/write device having this slot so that a SIM card is insertable.

(reading):

"The extrinsic evidence further supports uCloud's

construction in terms of the definition of the word "insertion," meaning "the act or process of inserting.

"Insertable" is merely the adjectival form of "insertion", modifying the noun to which it attaches" -- here, the SIM -- "in saying that the SIM is capable of being inserted.

"uCloudLink submits that SIMO's construction is improper.  They simply ignore the suffix "able" in the claim language and the extrinsic evidence, and attempt to rewrite the claim to require that the SIM card is inserted into the SIM card slot to infringe the claim.

They ignore the embodiments in the specification where a SIM card may be inserted -- they simply just skip over that portion of the intrinsic evidence.  And limiting the claims to embodiments that describe operations after the SIM card is actually inserted -- and that's what you see in their brief. They don't talk about the structure that is being defined, but rather, how does it operate.

And they also misapply the case law that we discuss here on Slide 22.  There, they resort to this District Court decision *Rackman v. Microsoft*.  That's inapplicable, though.

The claim actually, in that case, used both words, "insertable" and "inserted," but the issue was the type of medium that was to be inserted into that computer device.  And the Court was focused on whether it was any type of storage

medium or whether it was the type of mediums that could be actually inserted into a user.  And so, ultimately, the Court construed the term to cover (reading):

"-- storage medium inserted by a user, but not those storage mediums that are connected by a cable or a card."

And so the *Rackman v. Microsoft* case really has nothing to do and it's not applicable at all to this issue here that we have with respect to Disputed Term 1.

SIMO also attempts to argue that *Tom Hayden Enterprises versus S. Oregon Hot Bikes* is applicable because you cannot construe a claim in a way that would achieve inoperability.

But again, that's not what *Tom Hayden* stands for.  It's not a case that mandates that the term, quote/unquote, insertable must be defined as:  Inserted in order to achieve operability.

Again, going back to my car having a gas tank or configured -- having a gas tank configured to receive gas doesn't require that gas be actually in that car to infringe the claim.  Of course, to operate, you would need gas, but that's -- that's the distinction here.

And so under SIMO's view of case law, infringement of an apparatus claim for any power-consuming device within which batteries are insertable could be avoided by simply selling the device without the batteries needed to power that device.  And that cannot possibly be the case.

And with that, I'm done with Term 1, unless the Court has any specific questions.

THE COURT:  Let me ask you:  Another argument that you didn't make, and that is, if you look at Claim 1, the paragraph immediately after the "insertable" paragraph is -- the next paragraph that says, "A SIM scheduling management system configured to select appropriate SIM from at least one SIM card inserted in at least one SIM card read-and-write device," et cetera, et cetera.

And one could argue that the term "inserted" is distinguishable from "insertable," and there is the usual rule that if patentee uses a different term, different form of the term, it means something different.

MR. MASTERS:  That's correct.

THE COURT:  And so that further bolsters your argument.

MR. MASTERS:  That's right.  And that was, I think, a point I made earlier today, is that the inventors could have very easily have used the word "inserted" --

THE COURT:  And did.

MR. MASTERS:  -- if that was their intention.

THE COURT:  And did.

MR. MASTERS:  And they did, when they wanted to, but not with respect to the first dispute term.

THE COURT:  So your argument is that it is, sort of,

the structure that is defined by the '780, not just the actual operative state when you have -- I mean, some of it obviously depends on, at some point, the SIM card being inserted.  Well, it's not going to work without it.

MR. MASTERS:  Exactly.

THE COURT:  Right.

MR. MASTERS:  But if I'm selling the device with a read-and-write device, it has to have that slot where a SIM card is insertable at some point down the road.

It's not that I have to sell the read-and-write device with a slot with the SIM card in it to infringe at that time.

THE COURT:  Okay.

MR. MASTERS:  Thank you, your Honor.

THE COURT:  All right.  Thank you.

Response?

MR. WEED:  Your Honor, if we could, I'll start with Slide 15 from our presentation.

THE COURT:  All right.  Okay.

MR. WEED:  So I think one important point here is, as you recall from the tech tutorial a few weeks ago, one of the claim terms requires a SIM card read-and-write device, which -- on Slide 15, we have just clipped the art that we created for that device in the tech tutorial.  And that's important because that's really the term, if we turn to Slide 16, that uCloudLink is asking for construction of.

Their construction says, "Wherein the at least one SIM card read-and-write device is configured."  And that may well be true, but the term under construction here before the Court is the SIM card term.

So they are asking the Court to construe the SIM card term by wrapping structural capability around the SIM card read-and-write device.  So the proposal isn't even appropriate given the term that's being construed.  Our construction reflects what the SIM card itself must do or must be in the context of the system of Claim 1.

And on Slide 17, we have clipped the beginning part of Claim 1 -- I think Your Honor was talking about this portion of the claim.  And I think it's important, again, to note "Claim 1 is directed to a subscriber identity module or SIM-based service sharing system.

So it's an apparatus claim, and it certainly requires at least one SIM card read-and-write device.  That's unquestionable.  But the term under construction here relates to the SIM card itself.  And we have highlighted that in yellow.

**THE COURT:**  So let me ask you -- I mean, I understand your point, and the focus of their proposed construction is kind of the mirror image, or the inverse, or whatever.

Why isn't it -- why shouldn't it simply be construed to mean:  Wherein at least one SIM card providing service is

capable of being inserted, instead of "is inserted?"

That's the key.

MR. WEED:  Understood.

And I think Your Honor's last question for the plaintiff, actually, is illustrative.  If we turn to Slide 18, we have highlighted the next paragraph or the next section of Claim 1. And this paragraph is talking -- again, it's a system claim. The system further requires a SIM scheduling management system, which is configured to do some logic, but only can do that logic when a SIM card is inserted.  So the SIM scheduling management system can't do what's required of the apparatus claim without having at least one SIM card in the system.

THE COURT:  Just like a gas -- a car can't run without gas.  But does that mean it's a patent that covers a car?

MR. WEED:  If there was an apparatus further down the claim, in the hypothetical gas example, that required gas to be present to exist in that form, then, sure.

So if we stopped at the "wherein" clause of the SIM card we looked at on Slide 17, perhaps the plaintiffs' argument would have some merit.  But because the apparatus SIM scheduling management system on Slide 18 is required to do something with an inserted SIM card, to meet this system, there needs to be a SIM card in the system; otherwise, you can't have a SIM scheduling management system subcomponent of the Claim 1.

THE COURT:  Why can't a patent cover the structure

that allows things to be inserted, added, filled -- you know, you need a battery, you got to put the battery in, et cetera? Why can't a patent cover that, even if it's non-operative, without the -- that seems to be the dispute here.

MR. WEED:  Agreed.

And I think, again, the question that you're asking, and that plaintiff focused on, is what a SIM card read-and-write device is.  And that is certainly a device sized and shaped to receive SIM cards.  But I think it's important to look at the next limitation of the claim on Slide 18, which is a SIM scheduling management system that does something with an inserted SIM card.  It's effectively the part of the system that selects one of the one or more SIM cards inserted in the read-and-write device.

THE COURT:  Right.  So one of the elements is that once you do insert it, it's got to perform X, Y, and Z function.

MR. WEED:  Correct.

THE COURT:  Otherwise, it's not covered.

MR. WEED:  Correct.  Correct.

THE COURT:  Still doesn't answer the question, why -- if that condition is met, that element is met, why you actually have to have -- the patent requires that the -- that the SIM card actually be inserted.

MR. WEED:  Because, again, in our view, the SIM

scheduling management system can't do what it's required to do unless there is a SIM card in the system.

THE COURT:  Right.  And that's one of the other elements.  I'm not sure the latter implies or requires the former.  That's -- you know, there are two separate paragraphs --

MR. WEED:  Sure.

So I suppose that, perhaps, becomes an issue on infringement when we talk about what the devices look like when they are sold.

But in our view, even if the "wherein" clause from the first limitation -- which is on Slide 17 of our presentation -- itself doesn't mandate the presence of a SIM card, it may be that we have arguments regarding whether something is a SIM scheduling management system unless and until a SIM card is present.

But our point is, the way the claim is written, it's not just putting gas in the gas tank; it's thereafter using the gas for some other purpose in the context of the overall system.

THE COURT:  Okay.

MR. WEED:  And the only other point I would make -- if we turn to Slide 22 of our presentation -- I don't think it's our suggestion that there must be a SIM card present at all times.  I think the point is, the determination of infringement, or if it's a damages-related question, the

determination of whether a system practices a claim, would be made based on whether or not a SIM card is present.

So it's not, I don't think, going to drive the liability case one way or the other.  I think what it's going to do is say, at what point in time, where, geographically, who, by which party is the infringement occurring.

So it's going to come down to what 271 says about what constitutes an act of infringement.  It's not so much a limitation on the scope of the claim as it is defining what entity would be involved in selling a product that meets the claims or doesn't meet the claims.

But it's certainly not our suggestion that there must always be a SIM card present.  Just to meet the claim the SIM card has to be there, so that that SIM scheduling management system can do what it has to do.

THE COURT:  All right.  Well, this is -- this is the disadvantage of not having summary judgment combined with claim construction --

MR. WEED:  Yes.

THE COURT:  -- because I am sitting here in a total vacuum, no idea what exactly the context is.

MR. WEED:  Understood.

THE COURT:  But -- all right.

MR. WEED:  Unless you have any further questions, that's all we had on this topic.

THE COURT:  No, I think that's helpful.  Thank you.  Appreciate it.

MR. WEED:  Thank you.

THE COURT:  Okay.  So the next --

MR. MASTERS:  Judge, may I make one point to --

THE COURT:  Yeah.

MR. MASTERS:  I just want to look at the claim that counsel was referring to, the --

So counsel is pointing out the SIM scheduling management system.  They skip over the phrase "configured to select appropriate SIM," and then they highlight the rest, and argue that it, therefore, requires the SIM card be inserted.

But again, the SIM scheduling management system is configured to select; meaning, again, it's a focus on the structure, not that there is an actual SIM card inserted.

THE COURT:  All right.  Well, that seems to be the gist of whether you patented a structure as opposed to an actual operation.

MR. MASTERS:  Or a method claim.  Exactly.

THE COURT:  Okay.

MR. MASTERS:  So Disputed Term 2, I move to our Slide Deck 24.  This is the beginning part of the first phrase "at least one SIM card read-and-write device configured to simulate a read-and-write process performed by local user equipment of a SIM card providing service sharing to a physical SIM card."

Plaintiffs submit that no construction is necessary, that the term is plain on its face.  But if the Court is so inclined to construe, uCloudLink provides a proposed construction that reads as shown here on Slide 25 (reading):

"At least one SIM card read-and-write device that is configured to simulate a read-and-write process to a physical SIM card as would be performed by local user equipment of a SIM card providing service sharing."

One of the key words of the construction here, Your Honor, is the word "simulate."  Something is simulating something else.  I think the term is clear once you put it in that context.

Again, uCloudLink submits no construction is necessary, a POSITA would understand the scope of this term with reasonable certainty.  Plaintiffs' expert, a very well-distinguished expert in the field, Dr. Feuerstein, has also submitted a declaration to support uCloudLink's position.

SIMO's argument is contrary, applies the wrong standard, and amounts only to an unsupported attorney argument that the claim is somehow indefinite.

And then SIMO's disavowal argument regarding service sharing is, frankly, not understood.

The intrinsic evidence, on Slide 27 here, supports the ordinary meaning.  (reading):

"Based on the disclosure, a POSITA would understand

with reasonable certainty that the disputed limitation requires the SIM card read-and-write device to be configured to do two things:

"First, simulate certain read-and-write processes that would typically be," quote, "performed by a local user equipment of a SIM card providing service sharing," unquote," and to do so," quote, "to a physical SIM card," unquote, "that it is has access to."

This phrase, "the local user equipment of a SIM card providing service sharing," is like a hot spot.  If I set up my iPhone to be a hot spot, and I can have multiple people use my iPhone to get cellular service, that is "local user equipment" and of "a SIM card that's providing service sharing."

That's what the read/write device here is trying to simulate.  It's trying to simulate a hot spot, as one example, by using physical SIM cards that are stored in the SIM bank.

THE COURT:  Is providing service sharing that describes the SIM card used by the local user?

MR. MASTERS:  Yes.  The phrase "SIM card providing service sharing" is what is used by the local user equipment.

THE COURT:  And is that something that exists -- is that something that exists outside of the patent, the '780 patent?  Is there such a thing as a single SIM card that can provide service sharing?

MR. MASTERS:  Well, like in my hot spot example, if I

have an iPhone that has my SIM card that's being connected to the AT&T service, you can use my iPhone; I can use my iPhone; we all are sharing that SIM card to get access.

THE COURT:  That's what I asked in the beginning of this thing:  What is service sharing?

If you mean several communicative devices can share that spot, but it's still connecting only with AT&T, or Verizon, or whatever the Japanese equivalent is.

MR. MASTERS:  Well, in that example, and you're -- when we're talking about Japan, I was the one that was using my iPhone with my SIM card; it was just going to another service provider.

THE COURT:  But is that --

MR. MASTERS:  There is no sharing of the SIM card there.

THE COURT:  There is or is not?

MR. MASTERS:  There is not.

THE COURT:  Okay.  So that's what I'm wondering.

So configured to simulate the read-and-write process, which would normally, as you put it, typically be performed by a local user of a SIM card which provides service sharing.

MR. MASTERS:  Right.

THE COURT:  And I'm trying to understand, what would be an example of a single SIM card that could provide service sharing?

**MR. MASTERS:**  I think my hot spot is the one example.  The term "local user equipment" is known in the art as something that's using SIM cards to connect.  This is -- this process is not local here.  It's now made, perhaps, somewhere in the cloud, or somewhere else in a central location, where the read/write device now is using a SIM card from the SIM bank to provide service sharing, and it's simulating what the local user equipment would typically have done when it's sharing a SIM card.

**THE COURT:**  Yeah.  No, I understand that.

I guess my question is:  Does the term "providing service sharing to a physical SIM card," that modifies the process performed by local user of equipment of a SIM card?

In other words, it describes the -- of a SIM card of a local user, or does it describe the "at least one SIM card read-and-write device," which performs that function of service?

That's what I was trying to understand.

In other words, could you have put -- are you arguing that there is sort of a parentheses around the "configured to simulate a read-and-write process performed by a local user of a SIM card," close paren, "providing service," so that "providing service" describes the first seven words or eight words, or does it actually describe the "SIM card" that immediately precedes the words "providing service sharing"?

MR. MASTERS:  It modifies the "SIM card" preceding. So you could put a parentheses around "configured," and at the end of "sharing," because the read/write device is simulating that process to a physical SIM card.

THE COURT:  All right.  So the parentheses -- if we were using parentheses --

MR. MASTERS:  Yes.

THE COURT:  -- it would be after the "sharing"?

MR. MASTERS:  That's correct.  And I think our construction makes that clear because we -- we can -- if the Court is inclined to construe it, it says, "One SIM card read-and-write device that is configured to simulate a read-and-write process to a physical SIM card," okay, "as would be performed by local user equipment of a SIM card providing service sharing."

That phrase "SIM card providing service sharing" is used in the specification elsewhere, without commas or any other punctuation.  So it's clear that's what the -- that phrase, "SIM card providing service sharing" goes together.

And that's in -- I have Slide 28 up.  This talks about the SIM scheduling management selects appropriate SIM from SIM cards inserted in the SIM card read-and-write device.  That's at Column 6, lines 1 to 11.

And then Column 12, 18 to 25:  The read/write device controls the corresponding SIM card to calculate the

authentication data pocket to acquire an authentication result.

That's part of the simulation process of simulating the local user equipment.

And then at Column 7, lines 38 to 44:  The SIM card management unit implements read and write of a SIM card inserted in the SIM card slot.

Dr. Feuerstein, in Paragraph 59 of his declaration, also provides unrebutted testimony as to the meaning of this phrase. 59 here, set out on Slide 29, it says (reading):

"A POSITA reading the claim language, in view of the specification, would understand that the SIM card read-and-write device simulates the read-and-write process to a physical SIM card as would be performed by a local user equipment providing service sharing."

He goes on to say that (reading):

"The SIM card read-and-write device simulates the read-and-write process to a physical SIM card located, for example, in the SIM rack, SIM array, or SIM box, as would be performed by a local user equipment of a SIM card providing service sharing."

THE COURT:  So I guess -- I understand your point. I guess my question is:  When the term is used, "configured to simulate a read-and-write process performed by a local user equipment of a SIM card," singular, "providing service sharing," can a single SIM card provide service sharing, or is

this more of a hypothetical construct?

MR. MASTERS:  I'm not sure it's a hypothetical construct because I have given you an example of where it is providing service sharing.

THE COURT:  You said hot spot.  I'm not sure that's -- that's sharing.  So you define hot spot, even though it's only tied to one carrier, as service sharing?

MR. MASTERS:  If multiple people are connected to that hot spot.

THE COURT:  But that's not the purpose of this invention.  This purpose of the invention is to be able to access different carriers; right?

MR. MASTERS:  That's correct, based on where you are in the world.

THE COURT:  Right.  It's not the hot spot.  It's not the multiple connected devices.  I mean, it could, but that's not the teaching of this device.

MR. MASTERS:  That's true.

But that process of the read-and-write to the SIM card is what's being simulated by the read/write device with whatever SIM card it decides to select to provide the service sharing. It has to do this authentication process and follow a specific protocol so that the user then can get access to the service provider in whatever country he or she is in.

So that read/write device, somewhere in a central location

in the Cloud, that simulate -- or that has access to this bank of SIM cards --

THE COURT:  Right.

MR. MASTERS:  -- figures out which SIM card to use, and now it's simulating the process as if the local user equipment was going through the process of logging on to some service provider by reading and writing to a SIM card.

THE COURT:  So the "at least one SIM card read-and-write device to a physical" -- that's how you would read -- because you put the parentheses around "configured" up to "provide sharing" -- "providing service sharing."

But then what is it that it's providing?  It doesn't -- I have to look back at the original.

So you have to have -- at least one -- if you deleted the parenthetical for a moment, because that's only a descriptor -- right? -- then it would read, "at least one SIM card read/write device," skip over, "to a physical SIM card."

That doesn't seem to be -- it seems like -- I thought it meant at least one SIM card read-and-write device providing sharing service to a physical SIM card, and it does that through the simulation process.

MR. MASTERS:  I think the parentheses I gave you might be over-inclusive in terms of getting the simulation of the read-and-write process.

So the SIM card read-and-write device would simulate a

read-and-write process to a physical SIM card.

THE COURT:  Say that again.

MR. MASTERS:  The read -- SIM card read-and-write device --

THE COURT:  Yeah.

MR. MASTERS:  -- would simulate a read-and-write process to a physical SIM card.

THE COURT:  How do you get that?  I'm looking at the actual word.  How do you derive that --

MR. MASTERS:  That, I think, falls out of our construction, as well.  As I said before, I think my use of the parenthesis was over-inclusive to include "configure to" --

THE COURT:  Isn't the gist of this invention to have the read/write device provide service sharing to a physical SIM card?

MR. MASTERS:  Yes.

THE COURT:  That's why I thought --

MR. MASTERS:  But it has to negotiate with that SIM card in order -- and go through this protocol to get the authentication so that the user has the correct authentication results and can get onto the service provider in whatever country.

So the read-and-write device has to go through that process.  And they are liking the read-and-write simulation -- they are simulating what the local user equipment would

typically do to get onto a service provider.

THE COURT:  Yeah.  No, I understand that.

I'm struggling with this language here, which, frankly, is not the best drafted because it has got one comma.  It should have had, like, two commas, but -- or parenthesis or something.

But I'm still trying to understand, if the term "configured to simulate read-and-write process performed by local user equipment of a SIM card providing service sharing" -- in other words, if you ignore that descriptor, which you described as one -- one unit, then the remaining words are "at least one SIM card read-and-write device to a physical SIM card."

There's something missing.  It has got to do something. It's got to share providing to a --

MR. MASTERS:  But the read-and-write device is configured to simulate a read-and-write process to a physical SIM card as would be performed by the local user equipment of a SIM card providing service sharing.

THE COURT:  And it's providing that; right?

MR. MASTERS:  Yes.

THE COURT:  That's why it seems like the word "providing" would flow from "read/write device" above.

MR. MASTERS:  No.  The read/write -- well, the read/write device, again, is configured to simulate what would be done by the local user equipment of a SIM card providing

service sharing.

Because that's what the read-and-write device has to do in order to let the user get access to the service provider, wherever they are.

THE COURT:  So it's not a sentence; it's just describing the device?

MR. MASTERS:  Correct.

THE COURT:  The device which is configured to simulate, et cetera, et cetera -- okay.

Well, so where are we?

MR. MASTERS:  Well, I guess we're just talking about Slide 29, Dr. Feuerstein's declaration and his description of the language.  He made reference to the specification. (reading):

"SIMO contends" -- I'm on Slide 30 -- "that the term is indefinite because they want to disregard Dr. Feuerstein's testimony as being conclusory because of insufficient punctuation, they say renders the term 'providing service sharing' indefinite, that uCloudLink and Dr. Feuerstein improperly redefined the word 'simulate' contrary to its ordinary meaning, and we redefined 'to' to mean 'of.'

"First, Dr. Feuerstein's declaration is anything but conclusory.  It's very detailed.  It's descriptive.  It's based on his extensive expertise in this area, cites to

evidence, and it's unrebutted by defendants.

"SIMO fails to carry its burden of proof, which to show indefinite must be by clear and convincing evidence. This term, we submit, is reasonably certain to a POSITA.

"SIMO fails to support its position with any reliable evidence. It's based entirely on attorney argument. And in contrast, uCloudLink has Dr. Feuerstein's testimony, plus the intrinsic evidence."

Slide 32 is an example of the brief from SIMO where you can see the brackets with red are just showing that there is just no support for any of their statements or conclusions that this term is indefinite. And that, by itself, is -- means they have failed to carry their burden of proof.

In Slide 33, SIMO argues the insufficient punctuation renders the term "providing service sharing" indefinite. But here in the specification, in Column 2, lines 30 to 37, the phrase "SIM card providing service sharing" -- again, the term we were talking about -- is used there in Column 2. It's also used in Column 5, lines 43 to 52, which shows that there is no comma or other punctuation between the phrase "SIM card providing service sharing."

SIMO's argument that the claims should include added commas, then, just seems to be entirely inconsistent with the specification. In fact --

THE COURT: Let me go -- I have to -- I'm still -- it

makes their point about indefiniteness.

I am still bothered by the first -- what is describing what?  When it says, "at least one SIM card read-and-write device," you would say, "configured to," blah, blah, blah, blah.

But then what do you do with the words "to a physical SIM card"?  What does that describe?

MR. MASTERS:  That is what the -- the read-and-write device is working with a physical SIM card that has been selected based in the country you're in.  Okay?  It has a SIM bank.  One SIM card is selected.  The read-and-write device now is going to go through the authentication process with that selected SIM card to provide service to the user.

What is that read-and-write device doing with that SIM card?  It is simulating, emulating, doing the same process --

THE COURT:  You say "that SIM card."  Is that the SIM card that resides on the user's cell phone or --

MR. MASTERS:  No, no.  That's in the SIM bank.

THE COURT:  Okay.

MR. MASTERS:  Right?  That's the SIM card that's in the -- with the Japanese carrier, so I can get great service in Japan.

THE COURT:  Right.

MR. MASTERS:  If -- there's a SIM bank.  Maybe

hundreds of SIM cards.  One is selected based on where you are in the world.

THE COURT:  Yeah.

MR. MASTERS:  The read-and-write device is now going through the authentication process with that one SIM card.

THE COURT:  Yeah.

MR. MASTERS:  That authentication process includes read-and-write process.  That read-and-write process that it goes through is the same that the local user equipment, like my iPhone, would go through --

THE COURT:  If it had that card in it.

MR. MASTERS:  If it had -- if it had to get onto a network.  The read-and-write process, the authentication process, that's what SIM cards are for.  Right?  That's -- and we actually talk about that later in Terms 3 and 4.

But the SIM card provides the access to a user.  You go through the read-and-write process; you generate authentication codes; you know, that's sent to the service provider, AT&T, or, in Japan, DoCoMo, whatever; they say:  Yup, that authentication code is good.  You're allowed to have access to my server.

So this read-and-write device has to simulate what the local user --

THE COURT:  So once it gets access and gets authentication from the carrier, the service, how does, then, the user's phone get access?

**MR. MASTERS:**  Because that is sent -- that authentication result from the read-and-write device, generates an authentication code, it goes back to the user's, what we call the MCCD, the multi-channel communication device --

**THE COURT:**  Yup.

**MR. MASTERS:**  -- that is sitting next to my iPhone or laptop, whatever I have.  That gets that authentication code, and now that can communicate with the local service provider, like DoCoMo or whatever.

**THE COURT:**  So there is not a physical SIM card in the MCCD, the --

**MR. MASTERS:**  Not for the service sharing portion. Nope.  There is not.

**THE COURT:**  Okay.  So that's why I'm asking:  In this phrase, it's -- one of things that comprises the '780 is "at least one SIM card read-and-write device," it's got to be capable of doing certain things, configured to simulate this process.  And if -- and if what it has to do, this configuration and simulation, is to simulate the read-and-write process performed by local user equipment of a SIM card providing service sharing, then you have the words "to a physical SIM card."

That's what I'm trying to grammatically -- what does that -- what does that connect to?

**MR. MASTERS:**  That connects to the read/write device.

And the read-and-write process is to that physical SIM card. That's -- the physical SIM card is the one selected in the SIM bank that's going to give me the local service based on --

THE COURT:  Don't you need a verb?  At least one SIM card read-and-write device to a physical SIM card?  That's the part I'm not getting.

I thought -- I mean, I understand if it said, "read-and-write device providing service sharing to a physical SIM card," but that's, apparently, not what you mean because you said "providing service" describes the SIM card local user equipment.

So I'm just -- grammatically, I am not sure.  What do the words -- what are they attached to, "to a physical SIM card"?

MR. MASTERS:  The read-and-write process --

THE COURT:  Okay.  Then how do you --

MR. MASTERS:  -- to a physical SIM card.

THE COURT:  Does that make grammatical sense?  "At least one SIM card read-and-write device to a physical SIM card," there is a verb missing, or something missing.

MR. MASTERS:  Well, it -- it's -- the read-and-write device is configured to simulate the read-and-write process to a physical SIM card.

THE COURT:  So it describes "simulate," to simulate a read-and-write device to a physical SIM card.

MR. MASTERS:  Yes.  And I think that makes technical

sense.  It's -- the read-and-write device is configured, or designed, to simulate a read-and-write process to a physical SIM, to a physical SIM card.

THE COURT:  And how does it -- remind me.  How do you simulate a read-and-write process to a physical SIM card?

MR. MASTERS:  So once the SIM card -- physical SIM card is selected --

THE COURT:  Yeah.

MR. MASTERS:  -- and I'll have it connected.

THE COURT:  That's the one that can communicate with a Japanese carrier.

MR. MASTERS:  Yes.  That's up in the Cloud from the SIM bank.

THE COURT:  Yeah.

MR. MASTERS:  And you have the read-and-write device. Those two are now, logically, connected, electronically connected.

THE COURT:  Yeah.

MR. MASTERS:  There is -- the read-and-write device is going to initiate a read-and-write process to that physical SIM card -- okay? -- which process is simulating what would be done by local user equipment.

But I think your question is on the first part there.  The read-and-write device and the physical SIM card, they are connected; and the read-and-write device is initiating a

simulation of a read-and-write process to that physical SIM card.

THE COURT:  Emulating a read-and-write process to the physical SIM card.

MR. MASTERS:  Yes.  It's doing a read-and-write process to that physical SIM card.

THE COURT:  Okay.  And that read-and-write process is the one that is performed -- or you would say normally or typically performed by a local user equipment of a SIM card providing service sharing.

MR. MASTERS:  Right.  It's describing -- the general idea is that the read-and-write device is conducting a read-and-write process with a SIM card, physical SIM card, in order to get a user access to a local -- a carrier, a provider, which would -- in the same way that local user equipment would do that process.

THE COURT:  In a way, the parentheses, if one were to put a parentheses around it, it should be around the words "performed by local user equipment of a SIM card providing service sharing."  That describes the simulated read-and-write process.

MR. MASTERS:  Correct.

THE COURT:  That process is to a physical SIM card.

MR. MASTERS:  That's correct.

THE COURT:  Now that I have the beginning of the

parentheses, I see that makes a little more sense.  All right.

**MR. MASTERS:**  And as I said, I think I was over-inclusive on my parentheses.  But the way you just stated it is how it would be written.

**THE COURT:**  Okay.  All right.  Any further comments, then?

**MR. MASTERS:**  And I think just one last -- yes.

Slide 34, again, there is several instances of where the intrinsic evidence describes this process.  We have them identified there.

I'm not going to discuss the issue of simulation on 35.

I think one last point, Slide 36, is that SIMO filed a petition for IPR with respect to the '780.  They had no trouble interpreting Term 2 for purposes of challenging the claims, but now they are arguing the claims cannot be interpreted.

So for all those reasons, we'd submit that SIMO has failed to support its position, has not met the burden of clear and convincing evidence.  There is no evidence that they have. It's simply attorney argument.  And the claim term is reasonably certain to a POSITA, based on the intrinsic evidence, and Dr. Feuerstein's declaration, and our discussion today.

Thank you.

**THE COURT:**  All right.  Thank you.

**MR. WEED:**  Your Honor, I'm even more confused now than

when we started today.  I'm not sure I saw an answer to the question of what is the noun doing the service sharing.  And that was a big focus of the briefing before the Court.

And, in fact, I went back and pulled the reply brief that uCloudLink filed.  I came in to today thinking that the position they were taking is the SIM card read-and-write device was the device doing the service sharing.

And you can see that, I think, from Page 7 of the reply, which should be on the screen.  And if we scroll up just a little bit to Line 8 on Page 7 of the reply --

It's not scrolling.

In any event, I can read it.

They treat a statement we made as an admission.  They say (reading):

"Indeed, SkyRoam admits that the user equipment is historically the device that provides service sharing. But the invention in the '780 patent enables that service sharing to be performed by the at least one SIM card read-and-write device."

So it seems to me they are characterizing that as some kind of an admission beneficial to their position; yet, Mr. Masters got up, and the first thing he said was:  The device in the claim that does the service sharing is the SIM card, not the SIM card read-and-write device.

So that's a pivot from the reply brief.  And that's

exactly the point we made, first and foremost, in our briefing about this term.

We don't know, perhaps because of the sloppy language, perhaps because of the lack of transitional phrases or parentheses or punctuation, but we don't know what this claim term means.  And we still don't.  I still -- I know less about it now than I did an hour ago.

And if we go back to our slide presentation, on Slide 25 --

THE COURT:  Well, is it your problem you don't know what "service sharing" is, or you don't know what "providing service sharing" modifies?

MR. WEED:  The latter.  And I'm not sure I know what "service sharing" itself is.  But the problem with this claim term is, reading the claim term, we can't tell what device it is in the claim term that's providing service sharing.

It's equally likely, I would say, that the SIM card read-and-write device provides service sharing.  Indeed, uCloudLink treats that as an admission.

And it's also equally likely that the SIM card itself is providing service sharing, just by the proximity of that term to the claim language.

And in our brief, we actually point out that it's, perhaps, even the case that the local user equipment could be the device providing service sharing.  So there are at least

three nouns in this claim term that could be the noun

responsible for providing service sharing, and we can't tell

from reading the claim which one it is.

And the exercise that Your Honor went through just now to

try to guess what that might be shows you exactly why, under

*Nautilus*, and other causes like it, this term is indefinite.

That discussion, which spanned about a half an hour, does not

evidence a reasonable certainty about what this claim term

means.

And Dr. Feuerstein put in testimony of a person of skill

in the art, but it's a linguistic issue.  There is a problem

here with the language.  UCloudLink prosecuted claims that we

simply can't understand, as we stand here today.

On Slide --

**THE COURT:**  Why can't it be ascertained, I mean, from

the -- from the gist of the invention and all the

specifications, that it is about simulating a SIM card that

provides service sharing?

**MR. WEED:**  Well, the claim says simulated

read-and-write process.  So we're not simulating -- the claim

isn't talking about simulating a SIM card.  It's talking

about --

**THE COURT:**  You simulate a read-and-write process that

would -- you have to have the words "that would be normally

performed," or "that would be performed by local user of a

SIM card which provides service sharing."

Isn't that consistent with the gist of this -- of the patent?

**MR. WEED:**  Well, again, I -- I think that's a complicated question.  For one reason, because the word "simulated" is never described in the patent.  So we have to guess at what the claim term "simulate" might mean in the context of the patent.

We had some discussion during the tutorial about that Figure 8 bounce diagram; and presumably, simulate is part of that process.  But it's not used in the patent as a word to describe a series of actions.

So there is that hurdle; but beyond that, the question still becomes:  What device is doing what action in this claim limitation?

And so it may be the case that the SIM card read-and-write device is the thing configured to simulate -- you know, ellipses.

But the question still comes down, in our view, to:  What is the device providing service sharing?  Is it the SIM card read-and-write device?  Is it the SIM card?  Is it the local user equipment?

The lack of punctuation and clarity in the claim language, and the inability of the spec to point out a consistent discussion of what it is, is the problem here that, under

*Nautilus*, renders the claim indefinite.

THE COURT:  Of what consequence is it if, under their construction, as I now understand it -- that if you have a read/write device that is configured to simulate a read-and-write process to a physical SIM card, and part of that process is the kind of process that would be performed by a local user of a SIM card providing service sharing -- I mean, at the end of the day, that read/write device is effectively providing service sharing through the simulation of the process of a SIM card that would provide that service sharing.

I'm not sure why that's inconsistent, especially if you look at the other elements of the patent that kind of describes it in greater detail.  This only describes that there is a read/write and what it does.  And I don't see why the construction that has been suggested here -- and I would have to look at the reply brief to see if there is an inconsistency -- and I think I'll give counsel a chance to respond to that -- but I'm not sure why that's so vague and indefinite that it can't be construed with reasonable certainty.

MR. WEED:  Well, I'm not saying that the proposed construction is necessarily unreasonable.

The point is, we don't know for sure that it's the right one.  We don't even know with reasonable certainty that it's the right one.

So if the Court is endeavoring to arrive at a construction that makes sense, that's the wrong inquiry, in our view.

The inquiry is:  From reading the claim language, from reading the specification and the file history, can we tell with reasonable certainty what this claim term means?

As a member of the public going out and potentially putting together a system that might look like the system of Claim 1, can I do an analysis to figure out whether I would be infringing or not?

And the ability to guess at a construction that might make sense or might be linguistically consistent is not the inquiry under *Nautilus*.

The question is:  Is there one construction that is reasonably certain to be the correct one?

And all the briefing on this point, and all the argument we just heard, I think, shows that that's not the case.

THE COURT:  Well, I mean, that's an interesting question.  So if you can construe a term of a patent -- and I don't know if we're ever reasonably certain when we construe a patent --

MR. WEED:  Fair.

THE COURT:  But if the best construction that the Court can discern is X, and as construed along the lines of X, there is not indefiniteness -- I thought "indefiniteness" is something that inherently defies construction.  There is no

reasonable construction that can save it.

MR. WEED:  The way I understand the Federal Circuit's law on indefiniteness, the question is:  Can we be reasonably certain that the corrected construction is the right one, or are there multiple constructions to which a term is amenable?

The question focusing on public notice and, you know, as a potential infringer, can I read this claim and understand what it means without the aid of the Court construing the term in the way it deems appropriate?

And again, here, I think --

THE COURT:  That would seem to be raised -- indefiniteness seems to be inherent in every claim construction I've ever been to, because there is always two, three, four sides of the argument, and I don't think anybody is ever absolutely certain.

So if you apply the reasonable certainty test to the confidence by which the Court renders a claim construction, we would be committing indefiniteness all over the place, it seems to me.

MR. WEED:  I think that's fair.  I think a lot of times, claims construction focuses on whether or not a particular embodiment ought to be a part of a broader term. And so certainly with regard to the scope, you know, is it broad, or is it narrow?  There's always uncertainty in claim construction.

But the problem here is, we just don't know whether embodiments like the ones that we have on Slide 29, where the patent specification is talking about the SIM card providing service sharing, both in Column 2, lines 35 to 38, and again in Column 5, line 47 to 42.

Are these the kind of embodiments that are covered by Claim 1?  Or is it embodiments like those that I thought uCloudLink was relying on in the reply brief, where the SIM card read-and-write device is the device; it's the noun; it's the component of the system that provides service sharing.

And so here, it's the -- the fact that there are kind of at-odds positions, even reading the intrinsic record, that are not corrected or not clarified by the claim language, and whatever corrected, via certificate of correction or any other kind of patent office procedure, to give the public more clarity on this term, and that's really the problem.

And I think if we look at Slide 30 of our presentation, we have annotated uCloudLink's proposed construction here to show the Court again what the problem is, and the fact that that's not corrected by their construction.

If you look at the last phrase, the construction is talking about a SIM card providing service sharing.  But I think it could also be read, as we see on Slide 31, that the local user equipment is the thing providing service sharing.

And again, you contrast that with the reply brief where

they're saying it's the SIM card read-and-write device that's providing the service sharing.

So those are three options for the noun doing the verb of providing the service sharing that aren't fixed by the plain language of the claim, and certainly aren't fixed by the proposed construction from uCloudLink.

**THE COURT:** All right. Maybe this is a good point to hear -- to hear the rebuttal, if there is one, to your two points: That there is such an ambiguity here that providing service sharing could be a descriptor of three different things, and we don't know what; and that what's been argued here at the hearing is inconsistent with page 8 of the reply brief.

So there is -- you're saying they're shifting positions here. And I would like to know what the doctrinal interpretation of indefiniteness is and how that interplays with construction.

So let me just hear briefly on that point.

**MR. MASTERS:** First, Judge, I'm not aware of any inconsistencies in the reply brief. If I understood that was -- counsel was quoting from page 7, beginning at Line 8.

The statement is that (reading):

"SkyRoam admits that the user equipment is historically the device that provides the service sharing. But the invention in the '780 patent enables that service

sharing to be performed by the 'at least one SIM card read-and-write device' rather than the user equipment; thus, there is no dispute that the SIM card read-and-write device simulates processes as would typically be performed by a local user equipment of a SIM card providing service sharing, which is very consistent with this proposed construction of the term."

There are many attempts by defendants here to read this term, but it's entirely within isolation and out of context of the overall invention, and that's the improper standard.

You're supposed to read the claim term in view of the specification and the overall gist of the intervention, and here that's simply not what they are doing.

In terms of reasonable certainty, it's not to the attorneys; it's to a person of ordinary skill in the art. And that's where Dr. Feuerstein's unrebutted testimony is exacting on this issue in terms of setting out an explanation of the term, what is trying to be achieved, and how a person of ordinary skill in the art would, in fact, interpret this phrase.

THE COURT: What about addressing the interaction, if any, between the claim construction process itself and indefiniteness?

Is the Court supposed to look -- does the Court need to be reasonably certain that its claim construction is accurate,

otherwise, it might be subject to an indefiniteness problem? Or can indefiniteness -- whether a claim is indefinite can be informed by claim construction?

MR. MASTERS: Well, the standard is, the claim term has to be reasonably certain to a person of ordinary skill in the art. And if it's not, then the claim term would be indefinite. But they have the clear and convincing burden to show that --

THE COURT: Right. So what's the role -- is there any interaction between claim construction and the Doctrine of Indefiniteness? That's what I'm asking.

MR. MASTERS: Well, if the Court finds that it's not reasonably certain to a person of ordinary skill in the art, and they have met that burden, then the term can be indefinite because you --

THE COURT: It can't be reasonably construed, then.

MR. MASTERS: That's true. But if you have --

THE COURT: If it can be construed, does that suggest it's not indefinite?

MR. MASTERS: Absolutely. If you can construe it based on the specification, and the context of the entire invention, and it's, again, reasonably certain to somebody of skill in the art, it cannot be indefinite in that case.

And there is only one reasonable interpretation of this term once you understand the terminology that's used by the

inventor here.  And the one example of that is -- I keep losing it -- the SIM card read-and-write -- I'm sorry.  Let me get the language.

So the SIM card providing service sharing, SIMO comes here and says that you should be providing commas in between "SIM card providing service sharing," but that phrase is used in the specification without commas, without punctuation.

And once you understand that the local user equipment that -- of a SIM card providing service sharing --

THE COURT:  I'm not seeing it on your screen.  Where is your rendition of their proposal?  Is that on the screen?

MR. MASTERS:  I have Term 2 up here.  And I was just looking at the claim language, "SIM card providing service sharing."  But then on the --

THE COURT:  You're saying they want to insert a comma where?

MR. MASTERS:  Well, they suggest a few places between -- in the phrase "SIM card providing service sharing." But that phrase, as used in the claim, is used in the specification without commas.  So there is no reason now to take that term and insert commas and say, "Oh, Judge, you can't construe this because you don't know where to put the comma."

A comma is not to be inserted there.  That's why the construction that we advance is the only reasonable construction.

Slide 33 shows one portion of the spec, Column 2, line 30 to 37.  There, it refers to performing a local -- "by a local user equipment of a SIM card providing service sharing."  Again, it's using that phrase.

In Column 5, lines 43 to 52:  One or a plurality of SIM cards providing service sharing.

There is no commas in that phrase.  So there is no reason now --

THE COURT:  It's interesting.  See, the thing says, "One or a plurality of SIM cards providing service sharing."  So that describes once the box -- the read-and-write device has the -- the array of SIM cards in it; right?

MR. MASTERS:  That's true.  But that's what SIM cards are doing.  That's what the read-and-write device is simulating.

THE COURT:  Right.  But this is describing the -- isn't this describing the read/write device performing --

MR. MASTERS:  Yes, because it's --

THE COURT:  -- the service providing the service sharing?

MR. MASTERS:  Yes.

THE COURT:  And that's -- that's what I originally thought this meant.  Because it says, "at least one SIM card read-and-write device," and ignore all the other words in between, "providing service sharing to a physical SIM card."

But you say:  No, the "providing service sharing" describes the local user of a SIM card, or the SIM card that's used by a local user.

**MR. MASTERS:**  Because that's what's being simulated. Correct.

**THE COURT:**  Maybe in the end, it's not that different. Because if you're simulating that, you're providing that.

**MR. MASTERS:**  That's the intent of the invention.

**THE COURT:**  Well, okay.

And I would have to go back to -- so, again, you read this as saying -- with the parenthesis and ignore the parenthetical for a moment -- "at least one SIM card read-and-write device configured to simulate to a physical SIM card."

Right?

**MR. MASTERS:**  Configured to simulate a read-and-write process to a physical SIM card.

**THE COURT:**  So you simulate a process to.

**MR. MASTERS:**  To a physical SIM card.

**THE COURT:**  Is that grammatically correct?  You simulate a process to?

**MR. MASTERS:**  Simulating a read-and-write process to a physical SIM card, yes.  Read and write to a SIM card.

**THE COURT:**  You read and write, but you don't simulate --

**MR. MASTERS:**  Read-and-write process to a SIM card,

simulating the read-and-write process to the SIM card.

THE COURT:  But that's not the way it's -- that's not what it says.  It says "configured to simulate a read-and-write process to" --

MR. MASTERS:  Correct.

THE COURT:  "Simulate a process to."  That sounds odd to me for some reason.

MR. MASTERS:  Does it?  Because you read and write to the SIM card.  So you're talking about a read-and-write process to a SIM card, and you're simulating that process to a SIM card.  I think, technically, it sounds --

THE COURT:  Yeah.  If it said "to read and write a simulated," or "a simulation of," or something, I could see that.  That's a little plainer English.

If it said "to read and write a simulated process," or something like that, "to a SIM card."  This is "configured to simulate a process to."  It just -- it's just odd, it seems -- sounds to me.

Do you simulate something to?  Simulate a process to?  You configure it.  You can send it to.  You can configure it to.  You can, you know, implant, or whatever.  Transfer.

MR. MASTERS:  You can do a read-and-write process to a physical SIM card.

THE COURT:  Yes.  That's what I said.

MR. MASTERS:  Isn't that what's being simulated, to

simulate the process to a SIM card?

THE COURT:  Just grammatically, it's not -- I guess it's, "simulate a process to."  Well, that's your construction, right?  I'm reading that correctly.  I'm reading you correctly?

MR. MASTERS:  Well, that's -- what is in our brief in Slide 25 is our construction there.

THE COURT:  Okay.

MR. MASTERS:  And I think we have been consistent with the construction we proposed to the extent the Court feels that construction is necessary.

THE COURT:  All right.  All right.  Okay.

Let me see if there is any further comment from you, then, on that.

MR. WEED:  Nothing major, Your Honor.  I would just point the Court to Slide 40 of our presentation, which is a clip from the *Chef America* case, cautioning District Courts against rewriting claims to preserve validity.

THE COURT:  This is Slide 40?

MR. WEED:  Correct.  It comes up in another context, but that's Federal Circuit law saying the District Court should not be redrafting claims.

And the other point I would make is, it sounds to me, listening to these arguments, as if uCloudLink is both saying their construction is reasonable, and seemingly also agreeing with the Court's proposal regarding parentheses and other

punctuation.

So that is more evidence that there is not sort of one most certain, most reasonable construction here. I still think the inability to arrive at what this term actually means in the context of the patent show its indefiniteness.

**THE COURT:** All right. Thank you.

We should move on, the next term here.

**MR. MASTERS:** I think we can do these terms much faster, Your Honor.

**THE COURT:** Okay. What slide are you on?

**MR. MASTERS:** I'm on Slide 38.

So Disputed Term 3 focuses on the word, quote, on, unquote, and the meaning of the term "on." (reading):

"The claim language says 'a SIM database configured to store SIM data on the at least one SIM card of the at least one SIM card read-and-write device.'

"uCloudLink contends that the SIM database is configured to store SIM data of or about the one SIM card stored in the at least one SIM card read-and-write device. And on the other hand, SIMO contends that the SIM database is configured to store SIM data on the at least one SIM card of the at least one SIM card read-and-write device.

"SIMO's construction, again, makes no sense. It's manufactured. The intrinsic evidence clearly supports the plain and ordinary meaning of the Term 3. A POSITA would

understand Term 3 exactly the way uCloud proposes.  And SIMO ignores the context of the patent in order to achieve its construction."

On Slides 40, 41, and 42 (reading):

"The intrinsic evidence clearly supports that the SIM database 4-11 stores SIM data of the SIM card."

That's what it says there in the '780 patent at Column 8, lines 5 to 12.

Slide 41, again, Column 8, lines 13 to 17 (reading):

"The SIM data is stored in the SIM database 4-11."

Slide 42 (reading):

"The SIM scheduling unit 4-13 searches according to the service request in the SIM database to select appropriate SIM and assign the selected SIM to the subscriber."

So here, it's talking about searching the database to find the correct SIM card.

There is no instance anywhere in the intrinsic evidence, and SIMO cites none, that SIM data is stored on the SIM card. The SIM data is stored in the SIM database, which is exactly what a database is designed to do.

Slide 43.  The dictionary provides that there are several definitions for the word "on."  It can mean "of," and "about." It gives the example of, quote/unquote, a book on minerals.

Again, the intrinsic evidence, Dr. Feuerstein provided

testimony to support the construction of the word "on" as submitted by uCloudLink, and in the manner in which this invention operates as described in the specification that a POSITA reading the claim language, in light of the specification, would understand that the SIM database stores information of the SIM card and does so in the SIM database itself.

It does not store --

THE COURT:  So, for instance, it could be read, aside from "of" or "about," SIM data that resides on the at least -- I mean, the idea is this is data from the SIM card that's stored in the SIM database; is that the idea?

MR. MASTERS:  That's correct.  Nothing is stored on the SIM card itself.  The SIM data is not stored on the SIM card.

THE COURT:  In fact, the SIM data is sort of taken from the SIM cards.

MR. MASTERS:  That's correct.

THE COURT:  Unfortunately, it uses the word "on," which --

MR. MASTERS:  On.

THE COURT:  -- has a dual meaning, is what you're saying.  On can be "about," like a book on minerals or a book --

MR. MASTERS:  It does.  And if you look at, like,

again, Slides 40, 41, and 42, the specification is absolutely clear as to what it's doing, where the data is stored.  It's data -- SIM data about the SIM card that's being stored in the database.

And if you read the claim language just itself, the SIM database is not storing data somewhere else.  The SIM database is storing the information it needs.  That's what a database is.  So it's storing -- the database is configured to store the SIM data about the SIM card.

THE COURT:  Or you could say, "which is on the SIM card."

MR. MASTERS:  I guess that would work, too.

THE COURT:  Deleted the words "which is."

MR. MASTERS:  But the database is storing the information, not -- the database is --

THE COURT:  I understand that --

MR. MASTERS:  Okay.

THE COURT:  -- from all the intrinsic evidence and the teaching.

MR. MASTERS:  Exactly.

And I would just submit that SIMO has not looked at this -- is attempting to very, very narrowly limit the meaning of the word "on," not considering its other definitions, to come up with a construction that defines absolutely no support in the specification.

So unless you have further questions --

THE COURT:  No.  Let me hear their response to that.

MR. MASTERS:  Okay.

MR. WEED:  Your Honor, I'll start with Slide 39 of our presentation.  And recalling back to the first term we talked about today, the insertable/inserted term, Mr. Masters said: Hey, the inventors chose the words they chose.  Let's hold them to that.

We're talking about insertable/inserted.  That's fine. Here, uCloudLink is asking the Court to change the words the inventors chose.

On Slide 39, we've shown you the proposed red line uCloudLink advocates.  One is to change the word "on" to the word "of."  Another is to change that same word, "of," to the phrase "stored in."

Now, this is important because I just mentioned the last -- for the last term, the Federal Circuit cautions against amending the claims for any purpose in the District Court level, as we see on Slide 40.

But importantly, here on Slide 41, this is a clip from our brief where we detail the number of times throughout prosecution here where uCloudLink's attorneys had the chance to change this language.  This was part of rejections, responses to rejections.  The language was noted in the Notice of Allowance.  And never, until claim construction here, did

uCloudLink seek to change these words in this claim term.

So it's our contention that what's good for the goose is good for the gander on the insertable terms.  These words were intentionally chosen.  They mean what they mean.  They're very plainly understandable words, and they should not be changed by the Court.

THE COURT:  But what's the problem with the fact that "on" can mean, you know, data that -- on, or which is on -- Is mean, there are -- it's not so clear, like "able," "insertable."  It's kind of hard to argue, frankly, to ignore the "able".

Here, "on" has a more fluid meaning.  I mean, it can mean several things.  And their example of "a book on minerals," you know, it's "about."  Or, you know, "which is on."  You know, you can delete "which is" -- if they said, "which is on" --

MR. WEED:  Sure.

THE COURT:  -- that would have been clear.

And given the structure of this whole -- the teaching of this patent, it seems pretty obvious what is meant by that.

So what's wrong with a word that has some elasticity and that is capable, in light of everything else, of being construed the way they want to construe it?

MR. WEED:  So, first, I didn't hear an argument.  I don't think there is an argument that the word "on" in the context that SIMO asserts it should mean, is -- doesn't make

sense in the context of the claim.  It makes sense in the context of the claim.

The argument, as I understand it from uCloudLink, and as we see on Slide 44 of our presentation, is that there aren't embodiments in the patent, in uCloudLink's view, that would cover that situation.

I think that, really, what this boils down to as, they say, there are no embodiments in the patent here where SIMO's interpretation of "on" would make sense.

And I think even recent activities in front of this Court show that that's not the case.  During the tech tutorial -- and we have on Slide 45, a clip from the tech tutorial -- Your Honor had an exchange with uCloudLink's counsel drilling into exactly this point.

This patent is all about using SIM read-and-write devices. Not just SIM read devices, but SIM read-and-write devices.  And you asked Mr. Quist:  What kind of data could be written onto the SIM cards in the SIM read-and-write devices?

And not shockingly, he had an answer for you.

So the fundamental aspect of this patent is based on the use of these SIM read-and-write devices, which are read and write devices.

If we look at Slide 46, this is a passage that we had on our tech tutorial slides from Column 5 of the '780 patent, where in all three embodiments of the read-and-write devices,

those devices support read, write, and storage of data on SIM cards.

So I don't think it's inconsistent with a patent to read "on" as meaning "on."  And I don't think there is any reason to rewrite the term "on" to mean "of," as uCloudLink asserts.

If we go even further into Claim 2, this is not a disputed claim term, but it adds a further requirement, on Slide 47, for an element called a SIM card management unit, the task of which is to control read and write of the SIM card.

So now we affirmatively have an element with a name, a SIM card management unit, whose job it is to read and write on the SIM card.

On Slide 48, we have just clipped some of the 3GPP standards that I talked about in the tech tutorial.  And the data that's highlighted here in yellow is exactly the kind of data that the standards back in the nineties told implementers needed to be able to be written onto --

THE COURT:  Let me ask:  You emphasize -- you've underscored "write."  It's obvious that you write onto, I guess, a card.  But this term is "a SIM card database configured to store SIM data."  I wonder if there is a difference there.  It doesn't say "write" and "store."

MR. WEED:  Sure.  The name read-and-write device was given to the component called the read-and-write device, but a write activity is a storage activity.  The idea of writing is

the idea of storing something in memory for later retrieval. It's the opposite of --

THE COURT:  That can be ambiguous.  It's not so clear as writing onto something.  When you write, it's kind of a one-way deal, it seems like.  When you store something, you could store something from something; you could store it onto something.

I mean, it -- again, it's a little bit more elastic than "read."  So all of the context that you cited in Slides 46, 47, you highlighted "write."  If you just said "read," that would be different.  But it's the "write" part that opens the door to putting something onto -- writing onto a SIM card.

MR. WEED:  That is a fair point, Your Honor.

If you look at Slide 46 -- and, again, I wasn't -- it wasn't apparent this was going to go that direction, but if you look at Slide 46, we didn't highlight the word "storage" here. But storage is another capability of all three embodiments of the disclosed SIM card read-and-write device.

So if you want to make a distinction between storage and writing, the patent also tells us that storage is one of the functions of all three embodiments of a read-and-write device, as is writing, as is reading.

So it's not inconsistent to read the term the way it was written.  It's not inconsistent to assume that the application was prosecuted intentionally, with capable counsel, and with

words that were intended to be -- to have their standard meaning.

There is nothing in the intrinsic record to support the modifications that we saw, that uCloudLink advocates for on Slide 39 of our presentation.

THE COURT:  It's interesting.  On Slide 46, it does say, "Read, write, and storage of several to tens" -- oh, no. That's different.  Of.  It says, "of."

MR. WEED:  Tens of SIM cards.

THE COURT:  Of -- yeah, "of tens of SIM cards."

MR. WEED:  I think what that's getting at is just the idea that in the different embodiments of the SIM read/write device, it's kind of different orders of magnitude of SIM cards, you know, kind of the massive scale, the mid-tier scale, and then the SIM box embodiment, which is just a few SIM cards.

THE COURT:  "Storage" here seems to have a different connotation.  It says, "storage of physical SIM cards," not "storage of data."  Whereas, what we're talking about here is a database configured to store SIM data.  So the storage is about the devices, not the data.

MR. WEED:  In the Figure 5 embodiment, for context?

THE COURT:  In Page 46, when you said -- well, it says, "storage."  After my comments, it -- about you're emphasizing "write."

MR. WEED:  I think, if anything, Your Honor, that

enforces the intentional choice of words, and perhaps there is an issue with whether "storage" is supported by the disclosure of the patent, which is not right for claim construction.

The only point that I was trying to make is that the patent does not talk about a one-way flow of data from the SIM cards.  It talks about --

THE COURT:  No, I understand that, that it's capable of writing to, as well as reading.

All right.  Well, I think I understand both sides on that.

Let's -- why don't we get to the last one.  It's now past 12:00.

MR. ANDERSON:  Can I make one observation, Your Honor?

THE COURT:  Yeah.

MR. ANDERSON:  Counsel on the other side has repeatedly referred to this *Jeff Allen versus Lamb* [sic] as asking the Court to redraft the claim.  We're not asking the Court to redraft the claim --

THE COURT:  I understand that.

MR. ANDERSON:  -- we're asking him to interpret the claim.

THE COURT:  No, I understand that.  At some point, something becomes a redraft when the construction is -- it's a spectrum.  When the construction is so far out there, you are essentially, quote, redrafting the claim, that it's not consistent with the term.

On the other hand, if the term is elastic enough to be able to encompass the proposed construction, you're not redrafting.

MR. ANDERSON:  Sure.  And I think if you look at the Court's decision in -- the Supreme Court's decision in the *Nautilus* case, which was decided in 2014 on the standard of indefiniteness, and set it henceforth, I think Your Honor's point earlier that we're talking about the question of:  Is there a reasonable interpretation, not whether there are multiple interpretations?

I think Your Honor's observations were on point.

Thank you, Your Honor.

THE COURT:  Thank you.

MR. MASTERS:  Would you further hear me out?

THE COURT:  Certainly.

All right.  Mr. Masters, last term.

What slide are we on now?  46?

MR. MASTERS:  47 would be the last term, which is the phrase "the SIM function."  (reading):

"uCloud contends that no construction is necessary. SIMO, again, contends this is indefinite.

"The intrinsic evidence clearly supports the plain and ordinary meaning of the term -- should be four -- an explicit antecedent basis is not required in this context. SIMO's argument is, again, like with respect to Term 2,

based entirely on unsupported attorney argument.

"The ordinary meaning of the term 'SIM' to a person of ordinary skill in the art is 'a subscriber identification module,' which is understood to be a small computer chip inside cellular phones, or other wireless devices, and its function is to identify the owner of the device and to connect the device to a mobile network service.

"'Function' also has a very ordinary meaning.  And to a person of ordinary skill in the art, it would be:  The acts, capability, or purpose for which an item is used."

That comes out of the dictionary.  So the ordinary meaning of "SIM function" is thus the act, capability, or purpose of a traditional SIM card.

The background of the invention talks about this. (reading):

"SIM is a unique authentication ID issued by a service provider for controlling access of a user equipment.  The SIM enables the user equipment to enjoy data and voice services."

Again, the SIM is controlling access.  That's the intrinsic evidence.  (reading):

"SIMO attempts to manufacture an argument here that, because it lacks antecedent basis, it's, therefore, indefinite.  But the *Bose Corp. versus JBL* case clearly

established that failure to provide explicit antecedent basis for terms does not always render a claim indefinite. If the scope of a claim would be reasonably ascertainable by those skilled in the art, then the claim is not indefinite."

Here, there is clear evidence in the intrinsic evidence, and even the unrebutted testimony of Dr. Feuerstein, that confirms the scope of the phrase "the SIM function."  It's readily understandable to a person of ordinary skill in the art.

SIMO's argument, therefore, that Claim 1 is indefinite, which is merely in the opinion of its attorneys, fails because a person of ordinary skill in the art in this field of the invention would know the functions of a SIM with reasonable certainty.

The attorneys' lack of understanding is not the standard; plus, the specification clearly explains what a SIM is and the functions that goes with it.  For example, the unique authentication ID issued by a service provider for controlling access of a user equipment.

And again, on Slide 53, in the IPR that SIMO filed, they had no trouble asserting that this claim was invalidated by prior art; and thus, they were interpreting Term 4 at the patent office, but now they are telling this Court they cannot interpret it, and it should be indefinite.

They have no evidence to support their clear and convincing burden; and therefore, this term should be construed as it would be known by somebody of ordinary skill in the art, its plain and ordinary meaning in the term is definite.  It's not indefinite.

THE COURT:  All right.  Counsel.

MS. JOHNSON:  Good afternoon, Your Honor. Gina Johnson on behalf of SIMO and SkyRoam.

THE COURT:  Good afternoon.

MS. JOHNSON:  So I think Mr. Masters' analysis skips right into what Dr. Feuerstein has to say.  But I'd like first to do what *Phillips* tells us to do, and that is to look at the claim language.

SIMO contends that the SIM function is indefinite in the context of this claim term because there both is a lack of an antecedent basis, and the scope is not ascertainable by a person skilled in the art.

So looking at the claim term, Claim 1, we only see the term, "the SIM function" appear one time.  And the first time it appears, again, it shows up as "the SIM function."  So we don't have, Your Honor, any indication prior to this what a SIM function is.

Ordinarily, we might see in the claim "a SIM function," "the SIM function" selected from a list of the following.  But we don't have that here.  And we learn from the *MPEP* and *In Re:*

*Packard*, that a claim is indefinite when it contains words or phrases whose meaning is unclear.

And *MPEP* says --

THE COURT:  Not ascertainable by antecedent.

MS. JOHNSON:  That's correct.

And I think, going directly to that point -- I understand if that's what Your Honor is hung up on a little bit because Dr. Feuerstein inserts his opinion, and he shows parts of the specification that shed light on a SIM card.  But what Dr. Feuerstein does not do is ascertain the scope of the claim whatsoever.

So if we look at Dr. Feuerstein's declaration, he says:  I understand that a SIM function is anything a SIM card can do.

Well, Your Honor, the 3GPP standards on SIM cards are thousands of pages long.  So what does it mean that a SIM card's capabilities is going to rise to the level of the SIM function?  We just don't know.

And a claim term is indefinite, it we look at the case law, when they fail to specify clear, definite boundaries or standards.  And uCloudLink's proposition that the alternative construction functions of a SIM does nothing to solve the problem that the functions of a SIM -- which Dr. Feuerstein says is the acts, capability, or purpose for which an item is used -- are endless.  We simply do not have --

THE COURT:  Your argument here that, number one, the

specification, has -- describes what the function of the SIM

is; the nature of the invention obviously is to get authorized

access to a carrier.  It seems pretty evident.

What's wrong with -- why isn't -- why wouldn't a POSITA

construe a SIM function as something that has an

authentication, or as he put it, "unique authentication ID

issued by a service provider for controlling access to a user

computer, or something that identifies the owner of a device,

and connect it to the mobile service network"?

It seems common sense to me.  What's wrong with that?

**MS. JOHNSON:**  If that's common sense, Your Honor,

that's not uCloudLink's proposition.  Their proposition is that

the construction should be functions of a SIM.

And so to the extent that, then, we take that a step

further and say, well, Dr. Feuerstein said "functions of a SIM

are authentication and enabling voice and data services" --

which we do see in his declaration, I don't dispute that.

First of all, that comes in the context not of what a SIM

function is in the specification or the claims; that comes from

the construction of the term "the appropriate SIM."  And he

highlights that in Paragraph 65 of his report.

Further, it doesn't set boundaries on what is required as

a SIM function.  Functions of -- if we follow Dr. Feuerstein's

logic, functions are capabilities of a SIM card.  There are

endless capabilities.  At best, Dr. Feuerstein provides us,

from the specification, with two types of capabilities that are possible for a SIM card to perform.

However, as a potential infringer out in the world, we don't know if we just have to meet these baseline capabilities when we have a SIM card, or if there is other things that the SIM card can do, and that is what is going to require us to be infringing.

So I think --

THE COURT:  What's an example of something outside of what Dr. Feuerstein, or outside of what specification here, how it describes the function of a SIM card is to control access to a user network by -- through an authentication?  What's an example of something that you're afraid that's possibly beyond the scope, if you read SIM function so expansively, and it's beyond that function?  What's an example of what it --

MS. JOHNSON:  Sure.  So one example, Your Honor, would be something that Mr. Weed discussed previously, and that is the SIM card functions to store data.  So, for example, you can imagine -- I think if you remember old iPhones, you could put, what, six to seven phone numbers and store them on your SIM card.  So that's a SIM function.

Do we need to do that to be infringing here?

There is also the three --

THE COURT:  Say that again?  So you take phone numbers, and you store it onto a SIM card?

**MS. JOHNSON:** That's right. So that you can then transfer your SIM card over to another device when you get a new device, for example. And then you don't have to worry about losing the information from your original phone. So SIM cards can function as storage devices.

The 3GPP standards, frankly, Your Honor, go through thousands of things that a SIM card is capable of doing. And is edition -- I don't have this on a slide, but if we look to Dr. Feuerstein's declaration, Paragraph 68, he quotes SkyRoam's expert in the Southern District of New York case, which adds that a SIM card can be responsible for enabling the device to send SMS messages.

So we see the patent definitely requiring, at least requesting a type of service, and that type of service being voice and data services, but another expert having to deal with a similar term says you could connect to the Internet; you can make phone calls; you could send SMS messages. These are all things that a SIM card does.

So what we don't --

**THE COURT:** How is that different than enabling data access? Isn't it all under the data?

**MS. JOHNSON:** No, Your Honor.

If we're looking at what the system is doing here, the system at the front end has a multi-channel communication device requesting a type of service. And that type of service

inherently has baked into it -- or, I'm sorry, the request inherently has baked into it that there is a selection between a type of service.

So Dr. Feuerstein says (reading):

"The types of service that are possible to be chosen by the subscriber are data and voice."

And we see that in the specification.

But he doesn't say that that's it, that that's all that's required of the SIM function.  And that's the problem here, Your Honor.

And it's problematic because uCloudLink's construction does not address the metes and bounds; instead, they just swap around the language because they think they are fixing the antecedent basis problem.  But what they are not doing is fixing the scope problem.

**THE COURT:**  So if it said -- if it was limited to data and voice, you wouldn't have a problem.  It's the fact that it's not limited to data and voice?

**MS. JOHNSON:**  I don't necessarily agree with that.  I think that if it was limited to data and voice, that is not what is contemplated.  There is no linkage between the term "SIM function" in the claims or the specification.  That is only linked to the term "appropriate SIM."  And we don't know that the appropriate SIM is necessarily tied to the SIM function here.

In fact, if that's what the claim was contemplating, then the term "the SIM function" would be redundant in the context of the claim.

THE COURT:  All right.

Let me hear the response to that, the lack of metes and bounds here.

MR. MASTERS:  Your Honor, I made a few comments.  The first, which counsel started off with, is that the phrase is not ascertainable to -- by a POSITA.

Says who?  I mean, they provide absolutely no expert declaration, no other evidence to support that position.  That's mere attorney argument.  On the other hand, Dr. Feuerstein's declaration is 31 pages long and unrebutted.

The background clearly refers to -- before I get to the background.

UCloudLink is requesting that the Court give the SIM function its plain and ordinary meaning, and that no construction is necessary.  Alternatively, we say it's the functions of a SIM, if the Court is inclined to interpret this phrase -- and that's on Slide 47, where we set out our construction.

The background, which is Column 1, lines 20 to 29 of the '780 patent, and it's on Slide 50, again defines the SIM, which I don't think anybody is disputing that SIM is a unique authentication ID issued by a service provider, it controls

access of a user equipment, it enables the user equipment to enjoy data and voice services.

I understand counsel is trying to maybe parse out text messages, which makes absolutely no sense. There is no position or basis to do that. That's just part of the voice and data services.

In the context of this entire patent, the '780 patent, it is clear that the SIM function is intended to give access to a service provider. So I, therefore --

THE COURT: So would you concede that there are other functions of a SIM card, other than access to a service provider?

MR. MASTERS: Well, perhaps there could be additional functions that a SIM card may do that have absolutely nothing to do with the authentication process or providing the access.

THE COURT: That's part of their argument. When we say, "SIM function" or function of a SIM, then it encompasses, perhaps, other things other than this core responsibility or function of providing access through authentication ID.

MR. MASTERS: But if -- if, for example, we could store a phone number, and that's all it can do, how is that at all providing, within the context of this claim, access to a user or providing the service sharing that's required?

It has to do the service function, the SIM function that's set out in the background of the invention.

And as Dr. Feuerstein has submitted --

THE COURT:  Well, then, what you're saying is that the SIM function as used in Claim 1 is that which, as described in the background, perhaps, that it functions to provide unique authentication ID issued by a service provider for controlling access to -- access of the user equipment, enabling user equipment to enjoy data and voice services.

MR. MASTERS:  Yes.

THE COURT:  So that is a sort of a construction.  That would provide some metes and bounds, and yet perform the core function that this invention speaks to.

MR. MASTERS:  That's fair.  I mean, that's --

Again, based -- the term, "SIM function," based on the intrinsic evidence, Dr. Feuerstein's testimony, you know, is providing -- is controlling the access of the user equipment. I mean, that is what the SIM card does.

I mean, I think as far as I can remember, when cell phones started, SIM cards were involved and quite tedious at the time; and today, it's a lot easier to deal with.  But SIM cards have always been required to control the access to the service provider, so they know who is on their network and that you're allowed to be on their network.

And that's all this claim requires in the context of this invention.

THE COURT:  Okay.  Well, this gets us back to what we

were talking about earlier.  If there is a clarifying construction, or construction that has the metes and bounds that you say are missing, and it's a fair construction -- because in context, given the specifications, given the functions, given the way the thing is structured, why isn't that a fair construction?

Because sometimes that's what you do in construction, you apply, you know -- you construe certain terms -- if it's a fair construction.  If it's an unreasonable construction, you can't do it.  But it's not that often that you can imply certain terms that draw some limits or gives some degree of definiteness to a term without becoming -- falling to the problem of indefiniteness.

I guess we're back to the original question:  How do we define, under *Nautilus* and everything else, what indefinite is?

And I guess I continue to be of the view that there is a relationship between construction and something capable of construction and indefiniteness, to a certain extent.

**MR. MASTERS:**  Right.  And that's, you know, why we submitted the evidence of Dr. Feuerstein to support what a person of ordinary skill in the art would understand this term. We've cited to the intrinsic evidence.

And it's not always the case that you have to provide a construction; plain and ordinary meaning is sufficient, especially in a case like this.  And just to add on additional

words or redefine it, sometimes you just move the scope of dispute from, you know, this point to another point by using new words.

THE COURT:  Well, maybe.  Maybe.  But where you have an acknowledgment that there may be functions beyond what is described in the invention, in the specifications, there may be a reason to put some --

MR. MASTERS:  But its fundamental goal is to provide and control the access to it.

THE COURT:  I understand that.

So construed, what's wrong with that?

MS. JOHNSON:  I'm not sure -- okay.

So assuming that Mr. Masters is now proposing a construction that requires the SIM function to include the authentication process and the enablement of data and voice services, I think that that construction is definite.

I'm not sure that it's what is precisely, or the only thing that is contemplated by the term, "the SIM function." Certainly, the claim doesn't tell us that.

And, Your Honor, I would submit that the specification doesn't tell us that that's what this is intended to be limited to.

So therefore, I believe that this is not just a broad term, Your Honor, but we don't see anywhere in the specification or the claims that "the SIM function" is supposed

to mean a specific set of functions, which would be required --

THE COURT:  What about the background of the invention, at Page 1, lines 20 through 29, that -- which they quote in Slide 50, which kind of talks about what a SIM is?

I mean, why can't one use -- I understand it's not the same as a claim, you know, but it's enlightening; and it seems consistent with what one would think common knowledge would be.

MS. JOHNSON:  Sure.  I think it that this would be akin to reading into the claim term a preferred embodiment. This is something that -- you know, as Mr. Masters admits -- is the SIM card is capable of.  It's not the only realm of functions of a SIM card, and that's what's problematic.  We know, Your Honor, that we're not permitted to read preferred embodiments into the claim scope.

THE COURT:  Usually, it's the other way around.  It's usually --

MS. JOHNSON:  Right.  I know.  It's a little bit of a --

THE COURT:  -- the accused that wants it.

MS. JOHNSON:  Right.

But that's precisely the problem here.  And Dr. Feuerstein's testimony sheds no light on the scope.  In fact, in the conclusive paragraph on this term, Paragraph 69, all he says is "function is capability."  And if function is capability, then there are endless capabilities, and

Mr. Masters does not dispute that.

So, therefore, Your Honor, we submit that this claim remains indefinite.

THE COURT:  All right.

MR. MASTERS:  Judge, I would just focus on the sentence in the background that says (reading):

"SIM is a unique authentication ID issued by a service provider for controlling access of a user equipment, which is the function."

The last sentence is merely the result of controlling the access of a user equipment.  We haven't changed our construction.  We stand by the plain and ordinary meaning of the term.

THE COURT:  But it is data and voice services that this is all about.

MR. MASTERS:  That's what -- well, the function, though, is controlling the access; right?  That's what the claim -- that's what the background says, controlling access of the user equipment.

What's the result?  The user can do certain things.

MS. JOHNSON:  I think that's precisely the problem, Your Honor.  The user can do certain things, which is enabled by the SIM.  Their expert is saying anything that the SIM enables is a function of the SIM.

So is it now the provision of data and voice services?  Is

it just the authentication process?  We don't know.  And the specification doesn't tell us.

THE COURT:  All right.  So uCloudLink resists importing into the construction the limitation of data and voice services.

MR. MASTERS:  Well, we believe that goes beyond the necessary "of the SIM function."  I mean, that's the result that the user equipment, then, can enjoy.  But the SIM itself is controlling access of a user equipment.  That's the SIM function.

THE COURT:  All right.

MS. JOHNSON:  I would submit, Your Honor, that that's contradicted by the evidence that's submitted by their own expert, who says the patent describes that this is what the SIM does.  And he says, anything the SIM does or is capable of is a SIM function.  And then he doesn't have a precise construction. He just says, functions of a SIM should do.

So I think the -- it's just a little bit contradicted by what their own expert says the intrinsic evidence is in this -- with regard to this claim term.

THE COURT:  All right.  I'll take it under submission.

MR. MASTERS:  Thank you, Your Honor, for your time and patience with our arguments.

THE COURT:  There was a joint status conference here. I mean, at this point, I guess there are going to be issues

about discovery, once we get past this stage, given the situation, the whole situation.

MR. MASTERS:  So, Judge, first, as we submitted the status report, the IPRs were denied institution.  So those are, I think, behind us.

We are scheduled to take three depositions over the course of the next two wakes here, locally, deposition of witnesses that both sides have indicated to take place of Chinese nationals, still, I guess, would remain on a week-to-week, see how things go right now.

THE COURT:  Any of those witnesses --

MR. MASTERS:  Three from uCloudLink are on the list for SIMO to take.  And there is one witness, SIMO witness, that uCloudLink wishes to take.

THE COURT:  Four witnesses located --

MR. MASTERS:  Four total, right now, yes.

THE COURT:  They are in Hong Kong or China, or where are they?

MR. MASTERS:  I believe ours are in China.  That would go -- travel to Hong Kong.  But I understand that they still cannot travel to Hong Kong yet.

We even considered Vancouver, but I understand it's very difficult to get a Visa to get to Vancouver; although, some flights go from the U.S. to Vancouver, back to China.

MR. ANDERSON:  And, Your Honor, to be clear, each of

the witnesses we have noticed from uCloudLink is a Chinese citizen, so we have been able to take no depositions, and none are on the horizon.

MR. MASTERS:  Well, we will make them available as soon as we get beyond the --

THE COURT:  Is there the possibility of a video depo? Is that -- I know that's not preferred, but --

MR. MASTERS:  It's not preferred, but we are prepared to discuss that with counsel.

MR. WEED:  Your Honor, I think it's difficult, from our perspective.  These are fraud defenses for a lot of these witnesses and so I think assessing credibility in person is going to be critical.  These relate to inequitable conduct and inventorship.

THE COURT:  I mean, at least with video, you get visual.  I understand it's not as good, but -- I don't know.

We may be in a new reality here.

MR. WEED:  Understood.

THE COURT:  It's not the only case where we have got this issue.  We'll have to talk about that, but first things first.

So we will work on the claim construction, get that out.

Do we have a further status conference yet in this matter?

MR. MASTERS:  Not to my knowledge.

THE COURT:  Maybe we should set one out after you give

me a chance to issue the claim construction ruling, give you a chance to take what depos you can have, and we can see where things are at with respect to international depositions.

Maybe 90 days?  We can also --

MR. MASTERS:  That should be more than enough.

THE COURT:  All right.  And then we can figure out whether we're in a position to set further dates, or what, in this matter.

So, Angie, why don't we set a --

THE CLERK:  90 days, Your Honor?  June 11th.

THE COURT:  Okay.  At 10:30?

THE CLERK:  Yes.

THE COURT:  See what the world looks like at that point.

MR. MASTERS:  Fair enough.

Thank you, Your Honor.

THE COURT:  Is there a -- I forget now.  ADR-wise, is there -- have you had any kind of ADR process?

MR. MASTERS:  Not to my knowledge, but I --

MR. WEED:  Nothing formal, Your Honor.  I believe there have been discussions, but this is a dispute in a larger context of disputes.  There is a New York action, a Texas case, and this case.

THE COURT:  Well, I'm wondering if there is any chance for a global ADR.

PROCEEDINGS

**MR. WEED:**  We would always consider it.  I think there may be a problem with Chinese decision-makers.  So I'm not sure that that's appropriate now either, but --

**MR. MASTERS:**  We'll raise it with our client, Your Honor.

**THE COURT:**  Why don't you talk about that.  I mean, typically, after claim construction, there is a pause point where people can look and talk.  So maybe this will provide that occasion.  Okay.

**MR. MASTERS:**  Thank you, Your Honor.

**THE COURT:**  Okay.

**MR. WEED:**  Thank you, Your Honor.

**THE COURT:**  Okay.  Thank you.

(Proceedings adjourned at 12:40 p.m.)

---o0o---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Friday, March 27, 2020

_____

Ruth Levine Ekhaus, RDR, FCRR, CSR No. 12219
Official Reporter, U.S. District Court